PLAINTIFF'S EXHIBIT G

FILED
2024 Aug-02 PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA





IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

-------------------------------------------------------

KAYLIE TURNER, Individually,
DAWSON TURNER, Individually,
By and through his Mother and Next
Friend, KAYLIE TURNER,
DANNY TURNER, Individually,
Plaintiffs,

CIVIL ACTION NO:
VS. 1:22-CV-00757-RDP

DARLING INGREDIENTS, INC.,
A Corporation, and/or d/b/a
DAR PRO SOLUTIONS, A Corporation,
RODNEY KEITH GETER, Individually,
ALFA MUTUAL INSURANCE
COMPANY, Et. Al,

Defendants.

-------------------------------------------------------

Deposition of
WILL PARTENHEIMER
Taken on behalf of the Plaintiffs
March 4, 2024

-------------------------------------------------------

Prepared by:
COOKEVILLE COURT REPORTERS
April N. Daniel
License No. 141
www.cookevillecourtreporters.com
(931) 528-3641



APPEARANCES

For the Plaintiffs:
(By Zoom Video)
KEITH T. BELT, JR., ESQUIRE
Belt, Bruner & Barnett, P.C.
880 Montclair Road,
Suite 300
Birmingham, Alabama 35213
(205) 933-1500

For the Defendants:
HONEY L. SHAW, ESQUIRE
Drew | Eckl | Farnham
303 Peachtree Street NE
Suite 3500
Atlanta, Georgia 30308
(404) 885-6474

Also Present:
Bradley Dalton, Videographer,
Birmingham Reporters
Jessica Johnson



INDEX


| | PAGE |
|---|---|
| Direct Examination by Mr. Belt................ | 5 |


INDEX OF EXHIBITS


No. 1 Defendants' Objections and Reponses to Plaintiffs' Notice of Taking Videotaped Deposition of Will Partenheimer................ 112




STIPULATIONS

The deposition of WILL PARTENHEIMER, taken on behalf of the Plaintiffs, on March 4, 2024, at the offices of Law Office of William F. Roberson, 320 East Broad Street, Cookeville, Tennessee, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that April N. Daniel, being a Licensed Certified Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness is reserved.

* * *

*NOTE: Some spellings may be phonetic.

(Whereupon, the foregoing cause came to be heard on Monday, March 4, 2024, beginning at 10:00 a.m., as the witness was duly sworn under oath by madam reporter, and proceeds as follows: )

VIDEOGRAPHER: All right. We are now on the record. This is the video deposition of Will Partenheimer in the matter of Turner versus Darling Ingredients, Incorporated, Case Number 1:22-CV-00757-RDP in the United States District Court for the Northern District of Alabama Eastern Division. Today's date is March 4th, 2024, and the time is 1:02 a.m. Would counsel and all present, please, introduce yourself into the record. After which time, the court reporter will swear in the witness.

MS. SHAW: Honey Shaw for defendant, Darling Ingredients, Inc., and Rodney Keith Geter.

MR. BELT: Keith Belt for the Turners, and I think it's 10:02 a.m. central is the time.

WILL PARTENHEIMER,

was called as a witness, and after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BELT:

Q. All right. What's your name, please, sir?

A. Will Partenheimer.



Q. And, Mr. Partenheimer, what is your capacity in which you're testifying here today?

A. My understanding is, a rebuttal witness.

Q. And what does that mean?

A. It's in response to Mr. McCort's opinions and report.

Q. Has that always been your capacity that you've been hired in that case or did it change to that at some point in time?

A. Originally, I was just asked to look at all the material, so I think it's all part in parcel of that.

Q. Okay. Who hired you in this case?

A. Gosh, it's been so long ago. Originally, I was hired to observe an inspection, and I -- Barbara Marshan --

MS. SHAW: Marschalk.

THE WITNESS: -- Marschalk was the original attorney of record. I can't remember whether she called me or one of her people did, but Barbara Marschalk is the name that's on the list that's on my file.

BY MR. BELT:

Q. Is she a lawyer with the same firm that employees lawyers that are there with you today or is



she an employer with Darling Ingredients, Incorporate?

A. She's a lawyer with Drew, Eckl, Farnham; works with the lawyers that are here.

Q. And are you being paid in this case by Darling Ingredients or are you being paid through the law firm, Drew, Eckl, Farnham?

A. That I couldn't tell you.

Q. Okay. When did you first get involved in the case?

A. Hang on. Is there a bill in here? Will you plug that in?

MS. SHAW: Uh-huh (affirmative).

THE WITNESS: Somewhere around August 3rd of '21, somewhere in that week.

BY MR. BELT:

Q. Okay. Take a look if you could -- Exhibit 14 should be in that stack in front of you. In fact, it should be probably the bottom exhibit if they're in order.

A. Yep.

Q. Do you see that document?

A. I do.

Q. What is that document?

A. That's our office's letter of agreement.

Q. And that was executed August 9th of '21 with



Barbara Marschalk of Drew, Eckl, Farnham law firm?

A. This document says August 6th of '21.

Q. Excuse me?

A. This document says August 6th of '21 was when it was sent. They did sign it on the 9th.

Q. Okay. Is this a contract that's obviously been prepared by Bloomberg Consulting?

A. Yes.

Q. I didn't hear an answer. Did you answer?

A. I did. I said, "yes".

Q. Okay. I'm having some Zoom problems. I'm sorry. I still hadn't heard the answer yet.

A. I said, "yes".

Q. Okay. With regard to this contract, I noticed that in the second paragraph of the contract, can you read that third sentence to me which starts with "Our understanding"?

A. "Our understanding is that Bloomberg Consulting, LLC, is to provide the consulting services that we consider necessary to properly evaluate the case."

Q. All right.

A. "We will provide written estimates upon request. In the event of any deficiencies in our services, our sole responsibility will be to provide a

Page 9

revised analysis."
Q. Okay. Now, with regard to that first sentence you read, does Bloomberg Consulting -- let me clear this up. Are you an employee of theirs?
A. I am.
Q. Are you an owner?
A. No. I have a very small portion, but I am not an owner.
Q. And, as I read that, it says that you, as the employee of Bloomberg Consulting, that you would provide consulting services that you consider necessary to properly evaluate the case; is that true?
A. Correct.
Q. Meaning, that it's your choice of the work and scope you do or the client's choice of the scope and work you do?
A. Well, obviously, in a client-based business, the client gives you a scope of what they would like. And what we do is honor that scope, but there are times when we may feel like things need to be done that weren't originally talked about. So, you know, it just -- it goes into what the totality of the situation is.
Q. Now, do you have to get authorized -- if you believe additional work is needed, you have to get that authorized by counsel for the defense before you can do

Page 10

it?
A. We'll obviously have a conversation about what we're going to do so we're on the same page.
Q. But who controls whether or not the work is done? You or the client?
A. Obviously, the client.
Q. Okay. Let me -- could you take a look at Exhibit 13, which should be a stack of your invoices?
A. Yes, sir.
Q. Tell me what Exhibit 13 represents.
A. It appears to be invoices.
Q. Guys, I don't know. I've got terrible Zoom. I don't know if it's my end. Are y'all hearing me okay?
A. We're hearing you perfectly.
MR. BELT: Okay. Because I'm not even hearing maybe one of every five words. To this point, I've been able to fake it because we're going through pretty simple stuff. What should I do? Should I log off and then try to log back in? Because it may be my end, but I'm not getting a good signal from you.
THE WITNESS: We're not having any issues on this end, so it must be you.
MR. BELT: Okay. Let me log off and see if I can log back in. So excuse me for a moment.

Page 11

(A recess was taken.)
MR. BELT: Okay. Hopefully that will be better. Can you guys hear me okay?
THE WITNESS: We can.
BY MR. BELT:
Q. All right. Before we had to take that little break there, I was talking about Exhibit 13. Is this a full proof of all of your invoices to date?
A. To my understanding, yes, sir. I did not -- I don't have anything to do with invoices. But my understanding is, they put them together in preparation for this deposition.
Q. Okay. And at least, according to these invoices, your last time in the file is showing to January 16th of this year. Have you had any time in the file since January 16th of this year?
A. Yes, I have.
Q. How much time?
A. I have no idea.
Q. How much? I'm sorry. Once again, my Zoom is not working.
A. I have no idea how much time I have, but there is time; I know that. We bill on every other month, so it would bill March 1st, I guess. I guess it's going to start March 1st. I'm not sure. I don't have

Page 12

anything to do with billing.
Q. Okay. Well, let me ask you this: Have you worked on this file in the last couple of weeks?
A. Yes, I believe I have.
Q. How much time have you spent on it in the last couple of weeks?
A. I have no idea.
Q. Did you respond? I'm sorry. My Zoom is --
A. I did. I said, "I have no idea".
Q. How much is your billable rate?
A. Currently, $350 an hour. It might have gone to 375. I think it did go to 375. 375 is current.
Q. Is that what you're billing in this case?
A. It is now. It went up in the first part of the year.
Q. What did you do to prepare for your deposition today?
A. Read my report.
Q. Okay. Let me ask you this: With regard to the bills, in the description of these bills, when I look at the first bill from September of 2021, it says that you did research from various sources. What sources did you research?
A. Vinlink, Auto Stats, Diesel Truck Index; all those things.

Page 13

Q. Okay. And then it says that you were working with your point cloud specialist on creating a 3D computer model of the damaged vehicle. Did you ever do that?
A. I scanned the vehicle. The point cloud specialist made the model.
Q. So you do have a 3D scan model completed of this subject truck?
A. I do.
Q. Okay. Do you have that type of model on anything else in the case?
A. No. The truck -- I went to the scene, but I didn't scan the scene. So the truck is the only thing that I have seen other than the scene.
Q. Okay. It says in this invoice that you were going to do a preliminary accident investigation. Did you ever do an accident investigation -- I'm sorry -- accident reconstruction. My bad. That's a big difference. Did you ever do an accident reconstruction in this case?
A. I reviewed all the data, yes, sir.
Q. But did you actually reconstruct it?
A. To the extent that I needed to do what I was asked to do.
Q. What does that mean?

Page 14

A. Well, I'm a rebuttal witness, so I did it to the data that I needed to form my opinions is the form of accident reconstruction. So, yes, to form my opinions, I did.
Q. All right. So, for example, you would not have received McCort's materials until the fall, right?
A. That is correct.
Q. So this is two years before that, right?
A. Correct.
Q. Okay. So did you ever do any analysis prior to receiving McCort's materials about the speed and movements of Mr. Geter's truck, for example?
A. I reviewed the data that was available. But did I do any -- did I do any calculations? No.
Q. Did you do any calculations in the case?
A. Specifically, no. I mean, I reviewed McCort's calculations to make sure they were correct and that type of thing. But did I specifically sit down and -- I did some hand calculations on, you know, distance like 77 miles an hour, how many feet per second that is. I did that type of thing.
Q. Okay. But no calculation beyond that?
A. Well, that's not what I said. I did some calculations to determine whether or not the other data was correct. Those are the types of calculations that

Page 15

I did.
Q. I don't think I got a copy of those. Did you produce your calculations where you were verifying data in this case?
A. I did them with my calculator while I was sitting there, so there are no notes from it.
Q. Okay. So none of that information would have been provided to the lawyers to provide to me. Is that a fair statement?
A. That is a fair statement.
Q. Okay. With regard to Mr. -- well, and I'll get to it in a minute. But you provided a report in this case; did you not?
A. I did.
Q. And it's a federal court report, which you had provided in other cases, true?
A. Correct.
Q. And do you understand the requirements for a federal court report?
A. Yes.
Q. Okay. We'll come back to Exhibit 13 in a minute. But, while we're on this topic, let me get you to look at -- if you can, take a look at Exhibit 2. Let me know when you're there.
A. I'm there.

Page 16

Q. Okay. And this is just a summary. But this is the rule as far as what's required in an expert report, and I just want to make sure you and I are on the same page. You do, I guess, understand since you've done them before, that the Federal Rules of Civil Procedure dictate what must be contained in your report. Do you understand that?
A. I do.
Q. And do you understand your report must contain a complete statement of all your opinions?
A. They do.
Q. Okay. And so your report in this case, which is attached as Exhibit 3 -- does your report in this case contain a complete statement of every opinion you intend to offer?
A. Yes.
Q. Okay. And it says that those opinions also are supposed to include the basis and the reasons for the opinions. Do you see that?
A. I do.
Q. And does your expert report contain the basis and the reasons behind each of the opinions you have articulated in your report?
A. It does.
Q. Meaning, it's complete and thorough?

Page 17

A. Yes.
Q. All right. Now, it also says you're supposed to include the facts or data considered by the witness in forming your opinions. Did you do that in your report?
A. I did.
Q. And that is the bullet-pointed materials that are listed on pages 1 and 2 of your report?
A. Correct.
Q. And that would be all the information you had reviewed to come to your opinions; is that fair?
A. That's correct.
Q. And, as I understand it from looking at that list, Mr. Partenheimer, you would have reviewed everything that was produced by Mr. McCort; is that true?
A. It's my understanding, yes.
Q. Okay. Meaning, you would have reviewed his report, all his attachments, all his figures, you know, his deposition, all the exhibits, everything that he's produced to date as far as you know; is that fair?
A. That is fair.
Q. Okay. And, in fact, as I understand it, from what you said earlier in the deposition -- and you correct me if I'm wrong here. But really it sounds

Page 18

like to me what you focused on is really what Mr. McCort said, and then you're intending to come in and review that and offer rebuttal to that. Is that a fair statement?
A. That is what I was asked to do.
Q. Okay. Now, back to our requirements here. Requirement number 3, which is three little Is, it says you must -- the report must contain any exhibits that will be used to summarize or support your opinions, and I have not received any exhibits of that type. Is that a true statement, that you don't have any such exhibits?
A. At this point, I do not have any exhibits. I wasn't asked to make any.
Q. Okay. Roman Numeral 4 says that you also must give your qualifications, including a list of publications authored in the last ten years. And if you will take a quick look -- I did get a CV from you. It should be Exhibit 5. Is that your up-to-date CV?
A. It is.
Q. Okay. We'll go over that in a little bit later. But does that report -- does that CV specifically list any and all publications you've had?
A. Yes, it does.
Q. And it looks like you've authored three

Page 19

publications all of which deal with electronic data.
A. That's correct.
Q. And when we talk and use the term "electronic data", tell me what that means.
A. All those were on -- specifically on electronic control modules on diesel engines.
Q. So that would be similar to the one that would have been on the Mack truck in this case?
A. Correct.
Q. Okay. And is your experience with those modules that they record accurate data?
A. Yes.
Q. And there was a download of the Mack unit in this case that you've reviewed, true?
A. That is correct.
Q. Is that information contained in that report appear, the best you know, to be an accurate representation of the speeds of the Mack truck through the sequences prior to the event?
A. It does.
Q. And then, in this case, we also had data and report for the Bendix -- the Bendix, I guess, which is the brake recorder. Did you review those documents as well?
A. I did.

Page 20

Q. And is that -- is that a type of report you've had the opportunity to review in the past?
A. I have.
Q. And, once again, similar to the ECM on the Mack truck module to the Bendix recorder, at least as far as you know, record accurate, appropriate information?
A. Well, they all have to be validated. But, yes, they do record accurate and accurate data in most cases.
Q. Okay. And really where I'm going with this is with regard to the download from the Mack truck as far as the diesel DCM, as well as the Bendix recorder, the information from those two sources in this case appear to be accurate and appropriate memorializing this truck's movements prior to the wreck; is that fair?
A. They do.
Q. Okay. We'll come back and deal with the CV a little more in a minute. Let me go back to the list of what's required in the report. Roman Numeral 5, you're supposed to give a list of all other cases you've testified in the last five years, and I believe we've got that in front of you. Is that your case list in Exhibit No. 4?
A. I believe it's four years, not five, and

that's a current list of four years.
Q. Okay. All right. We'll touch on that in a minute. And the last requirement is the statement of compensation to be paid for, the study and testimony in the case. And, as I understand it, I've gotten all of the available invoices, which we already talked about some, and then you would have another invoice coming, I guess, probably very shortly here for your work since January. Is that a true statement?
A. That is correct.
Q. So when I get a copy of that from Ms. Honey, then I would be up to date at least as far as through the time of the deposition?
A. Correct.
Q. All right. Now, if we could, I want to go back to the billing, which is Exhibit 13. If you can, get that in front of yourself, please, sir.
A. Okay.
Q. There's some discussion in your first invoice there, that first page of Exhibit 13, about to procure data to use in an animation. I'm assuming you have not done an animation, and at this time, do not intend do one. Is that a fair statement?
A. Where do you see one for animation?
Q. Well, it says -- the bottom of that says,



"Obtain the photographs from recent fieldwork for preliminary accident reconstruction. Provide copies of" -- well, I'm sorry. It's the one able that. My bad.
"Process raw scan data from fieldwork of the Mack for use in the accident reconstruction and/or animation."
A. Okay. I have not done an animation.
Q. And do you understand, if you had intended to do one, you would have needed to produce that and provide it prior to your deposition?
A. I wasn't asked to do one, so I didn't do one.
Q. Okay. And you also, despite this time, you were planning on doing an accident reconstruction, you ended up not doing an accident reconstruction, true?
A. That's not what I said. I said I did an accident reconstruction in relation to what I was asked to do, and that was to rebut some other opinions, and that's what I did.
Q. Okay. Well, as far as your report, which has been produced to me under the Federal Rules of Civil Procedure, you agree with me, Exhibit 3 does not contain an accident reconstruction as that term is used in your world?
A. Exhibit 3 being my report?



Q. Yes, sir.
A. That's incorrect. It is my review of the data, and that's what I was to do. So, yeah, it does include a reconstruction.
Q. Okay. So you would call what's contained in Exhibit 3 an accident reconstruction of this accident?
A. A rebuttal, yes, I would. I had to do all of that to get to the rebuttal evidence.
Q. Okay. Well, let's just track this. As I review your report, your report has listed three opinions, correct?
A. Correct.
Q. And I noticed that, in your opinions, opinion number three, you do address the distance relationship between the Chevy relative to the Mack prior to the wreck, right?
A. Correct.
Q. Okay. We'll deal with that later. But I noticed that, in your report, at no point anywhere in your report do you raise any issue about Mr. McCort's plotted movements of the Mack truck. Do you agree with me on that?
A. Yes.
Q. Okay. And so do you understand that if you were critical of Mr. McCort's plotted movements of the



Mack truck relative to speed, steering angle, and relative positioning to the lanes of travel, you would have had to put that in your report if you had such criticisms. Do you understand that?
A. I do.
Q. Okay. So then the next step of that is -- so is it a fair statement, sir, that as to Mr. McCort's plotting of the movements of the Mack truck relative to speed and positioning in the lanes and how it moved, you would agree with his plotting of those movements of the Mack truck in the, say, five to ten seconds before the accident; is that fair?
A. Yes.
Q. Okay. Because it appears to me pretty clear, based on your few opinions here, that you're really focusing more on what Ms. Turner was doing. Is that a fair statement?
A. No. I'm focusing on the things in Mr. McCort's opinions that I didn't agree with.
Q. Okay. All right. So let's go back, if we could, to our invoices. And let me take you, if I could, to Exhibit 13 on the third page, which is an invoice from July of 2023. Do you see that?
A. Yes, yes, I do.
Q. Did you go to the accident site?

Page 25

A. I did.
Q. And it says, when you were going to the accident site, you were going to analyze and mark available roadway evidence, and I did not see any photos of any marks at any roadway showing any evidence. So is it a fair statement, by the time you got there, there was none?
A. That's correct.
Q. Okay.
A. Well, let me back up. There was some paint that was on the -- in the area between the fog line and the edge of the pavement. There were some paint marks that showed up in the scene photographs. So I used that paint mark to establish where other things would be. But you are correct; there was nothing in the road for me to mark.
Q. Okay. Now, on the next page of Exhibit 13, which would be your invoice from 11/30/2023, if you could take a look at that. Let me know when you're there.
A. I'm there.
Q. The second line says you're going to analyze incoming file materials with respect to the case issues. What case issues are you talking about there?
A. The totality of the case.

Page 26

Q. Excuse me?
A. It's like pieces of a puzzle. If you send pieces of a -- you get pieces of the puzzle, you have to determine where they fit and what they do to the rest of the puzzle.
Q. Okay. Now, as far as fitting pieces of the puzzle together, this is something you do with great regularity as an accident reconstruction, correct?
A. Correct.
Q. And with regard to the pieces of this puzzle, did you review the accident report, which is in front of you, Exhibit 12, that was filled out by the Alabama state trooper for this wreck?
A. I have.
Q. And I noticed in your materials that you reviewed, you also would have reviewed the body cam video from the trooper on the day of the accident -- actually, two troopers' body cam videos; is that fair?
A. It is.
Q. And in the body cam video, there was two separate discussions with the eye witness to the accident, Mr. Kyle Bennett. Do you remember that?
A. I don't recall it specifically off the top of my head --
Q. Okay.

Page 27

A. -- but I did review the data.
Q. Okay. And you do recognize that the state trooper, not only did he interview Mr. Bennett that's all contained and shown in the body cam video, but he's also the only witness listed in the accident report, true?
A. That's my understanding.
Q. And, as far as pieces of the puzzle, would you agree that as to the dynamic of the accident, that the accident report, the rendition by Mr. Kyle Bennett and the rendition by Kaylie Turner as far as all describing Mr. Geter's truck moving from right lane to left lane and slowing and there being a rear impact, all of those would be consistent. Do you agree with that?
A. I'd have to -- dynamics, you're just talking about slowing, is that what --
Q. Yeah. I'm just saying, you were talking about part of what an accident reconstructionist does is, you put pieces of the puzzle together. And this puzzle, we've got three eye witnesses, right? We've got Ms. Turner, Mr. Geter, and then Mr. Bennett; is that right?
A. That's correct.
Q. Okay. And then you've also got the pieces of the puzzle, which is the electronic evidence, which

Page 28

tracks the movement of the vehicles and the speeds. Do you agree with that?
A. I do.
Q. And, I guess, the point I'm making is that Mr. McCort's tracking of the movement to the Geter vehicle, Mr. Bennett is saying that the Geter vehicle came from right lane to left lane and slowed, Ms. Turner's basically rendition of the same event, those would all be consistent with each other -- would they not -- as far as the dynamic of the accident?
A. Well, that's what they said. You have to take what they say with a grain of salt. But that being said, the data, I believe establishes that.
Q. Okay. That's true. I mean, the ECM, let's take a look at that real quick, if we could, which that is also in front of you. The Mack ECM is in front of you, Exhibit 9. Take a look at that. Tell me when you've got it in front of you.
A. I have it.
Q. Okay. And, according to the ECM, if you could turn to the page where you've got the trigger recorded. Tell me when you're there.
A. Let me see what you have here because this does not appear to be the complete report.
Q. Okay. Well, I mean, this is the portion of

the report that deals with the speeds of the vehicle, correct, and the braking?
A. You have the logged incident on it, and it appears that's all you have of ECM data.
Q. Okay. Let me ask you this: Pursuant to this data, how fast is the Mack truck going at the time of impact? Are you speaking? Because, if you are, I can't hear you.
A. I am not. I'm reviewing the data.
Q. Okay.
A. Well, the trigger says 27.3, but I believe it's probably a little bit before that, but that's what the trigger says on this.
Q. What makes you think it would be before the trigger?
A. Because the trigger is not necessarily the point in all of these, but 27.3 is where the trigger is.
Q. Okay. And do you see how, pursuant to the index at the bottom, that SW1 deals with the braking by the Mack truck. Do you see that?
A. SW1 is the service brake, that's correct.
Q. And do you see when that was activated at 8.25 seconds before impact? If you turn to the prior page, you'll see it, second line from the bottom.



A. I do.
Q. So that would indicate that, for eight seconds prior to impact, Mr. Geter was in a braking maneuver. Is that a fair statement?
A. What it means is, the brake was covered. It's actually just a brake switch. So it means that the brake switch was activated. It does not give you any determination of how much braking is occurring.
Q. Well, you do understand that if you look at this chart, it shows that he went from 67 to 27 miles an hour, so he lost 40 miles an hour in that 8 seconds, rights.
A. I'm not disputing that there's braking going on. What I'm saying is, you cannot look at that switch and say because that switch is closed, that there's braking going on.
Q. Okay. Well, looking at the speed going from 67 -- looking at the speed alone, we know that between 8 seconds pre-incident and impact, we know that he's breaking during that 8 seconds, true, based on the speed alone?
A. He's slowing down, and he does have his foot -- is covering the brake. So, yes, I agree with that completely.
Q. And that 8 seconds of braking, why was he



braking?
A. You'd have to ask him.
MS. SHAW: Object to the form.
MR. BELT: Do you know?
MS. SHAW: Same objection.
THE WITNESS: I said, "you'd have to ask him".
BY MR. BELT:
Q. So you have no opinion on that?
A. I have no opinion on that. You'd have to ask him on that. I can't surmise what he -- his reason for braking.
Q. Would you agree that during the time period that he's braking, he's -- obviously, we know he moves from the -- at some point, from the right to the left lane, true?
A. Correct.
Q. And the left lane would be the passing lane?
A. It would be the inside lane.
Q. Do you deem the left lane or the inside lane on the interstate to be the passing lane?
A. It depends upon what state you're talking about. In the state of Texas, it is the passing lane. It would depend upon how the laws define it, and I'm not sure off the top of my head how Alabama defines it.



If you look at the cars out there, people sit out there in that lane all the time.
Q. Did this accident occur right before a crossover in the median?
A. It did.
Q. Do you know whether or not Mr. Geter was slowing down so that he could get through that crossover in the median so that he could head back west?
MS. SHAW: Object to the form.
THE WITNESS: You'd have to ask Mr. Geter.
BY MR. BELT:
Q. If Mr. Geter was going to make a U-turn through the median of the interstate, is that a legal and proper maneuver for an 18 wheeler to do that?
MS. SHAW: Object to the form.
THE WITNESS: At this point, he's not an 18 wheeler. Number two, it would depend if there were signs there. I don't recall whether there was a sign there. Most of them say "Authorized vehicles only". If the sign was there, yes, it would have been against the regulations.
BY MR. BELT:
Q. When you drive down the interstate, do you

Page 33

ever make U-turns through the median?
MS. SHAW: Object to the form.
THE WITNESS: I have, but I don't make a habit of it.
BY MR. BELT:
Q. Have you ever done it while driving a Mack tractor truck?
MS. SHAW: Same objection.
THE WITNESS: I have not.
BY MR. BELT:
Q. Okay. Let's take a look, if we could, at Exhibit 5, your CV. Let me know when you're there.
A. Give me a minute. All right.
Q. Now, it says that you specialize -- in the first paragraph, you specialize in commercial vehicle crashes. Is that a true statement?
A. It is.
Q. How long has that been a true statement?
A. Really since I moved to the private sector, which would have been --
Q. What year was that?
A. It would have been August -- excuse me. It would have been November of '99.
Q. Have you ever driven an 18 wheeler before?
A. I have, but not -- not on a public roadway.

Page 34

I'm not licensed.
Q. So you do not have a CDL?
A. I do not have a CDL.
Q. So you've driven one in a parking lot?
A. It was an air strip.
Q. What was the purpose of you driving the 18 wheeler on an air strip?
A. Training.
Q. Training for what?
A. It was a NAPARS course I took several years ago, and that was one of the things.
Q. What was that course about?
A. It was crash testing with commercial vehicles, and it was also getting the ability to actually drive a tractor-trailer.
Q. Did it have a trailer on it?
A. It did.
Q. What type of crash testing were you doing?
A. There were several. There was side impact under a tractor-trailer or under a trailer. Excuse me. I think there were a couple motorcycles and a couple cars, too. I don't remember specifically. It's been a long time.
Q. They were all on the side under-ride-type orientation?

Page 35

A. No, just under the trailer was that one. The others were angular.
Q. Okay. Have you ever driven a Mack tractor without a trailer attached; i.e., bobtail?
A. I have not.
Q. With regard to driving a Mack tractor bobtail, does driving bobtail, how does the braking differ than if you're pulling a trailer?
A. Well, there's no weight on the rear wheels, so you have to be careful with your braking because it's not going to brake as it is when you have a trailer on it or a fully loaded trailer on it.
Q. You're not able to get quite as much friction -- would that be a fair statement -- on those brakes because they don't have weight over them?
A. It would be a fair statement.
Q. And how does that affect the handling characteristics of a bobtail tractor when attempting to stop?
A. Well, it just means you have to pay attention more when you're slowing it down. It's going to -- it's going to be harder to stop than just say a regular conventional vehicle because there's no weight on the rear end.
Q. It's going to take more distance to stop?

Page 36

A. It can, uh-huh (affirmative).
Q. Now, with regard to your ACTAR certificate, I don't see a date on there. When did you get ACTAR certified, full accredited?
A. 2002.
Q. And, as far as your education goes, do you have a college degree?
A. I do not.
Q. It looks like you did spend some time at Georgia State University. Was that taking specialized classes or was that actually as a student at least at that point working towards a traditional-type degree?
A. That was as a student taking basic courses towards a degree.
Q. What year was that?
A. That would have been the end of '79 into '80.
Q. And how many actual credit hours did you achieve in college?
A. I'm not positive. Somewhere in the neighborhood of 15, maybe 20. I don't recall off the top of my head.
Q. At least, at that time in your life when you were taking those classes, what type of major did you have or what type of degree did you intend to work towards?

Page 37

A. At that point, I had not established what type of degree I wanted.
Q. Okay. And then did you leave the school to become a police officer?
A. No. At the time, I was working full time for Rich's department store. I was in corporate security and -- well, I actually started at Rich's as a driver then -- at the perimeter store. Then got into security because I was helping them catch too many shoplifters, so they put me in security. I was in security for -- at that location for three or four years. Then they made me a supervisor. I didn't like being a supervisor. I liked investigation, so they put me back in corporate security as an investigator. And I was an investigator in corporate security until 1987 when I went to the police department.
Q. And then you were an active police officer for how long?
A. A little over twelve years, twelve years and three months right in there.
Q. Roughly '87 to '99?
A. Yes. I started in, I want to say, May or June of '87, and I left August 31st of '99.
Q. Okay. And it would be a fair statement, you do not have an engineer ing degree of any type?

Page 38

A. I do not.
Q. And you do not have any sort of psychology or human factors degree?
A. I do not, and I don't hold myself out as a human factors expert.
Q. Okay. And that was going to be my next question because I did look through your professional development as far as the seminar-type courses you've taken, and I did not see any coursework you've ever done in human factors. Is that a true statement?
A. That's not true. There's human factors in and around the reconstruction classes, so I have a working knowledge of human factors and how it relates to accident reconstruction. But I do not hold myself out as a human factors expert, and I do not give human factors opinions.
Q. Okay. And with regard to -- and that may be -- as I understand what you're saying, some of these courses, some issues that could be called human factors may be discussed, but I didn't see the title of any of these courses to be a strictly human factors course. Is that a fair statement?
A. I don't recall taking one strictly on human factors because that's not my area of expertise.
Q. Okay. And do you agree that there is a large

Page 39

body of peer review literature coursework and textbooks related solely to the issue of human factors?
MS. SHAW: Object to the form. You can answer.
THE WITNESS: Yes. There are multitudes of papers and all, and you can wade through them and pick the ones you think are valid and the ones that aren't.
BY MR. BELT:
Q. Did you do any sort of literature review in the work you did in this case in order to support your opinions?
A. Literature in the area of human factors or any?
Q. Well, I guess we'll start with any.
A. I don't know that I pulled out -- I mean, most of the things that I did in this thing are, you know, based upon experience and training that I've had over the years. I certainly didn't pull out anything human factors because I don't give human factors opinions.
Q. Okay. And I didn't get attached to -- the file I received from you didn't contain any peer reviewed literature in there. So is it a fair statement you did not review any peer review literature or seek out any peer review literature to validate any

Page 40

aspect of your work?
MS. SHAW: Asked and answered. You can answer.
THE WITNESS: I did not need to pull out peer reviewed literature to establish the opinions that I made.
MR. BELT: Okay. I tell you, we've been going right at an hour. Y'all want to take a five-minute break? I've been drinking a lot of water this morning.
MS. SHAW: Sure.
MR. BELT: You want to take five?
THE WITNESS: Fine with me.
MR. BELT: I guess leave the Zoom going, but everybody can pause it or whatever. We come back at maybe right at 11:00, 12:00 y'all's time.
MS. SHAW: Sure.
MR. BELT: Actually, maybe just a touch before, but we'll see you in a minute. Thank you.
(A recess was taken.)
BY MR. BELT:
Q. Now, Mr. Partenheimer, has any opinion that you sought to give in any court ever been struck or not allowed to be given?
A. No.

Page 41

Q. So you've never suffered a Daubert challenge where something you were intending or wanting to say was disallowed?
A. There was a case in Rutherford County, Tennessee, and this would have been 15 -- 15, 16, 17 years ago, something like that. I was the only expert in the case. They brought me in. The judge listened to what I had to say, qualified me, said that I was qualified to say what I had to say; and what I had to say was okay, but I get the impression he didn't want any experts because I was the only one. And his ruling was the fact that my attorney did not have me sit in the trial for the whole trial is why he wouldn't let me testify, and that's the only time.
Q. Okay. Have you ever been an expert in a case that involved a rear ender?
A. Several.
Q. How many?
A. Hundreds, thousands probably.
Q. Where you've been an expert or a retained expert?
A. Yeah. Rear enders happen all the time.
Q. Okay. And how many of those times have you been representing the -- not representing. How many times have you been testifying on behalf of the side of

Page 42

the vehicle getting rear ended?
A. I couldn't give you a number of that.
Q. How many times have you been testifying on behalf of the vehicle that did the rear ending?
A. Again, I couldn't give you a specific number on that either.
Q. Okay. Have you been utilized as an expert witness in rear-ender cases on both sides of the equation, the striking vehicle and the vehicle receiving the strike?
A. Yes, I have.
Q. Have you ever testified on behalf of a plaintiff when the plaintiff was the striking rear-ending vehicle like we have here?
A. I have.
Q. How many times?
A. I couldn't give you a number. It's happened numerous times.
Q. And give me the names of those cases.
A. I couldn't give you a name of the case. It's been -- I've been doing this almost 30 years now.
Q. Okay. In the cases where you were testifying for the plaintiff when they were the rear ender, they were rear ending someone, what was the nature of the opinions in those types of cases?

Page 43

A. Again, I can't give you specific opinions about cases. I mean, there have been situations where people pulled out in front of somebody, you know, those type of things. But I couldn't give you a blow by blow from a specific case.
Q. Okay. Do you agree with me that just because a vehicle hits another vehicle from behind, that alone with no other facts being centered in and of itself does not make the striking party at fault? Do you agree with that?
A. You have to look at the totality of the circumstances.
Q. Right. Meaning, you can have cases where the rear-ending vehicle who's striking someone else from behind may not be at fault. That can happen depending on the facts?
A. That can happen.
Q. And in the cases where it does happen and the striking vehicle is not at fault, at least a portion -- if not the whole -- basis for that would be due to a lack of adequate time to properly respond. Would that be a fair statement?
A. There could be numerous reasons. I don't think you can put on -- I don't think you can zero in on just that.

Page 44

Q. Okay. Well, give me an example of how a striking vehicle from behind in a rear-ender case, how that you would find the plaintiff not at fault other than due to a lack of adequate time to respond. Give me any other examples you can think of.
A. Improper lighting, making a turn, failure to yield. There can be a lot of them.
Q. Now, this is where it's a rear ender. So making a turn, explain to me what you're saying there.
A. If somebody turns out in front of you and is in your lane and they turned out and failed to yield to you and you strike them in the rear, that's on them.
Q. Okay. Fair enough. But, in that scenario, part of the opinion would also be that even though they were able to get their vehicle completely in front of you in the lane to where you rear ended them, the other part of that would be the fact that the person didn't have adequate time to respond, right? There would be two parts to that.
MS. SHAW: Object to the form.
THE WITNESS: Again, that could be part of it. These sound like hypotheticals.
MR. BELT: They are.
THE WITNESS: And, again, there can be many, many factors, as I've said. So, you know, I

don't know what else to say.
BY MR. BELT:
Q. All right. But we had lighting, making a turn in front of you. What was the third one? You said one more.
A. I don't recall.
Q. Okay. Have you ever had a case involving a bobtail truck?
A. Yes.
Q. How many times?
A. Hundreds.
Q. And these are cases where you were working as a retained expert for one side in civil litigation?
A. That is correct.
Q. And have you had both sides of that, times where you were testifying on behalf of a trucking company or whoever owned or was operating the bobtail? And have you also had times where you were representing the other party?
A. I don't recall specifically.
Q. What percentage of your work involves accidents with big trucks? Meaning, tractors whether attached to a trailer or bobtail.
A. Well, are you limiting big trucks to just Class A commercial vehicles, tractors, trailers? Or



are you including box trucks? Are you including buses? I mean, commercial motor vehicles encompass a lot of different things.
Q. Let's go with commercial motor vehicles with the breadth you just described. So, of those cases, how many cases have you testified and commercial vehicles where that's the breadth?
A. Probably 85 percent, maybe a little higher.
Q. So 85 percent of your cases do involve a commercial vehicle?
A. Do involve commercial vehicles, yes.
Q. What percentage of those cases would you be working on behalf of the defendant trucking company?
A. I don't keep specific numbers for myself. I am told, as a company, we are 70/30 defense.
Q. Okay. Now, if I could -- could you take a look at Exhibit 1, which is your deposition notice in this case?
A. Okay.
Q. Let me know when you have it in front of you.
A. I have it in front of me.
Q. Have you seen this before?
A. I have.
Q. And it asks for, it looks like, 20 different categories. Although, some of those categories are



really multiple categories, but 20 numbered paragraphs of information we're seeking. Do you see that?
A. I do.
Q. And did you provide your entire file to us via a ShareFile link?
A. My office did.
Q. And, you know, that's pretty routine -- is it not -- for a deposition that you would be providing your whole file?
A. It is. We don't hide things.
Q. And your office would have in place ways to make certain that the whole file gets produced; is that right?
A. They were on OneDrive Cloud stuff that whatever I have, they have -- they have in the same -- not necessarily in the same spot, but what I have syncs with what they have.
Q. Okay.
A. And vice versa.
Q. All right. And, in going through all the materials that are provided, rather than specifically go through all of that -- because it was obviously a pretty large file, isn't it?
A. Yeah. It was like 17 gigs, I think.
Q. Okay. So I'd really like to talk about some



of the things I didn't see in there, and I want to confirm that these things don't exist. Can we do that?
A. Fine with me.
Q. Okay. I did not see any sort of -- we kind of talked about this earlier, but I want to make sure I'm hitting all my checklist here. I did not see any sort of calculations where you were doing any math in this case.
A. I did those on a calculator.
Q. Okay. Nothing written?
A. Correct.
Q. Nothing you'd report? Nothing written down anywhere?
A. Correct.
Q. And you agree, if you were intending to rely upon calculations at trial, you would need to include that in your report as all of your opinions, right?
A. I included what I needed.
Q. You didn't do any testing in this case?
A. I did not.
Q. You didn't --
A. Well, hang on. It depends upon your definition of testing because they sent me and everybody a control module, and I attempted to download it. So, in a way, that could be testing, but that was

all I did with that. Then as far as inspecting the truck, we didn't do brakes or anything like that. But, you know, I inspected the truck, the lights, and all that stuff. So, I mean, that could be defined as testing. It depends upon your definition of testing.
Q. I think, I like what you -- I like -- inspection is different than testing. I'm saying, you didn't run any tests. You didn't setup and run any tests or anything to prove or disprove any aspect of this case?
A. Correct. I did not attempt to recreate the crash.
Q. Okay. You don't have any sort of models or simulations or illustrations you created?
A. I wasn't asked to do one.
Q. You didn't do a PC-Crash or any sort of online analysis or any sort of software analysis?
A. I didn't understand what you said.
Q. You didn't use any software to do an analysis here like PC-Crash or anything like that?
A. No.
Q. Are you familiar with PC-Crash?
A. I am.
Q. Have you used it before?
A. I have not.



Q. In looking through the file that was provided to me, it looked to me as far as documents that you created, that's distinguished from documents that you gathered or documents provided to you. Let me ask you if this is the limits of documents you created. The BC photos folder, which included photos of the Mack truck and photos of the accident site, that would be something you created, right?
A. Correct.
Q. You did a FARO scan of the Mack truck?
A. It was multiple scans, but yes.
Q. And then you attempted to download the ACM module from the Chevy Traverse?
A. That's correct.
Q. And you were unsuccessful in being able to achieve the download?
A. That's correct. It would not connect.
Q. Which you understand was the same result Mr. McCort got and the same result that they got even back before McCort?
A. It's my understanding that no one has come out and said they actually were able to connect to it other than Delta V -- excuse me -- other than Delta V.
Q. Okay. And Delta V even then didn't connect to the module. They had to remove the chip and put it in



a whole other model and totally -- you know, they didn't work with the existing hardware.
A. Well, they pulled out the existing hardware. The existing hardware was fried, so the power board.
Q. But as far as what I listed -- photos of the truck, photos of the scene, FARO of the truck, attempted download ACM -- that would be the only documentation would be -- those generated by you would be those items. Is that a fair statement?
A. You forgot to mention my report.
Q. Excuse me?
A. My report as well.
Q. Okay. All right. Anything else?
A. Not that I'm aware of.
Q. Okay. With regard to your testimony, let's take a look at that if we could, Exhibit 4.
A. Okay.
Q. And is this a list of all of the testimony that you had given in the last four years?
A. It is.
Q. Are any of these trial testimony or are they all depo?
A. The two that are marked in the trial column are trials.
Q. Okay. So those would be the only two that are



trials of those cases.
With regard to the second or the last listed trial, which is, it looks like a case in Alabama, Faron Waters v. Roy Hall, Jr., and R and D Trucking, LLC. Did you testify for plaintiff or defense there?
A. Defense.
Q. And then, the other trial, which is about six ahead of that, it looks -- is that actually an arbitration?
A. It's an arbitration. It's a workers' comp arbitration in the state of Texas.
Q. Okay. Did you work for the plaintiff or defense there?
A. That was defense.
Q. Are any of these cases that are listed on Exhibit 4, are any of these cases, cases where you were retained by the lawyers for an injured party, which would typically be the plaintiff?
A. Tammy Wash -- excuse me. Tommy Washburn, Tammy Rawls; three from the bottom on the second page is the plaintiff's case.
Q. Hold on. Washburn and Rawls. That's three from the bottom. That's the plaintiff's case.
A. Washburn. All right. And then it appears all the others have fallen off. Oh, the second from the

Page 53

bottom -- oh, no. I'm sorry. That's a different one. Disregard. The Deborah Shipes, Nathan Shipes, it's four from the bottom on the first page.
Q. Okay.
A. Old Town Trolley, that's plaintiff's case.
Q. Where is that one?
A. It's four from the bottom on the first page.
Q. Shipes versus Old Town Trolley. Okay. I got that, yeah.
A. Yeah. And then Christine Marie Bradshaw versus Lem Byrd, Junior, et. al., third from the top on the first page is the plaintiff's case.
Q. Any more?
A. That top one I don't remember. Those are the only ones that strike me as the ones that were plaintiff's cases.
Q. Okay. Going through those in chron order, the most recent, which is Bradshaw, the third from the top, we worked for the plaintiff, which is Baldwin County, Alabama, who hired you in that case?
A. What was his name? Ed Ellis.
Q. Ed Ellis?
A. Ed Ellis.
Q. What type of was case it?
A. Bradshaw was a fire -- I think he was a

Page 54

captain, and he got out on an accident scene and a tractor-trailer failed to stop and went through several vehicles and wound up on top of him.
Q. Okay. So your opinions were against the tractor-trailer driver and company?
A. Yes.
Q. The next plaintiff's case, which is about three below that, who did you work for in that one? Who hired you?
A. I don't remember that guy's name.
Q. Do you remember what the case was about?
A. Yeah. The guy driving the trolley, based on his file, had some anger issues. And he thought it would be fun to make a hard turn in the trolley and he whipped the third car around and dumped the thing over and dumped a bunch of people out of it.
Q. All right. And then the last plaintiff's case, which is the third from the bottom on the second page in Marion County, Alabama, Washburn and Rawls verse Greenbush Logistics, who hired you there? And what was that case about?
A. The -- I think her name was Tammy. Wasn't it Tammy? Yeah, Tammy. Tammy was driving a Dodge Neon up the road and a tractor-trailer had a blowout and crossed the center line, tagged her, and then she got

Page 55

tagged by another vehicle behind the tractor-trailer.
Q. And who -- what lawyer hired you in that case for the plaintiff?
A. I don't remember the lawyer. I remember the investigator. It was Marsh | Rickard if you're familiar with them.
Q. Yeah.
A. Greg Carden -- Greg Carden is the investigator, him and the other -- Andy -- Andy something. Good dudes.
Q. Okay. All right. As far as your work on this matter, did you take any measurements of anything? I did not see any measurements in your report.
A. Well, obviously, when I scan the truck, that's taking measurements because it's all to scale. Did I take any measurements at the scene? No, I didn't take any measurements at the scene. Those are the only other things I looked at.
Q. Did you do any photogrammetry of any type?
A. No, I did not.
Q. And you did not do a human factors analysis in this case?
A. I'm not a human factors expert, so I wouldn't do that.
Q. All right. All right. Let's take a look, if

Page 56

we could, at Exhibit 3. What is Exhibit 3?
A. My report.
Q. Okay. If we could, let me start from the back. With regard to your third opinion, which is listed on Darling-D 1704, do you see that?
A. I do.
Q. You do recognize -- do you not -- that when Mr. McCort did his report, the data from the ACM of the Chevy Traverse was not available?
A. I do.
Q. And you do -- and he made that clear in his report -- did he not -- that he did not have the data or did not know the speed of the Chevrolet?
A. I think I quoted him, didn't I?
Q. Well, you quote him on if the actual -- he's talking about speed. But I'm saying, he actually says in his report that, you know, he doesn't know the speed of the Chevy and that he used a 65-mile-per-hour speed as just a point because, based on Ms. Turner's testimony, she believed she was going less than 70. Is that your understanding of where that number came from?
A. I don't recall the specific wording. I just remember, when he talked about it, the last word he talked about, that if it was different. And, obviously, it was and, obviously, he didn't have that

data. I'm not trying to say that he did. All I'm saying is, he put in there, so he agrees with me on that particular opinion. The distance relationships between the two of them are incorrect in his report.
Q. Right.
A. And he acknowledged that. I mean, all I'm doing is pointing it out. I'm not -- I don't know.
Q. Right, and that's where I'm going with this. I just want to make sure that I'm understanding the opinion here because if -- if Ms. Turner is going faster -- 77 as opposed to 65 -- then in the simulation that Mr. McCort did, it's going to put Ms. Turner's vehicle farther back -- farther back from the Mack truck as it's making the maneuvers.
A. Well, if he's got her going at 65, at 65 -- that's not what I want. At 65, she's running 95 feet a second. At 77, she's running 112 feet a second. So, in reality, if she's running 77 miles per hour leading up to the crash, which the data supports, she was actually farther away.
Q. Yeah, that's what I -- that's what I said. If she's going faster, then if you look at Mr. McCort's simulations, doesn't change anything about the Mack truck and what he's doing. She's farther back -- if you took the simulation, she would be farther back,



farther away, from the truck as it's making those maneuvers. That's my point.
A. You're correct. She would have more time and distance to see it and react to it.
Q. Well, and let's -- with regard to see and react -- well, with regard to a driver, a driver is going to react to a hazard, right?
A. Correct.
Q. And, in order to react to a hazard, the driver has to appreciate whatever they're looking at is a hazard, right?
A. Somebody changing lanes in front of you is potentially a hazard.
Q. Yeah, but it's also potentially not a hazard. It happens every day, all day long, on roadways all across the country that you're driving on the interstate and people are changing lanes in front of you, true?
A. True. And if they're going slower than you are, then you have to slow down.
Q. Okay. Well, we're going to talk about that in a minute. But, as far as your opinion three, you're just -- as I'm reading it -- you tell me if I'm reading this incorrectly. You're just making the point that per Mr. McCort's report, that if you use the 77 miles



per hour for the time period she's driving that speed, that that would change his figures as far as his simulation and the orientation of those vehicles to each other?
A. It invalidates his simulation.
Q. What now?
A. It invalidates his simulation.
Q. Okay. But when he responds to your deposition report and this new data, he can obviously modify it to fit the data we have now from the download of the Chevy, correct?
A. Absolutely, he can.
Q. Okay. All right. I'm just making sure. For opinion three, that's all that's saying is that his simulation is invalid because he didn't have the available data from the download of the Chevy; and, therefore, it would need to be redone with that new data?
A. I thought it was pretty clear the way I worded it.
Q. Okay. Just checking it off here.
Now, with regard to opinion two, with regard to this Mr. Geter, did you read Mr. Geter's deposition?
A. I did.
Q. Okay. And then you also, obviously, reviewed



this written statement, right?
A. I did.
Q. And your opinion is, you're saying that, in Mr. Geter's written statement, he observed Ms. Turner coming up behind him at a high rate of speed and was not slowing down. The ACM data confirms that testimony. Did I read that correctly?
A. You did.
Q. Okay. And she didn't slow down until right before impact, true?
A. Correct.
Q. Okay. And is there anything about that statement that requires an accident reconstructionist to give that statement?
A. The ability to interpret and validate the data.
Q. Okay. Well, you're saying the ACM data?
A. I am.
Q. Okay. But as far as once the ACM data shows that braking occurred roughly a second before impact, I mean, I can read that report just like you can, right, as far as it does show that, doesn't it?
A. Is it a whole second?
Q. Well, we're going to get to that in a minute, but it's --

A. No. I'm telling you, you don't know the ins and out of that report to make that determination and I do.
Q. Well, we're going to see if you do.
A. I do, and I can tell you that. And I can tell you that --
Q. Okay.
A. Well, I'll wait until you ask the question.
Q. Well, when did she start braking?
A. Somewhere between one second and point five seconds.
Q. And was she going 67 miles an hour at point five seconds?
A. Somewhere in that time frame. It doesn't necessarily mean right at point five seconds because the -- where it polled the data can happen anywhere in that point five seconds. It could have been at point five. It could have been at point one. It could have been at point four. It could have been at point three. You don't know.
Q. Okay. Well, that same would be true with the one second, right?
A. Absolutely.
Q. Okay. And in fairness to you, sir, do you believe that she's going 67 miles per hour at around



point five seconds before impact?
A. Somewhere. I mean, that's the speed that it picked -- that it polled in the point five second box.
Q. Okay.
A. It could be anywhere from zero to point five it got that information.
Q. Okay. And with regard to one second before impact, how fast is she going per the data?
A. 77. Excuse me. 77.
Q. Okay. And with regard to a Chevy Traverse, how many Gs in braking can a Chevy Traverse achieve in a max braking maneuver under this type of scenario?
A. You'd have to test that to get you a good number.
Q. Do you have any idea as an accident reconstructionist on a production automobile like a Chevy Traverse how many Gs you can achieve in max braking?
A. There's a range, and it would depend upon the range for that vehicle. I haven't specifically looked that one up.
Q. You hadn't looked that up?
A. Nope.
Q. We can compute that, can't we?
A. I'm sorry.



Q. We can compute the Gs of braking, can't we?
A. We can.
Q. Okay. So, for example, if she started braking at one second pre-impact and we know that she's going 67 a half a second later, that would indicate that she took off 10 miles per hour in point five seconds, right?
MS. SHAW: I'm going to object to the extent that this is outside the scope of his rebuttal report. But, to the extent he can answer, he can.
THE WITNESS: Again, you're going to have to see where in that one second -- you really can't -- where in that one second it came on. You don't know the exact amount of time. You can range it.
BY MR. BELT:
Q. That's the point I'm trying to make is, for example, let's assume for the sake of argument that she started braking at point nine, and then at point five, she's going 67. Do you believe a Chevy Traverse could scrub off 10 miles per hour in point four seconds? Is that even possible?
MS. SHAW: Same objection.
THE WITNESS: Again, I haven't tested it. I haven't looked at the numbers on that. It does seem that that would be a little -- a little high. But, you



know, it could potentially do it. I don't know.
BY MR. BELT:
Q. Okay. Do you think a Chevy Traverse could brake at 1.14 Gs?
MS. SHAW: Same objection.
THE WITNESS: Probably not, no.
MR. BELT: Okay. Do you know whether or not dropping at 10 miles an hour in point four seconds, whether that would equate to 1.14 Gs?
MS. SHAW: Same objection.
THE WITNESS: Again, I didn't do that math. Again, you're talking hypothetically because you don't know.
BY MR. BELT:
Q. Well, but we're trying to figure out -- what is important here is when the brake was activated. Is it a fair statement you don't know exactly when the braking is activated?
A. It was activated sometime in that time frame. That's all we can say.
Q. Sometime at 1.0 verse point five, somewhere in there?
A. Well, again, it could have been just the point five because it's not showing at 1.0. So, again, we don't know for sure.

Q. Well, if she started braking at point five, she couldn't instantaneously drop 10 miles an hour.
A. Again, that number is polled in that whole section, so you don't know. But, again, that's outside of what I was asked to talk about, so...
Q. Okay. Well --
A. I may have that opinion if you come up with rebuttal opinions. So, you know, we'll see.
Q. Do you know how fast the Chevy Traverse is going at impact?
A. Somewhere below 67 miles an hour would be my belief. I don't have an exact number, no.
Q. And would you agree with me -- let's assume for the sake of argument, this data is exactly accurate. Let's assume for the sake of argument that at point five before impact, she's going 67, and she's dropped 10 miles an hour in roughly a little less than maybe a half a second. If that type of braking continued, then at impact, she would be -- if impact says zero roughly, maybe 57 to 59.
A. Again, I haven't calculated that, so I couldn't tell you.
Q. But that's a possibility?
A. I don't think it could be that low. But, again, I haven't run the calculations.



Q. All right. Have you run any calculations to determine the amount of Gs deceleration would be required at various times between negative point one and point five relative to determining the braking here?
A. I have not, as I stated.
Q. Now, this would have been max braking, true?
A. It could have been. I don't know. I haven't tested it.
Q. Okay. So you don't have an opinion whether she was in a max braking maneuver?
A. I do not.
Q. Would the average person when about to strike the back of another vehicle at interstate speed get into a max braking maneuver when they realize the hazard?
MS. SHAW: Object to the form. You can answer.
THE WITNESS: Would you hope that they would? Yeah, but you'd also hope they were paying attention before that last second to crash into the rear of them. So that's kind of a human factors opinion.
MR. BELT: All right. Well, let me ask you this: What is the average perception-reaction time



for the average person when driving on the roads?
MS. SHAW: I'm going to object as it calls for speculation. It's outside the scope of what he's been asked to prepare to testify to. But, to the extent he can respond, go ahead.
THE WITNESS: If you ask your human factors experts, they'll tell you that's a human factors opinion.
BY MR. BELT:
Q. Do you have any sort of standard perception-reaction time that you would utilize when you've done accident reconstructions in the past?
A. Well, in the past, I have. But if you talk to the human factors people, using a standard perception-reaction time is incorrect.
Q. What's the one you used before?
A. Before it used to be three-quarters of a second, and that's actually in the Virginia code, three-quarters of a section -- excuse me -- three-quarters of a second perception, three-quarters of a perception-reaction. But, again, in testing as of late and the human factors people that are out there, they're saying that that's not a valid perception-reaction time.
Q. All right. We'll talk about that in a minute.



But you used -- you done past accident reconstructions, and giving depositions and reports were used 1.5 seconds as kind of a standard, haven't you?
MS. SHAW: Object to the relevance. You can answer.
MR. BELT: You can answer.
THE WITNESS: Well, again, I didn't use a perception-reaction time in this at all. But, in the past, have I used one-and-a-half seconds perception to reaction? Sure, I have. Almost every recon has.
BY MR. BELT:
Q. All right. And with regard to -- have you reviewed any papers that discuss in the peer reviewed literature the relative velocity detection by a driver of a following vehicle and the driver response times to that?
MS. SHAW: Are you asking him in preparation for this case or are you asking him just generally?
BY MR. BELT:
Q. Generally, are you familiar with that body of literature?
A. You'll have to repeat that question.
Q. Are you familiar with the body of literature that deals with relative velocity detection by a driver

of a following vehicle and driver response times to hazard?
A. Yes. That's a human factors opinion.
Q. Are you familiar with the literature that addresses that perception and possible reaction times associated therewith?
A. I have seen it and read it in relation to accident reconstruction. But, again, I don't hold out myself as an expert in human factors.
Q. Okay. Have you ever heard of the concept of looning?
A. Looning?
Q. Yeah.
A. I have not.
Q. Do you gree with me; there's a difference between seeing a vehicle and recognizing when it becomes a hazard?
MS. SHAW: Object to the form, but you can answer.
THE WITNESS: Well, I do agree that vehicles can be doing things, and it can appear -- it can take a person a longer time to appreciate what they're doing. I know that from personal experience because I drive usually, you know, 70, 80,000 miles a year. So, yeah, I'm familiar with that concept.



BY MR. BELT:
Q. Okay. And you agree with me that -- and we kind of talked about this a little bit earlier. But with regard to drivers, they wouldn't typically respond to a lane change unless they perceive that the vehicle changing lanes in front of them was a hazard.
A. I disagree with you. I think drivers -- people that change -- a lane change is different than just driving slap up on a vehicle in front of you. A vehicle in front of you that's not giving you any visual clues that something is going on and you're just coming up, that I agree with. That happens all the time.
A vehicle that changes lanes in front of you is going to require you to potentially do something, and I believe that people have a better opportunity to understand that something is not going as fast when it's changing lanes. That's from personal experience with the amount of driving that I do.
Q. Okay. But that's not based upon your review of any literature or any human factors studies you can point me to, true?
A. Again, I'm not a human factors expert, so I wouldn't be pulling out human factor studies to try to establish that point.



What I can tell you is from my personal experience and as it relates to my 30 -- almost 30 years in accident reconstruction, it's different. And, in that sense, I do feel like that's an expert opinion for me because most people don't drive as much as I do.
Q. When traveling on the interstate, is there a general assumption that the other vehicle is going to be traveling at around the same appropriate interstate speed?
MS. SHAW: I'm going to object to the form. You can answer.
THE WITNESS: Do I think every vehicle out there is going the speed limit? No. Vehicles out there are well excessive the speed limit. Vehicles are below the speed limit. I mean, if you're a driver out there, you have to be prepared for anything.
BY MR. BELT:
Q. Are you familiar with the five stages of response time for a following driver relative to a lead vehicle?
MS. SHAW: I'm going to object to the extent this is outside of his opinions, but he can answer.
THE WITNESS: That's outside of the scope



of what I was asked to do.
BY MR. BELT:
Q. Are you familiar with the concept that there's actually five stages of response for a following vehicle to a lead vehicle? Are you familiar with that concept?
MS. SHAW: Same objection.
THE WITNESS: It sounds like a human factors paper, and that particular one I don't necessarily recall reading off the top of my head.
MR. BELT: So if those stages as described in the literature are detection of a vehicle, detection of closing, detection of relative velocities, cognitive response, and motor response, would those five stages be consistent with what you would understand a driver would go through when following a lead vehicle that's doing something possibly hazardous?
MS. SHAW: I'm going to object that he's testified he's not familiar with these five stages. It's not what he's been asked to testify to today. But, to the extent he can respond, he can go ahead.
THE WITNESS: Have I sat down and looked at the five stages? No. What I can tell is what I've already testified to based upon my training and experience and my extensive experience with driving and

being out on the road. As I said, are you talking about a vehicle just in front of you or are you talking about a vehicle changing lanes? Because, in my opinion, those are different.
BY MR. BELT:
Q. What's the -- tell me what in your training makes those different.
A. It makes a --
Q. I'm not talking about your experience driving on the road. What in your training tells you there's a difference?
A. Well, in training, defensive driving training, emergency vehicle operations training. I mean, there's lots of training that I've had that relate to that. And, again, you can't discount the experience because as much as I'm out there -- have I seen cars that I've come up on that are going significantly slower and it took me a longer time to figure out they were going significantly slower? Yes. People that are changing lanes is different.
Q. Okay. So is it your testimony that if I'm going down the interstate at -- whatever -- 70 miles an hour and there's a vehicle in my lane that's in front of me for however long -- ten seconds -- and they're going 30 the whole time verse if a vehicle from a right



lane pulls into my lane and when it gets into my lane, it's going 30, which would have an easier and faster response time? The vehicle that's been there for ten seconds or a vehicle that's only been there for a second or two?
MS. SHAW: I'm going to object --
THE WITNESS: Well, it takes more than a second. I'm sorry. Go ahead.
MS. SHAW: I'm just objecting. It's outside the scope. It's speculation. Go ahead.
THE WITNESS: A vehicle -- a tractor-trailer changing lanes takes more than a second to change lanes. Okay? That being said, a vehicle changing lanes provides additional clues. Particularly if they're coming into your lane and you're speeding, your expectation would be that that vehicle may not be going as fast as you, and there's a reason for that vehicle coming out there.
So, at that point, yeah, I think the reaction -- the perception of it to me would be easier than if it's just a vehicle in front of you and it's just creeping along right in front of you.
BY MR. BELT:
Q. Now, with regard to -- so you're saying that a vehicle moving from the slow lane into the passing



lane, that the driver would appreciate the relative velocity of that vehicle relative to its own vehicle easier than if the vehicle is already in the lane --
A. What I said was it --
Q. -- at passing speed?
A. I'm sorry. I walked on you. Go ahead.
Q. No. I'm saying, you're saying that if both vehicles -- one is in the lane that they're in and one is moving in the lane going 30 and the distances are the same, you're saying that you believe it would be easier to perceive the difference in velocity of the vehicles when it's moving laterally as opposed to just in front of you?
A. You're going to have to rephrase that because you used speeds, and I need to know the speeds that you're using.
Q. Look, let me back up. What's important in an accident avoidance is appreciation of hazard. Do you agree with that, appreciation that what in front of you is presenting a hazard? Eminent hazard, I think, is the term often used.
A. That's one of the things. There's several. But, yes, that's one facet of it.
Q. But, I mean, in this case, the issue is, when should the Mack truck had been appreciated to be an



eminent hazard? I mean, that's really what we're talking about, right?
A. Well, if you're speeding down the road and a bobtail tractor changes lanes in front of you, the odds of that bobtail tractor going slower than you are at 77 miles an hour is probably pretty high.
Q. Even though he's pulling out in the left lane to pass another truck?
A. Is there anything that says he was passing another truck?
Q. Only the testimony of Mr. Geter.
A. If that's what he said. I don't recall that off of my head. But, again, that's even a bigger clue to the person driving behind him at 77 miles an hour because if you see a truck pull out into the left lane from the right lane and they have gone; and when that occurs and you can see a vehicle in front of them, that is a huge clue that that vehicle is going slower than you would anticipate.
Q. Once they get in front of you, you can appreciate that?
A. No. As soon as they're moving from a vehicle that's in the right lane -- the passing lane as you call it -- once you go out into the passing lane, if you've come from a -- with a vehicle directly in front

of you, that's a big clue that that vehicle is not going as fast as you want to go. And, if you're in a bobtail Mack tractor on a 70-mile-per-hour road, you know, that vehicle is likely going less than 70 miles an hour. And, if you're humming along at 77, that would be a visual clue to you that she would need to do something.
Q. Okay. With regard to a -- do you agree with me that the truck, when it's in the right lane, is not a hazard to someone in the left lane? While it's still in the right lane, it's not a hazard at that point. Do you agree with that?
A. I do.
Q. Okay. And do you agree with me that it takes a truck, the average truck, about four to six seconds to change lanes?
A. Okay.
Q. Have you ever seen that anywhere?
A. It's within the range. I haven't seen it written down that number exactly that I recall, but that's about the right range.
Q. Okay. And would you agree with me, there are occasions on the roadway that we would all encounter where someone starts to come over for a lane change and then they go back into their lane? They abort the



maneuver. You've seen that before certainly?
A. Absolutely. And that, again, would be another visual clue that would cause me concern as I was coming up exceeding the speed limit.
Q. With regard to Ms. Turner, did you compare -- did you ever attempt to figure out per -- strike that.
Did you ever compare her response in this situation against anything?
A. Well, the only thing you have in response is somewhere within a second. So, again, I'm not a human factors guy, but we know she wasn't doing anything much more than a second before the incident.
Q. How many seconds before impact do you believe she should have, quote, done something as far as trying to avoid the truck?
MS. SHAW: Object to the form. You can answer.
THE WITNESS: Well, number one, you're asking for a human factors opinion there, it seems like. But, in the reconstruction world, when that vehicle starts to move over, and as it moves over a little bit and then moves back, that's a clue to say, hey, it may not be done. And, as you're coming up, you should prepare for that vehicle to come back and potentially be going slower than you are.



BY MR. BELT:
Q. Okay. When you say "prepare", I mean, prepare could just be, you know, covering your brake or whatever. I'm asking -- let me ask it this way --
A. It would be doing something other than going along at 77 miles an hour.
Q. Let me ask it this way because I've got your report, and I see what your opinion says.
Would it be a fair statement, sir, you did not do any sort of simulation to make a determination of in your opinion how many seconds out from impact Ms. Turner should have started braking?
MS. SHAW: Objection. Asked and answered.
BY MR. BELT:
Q. You did not do that?
A. No. It's outside of the scope of what I was asked to do.
Q. Okay. And you do not have an opinion as to how many seconds before impact Ms. Turner should have started braking?
A. Well, I believe your guy says that at eight seconds, he started to come over. So eight seconds out with him starting to come over, I'm saying, she should have been prepared for a slower moving



vehicle coming out in front of her. So when he started moving into that lane, that's when she should have started preparing.
Q. You said "preparing", but you don't give that opinion anywhere in your report, right?
A. Yeah, I did. I said she had sufficient time and distance. It's opinion number one. "There was sufficient time and distance for Ms. Turner to respond to the traffic ahead of her and avoid crashing into the Mack tractor by braking and/or changing lanes had she been giving proper attention to the driving task." I believe that covers it.
Q. Okay. Well, with regard to this -- whatever this eight seconds is, you're not contending she should have started braking at eight seconds?
A. That's not what I said. I said she needed to react to the traffic in front of her and prepare.
Q. What does react mean there? When we're talking about -- when we're not talking about braking, what are you talking about react? Jut be prepared for what's about to happen?
A. It could be slowing down. It could be letting up on the gas. That's the first easiest method.
Q. How many times will the average driver experience a situation where a bobtail truck changes

lanes in front of them in a rural section of interstate and gets on their brakes and slows to less than 30 miles an hour.
MS. SHAW: Object to the form. Way outside the scope of what he was asked to testify to. Irrelevant. Do you want to ask him something about this case?
MR. BELT: You can answer.
THE WITNESS: I don't know a way to answer that. I mean, what? Now I'm supposed to go out and see how many bobtail trucks are out on I-20 between Heflin and the state line and give you an opinion? Come on now. That's not even a good question.
BY MR. BELT:
Q. My point is, sir, this is a very unusual accident scenario.
A. No, it's not.
Q. It's not?
A. No, it's not at all.
Q. So you think it's common and normal that bobtail trucks would be driving on rural interstates at 30 miles an hour?
A. It happens every day.
Q. Huh?
A. It happens every day. I got tons of them.



Q. What's the minimum speed on this roadway, legally required minimum speed?
A. I believe it's 40.
Q. So he was traveling below the minimum speed limit?
A. He was, and she was traveling excessively at maximum speed limit.
Q. What's the purpose off minimum speed limits on U.S. interstates? Why do you have those?
MS. SHAW: Object. Outside of the scope of what he's here to testify to. You can answer.
MR. BELT: You can answer.
THE WITNESS: Again, it's to prevent rear-end crashes or at least attempt to prevent rear-en d crashes like that.
MR. BELT: Are slow moving vehicles on interstates a danger?
MS. SHAW: Object. Calls for speculation. Legal conclusion.
THE WITNESS: Any time you have vehicles traveling at significantly different speeds, yes, that presents hazards.
MR. BELT: Do you agree that for a Mack truck to change from the right lane to the left lane and immediately slow down to make a U-turn through a



median would be an unreasonable and unsafe maneuver?
MS. SHAW: Object to the form. You can answer.
THE WITNESS: Is that a hypothetical?
MR. BELT: Well, that's what happened here. So if you want to call what happened here a hypothetical, you can.
MS. SHAW: I'm objecting that that's misstating facts in the record, but you can answer.
THE WITNESS: Whether he got out in the left lane -- I don't know what he was doing. Could he have been turning in there? Absolutely, he could have been. Okay? But, again, once he makes that change over there, that puts her on notice. So she needs to respond to the hazard.
MR. BELT: And that wasn't my question. My question was, do you agree that for a Mack truck to change from the right to left lane and slow down to 30 miles an hour or less to make a U-turn through the median would be an unreasonable and unsafe maneuver?
MS. SHAW: Object to the form. Same objection.
THE WITNESS: In your hypothetical, I do think it's against Alabama law.
MR. BELT: So would that be unreasonable



and unsafe and reckless in your opinion?
MS. SHAW: Same objection.
THE WITNESS: Same answer.
MR. BELT: Which is what? Yes?
THE WITNESS: That I believe it would be a violation of Alabama law. So, yeah, that would make it a hazard.
MR. BELT: For a Mack truck to change from the right lane to the left lane and get on their brakes to slow to less than 30 miles an hour in order to turn through the median, do you believe that that would be a safe and appropriate maneuver?
MS. SHAW: Object to the form.
THE WITNESS: I believe I've already answered that. I said it would be a violation of law.
MR. BELT: Does that make it reckless and unreasonable?
MS. SHAW: Object to the form.
THE WITNESS: I don't know that it makes -- sorry. I don't know if it makes it reckless, but it's against the law.
BY MR. BELT:
Q. Eight seconds before impact, how far was Ms. Turner's vehicle from the Mack truck?
A. Assuming she's running 77 miles per hour

through the whole time, approximately 900 feet. Oh, no. Hang on a second. Yeah, that's right. Hang on one second. Yeah, it's about 900 feet approximately.
Q. That wasn't my question. You just gave me the distance that she would have been from point of impact eight seconds before. That's not what I asked. Let me re-ask it.
A. Okay.
Q. Eight seconds before impact, how far behind the Mack truck was Ms. Turner? Do you know?
A. I haven't calculated that number. I could, but I haven't.
Q. Seven seconds before impact, how far behind the Mack truck was Ms. Turner?
MS. SHAW: Asked and answered, but go ahead.
THE WITNESS: Every one of them, I haven't calculated that.
MR. BELT: Same for seven, six, five, four, three seconds; you haven't calculated the relative distance that Ms. Turner's vehicle would be behind the Mack truck. Is that a fair statement?
MS. SHAW: Asked and answered. You can answer.
THE WITNESS: Yeah, because I took her



from the point of impact.
BY MR. BELT:
Q. What does that mean, "I took her from the point of impact"?
A. Well, she made it to the point of impact. Eight seconds before impact, she was 900 feet away from the point of impact. When that vehicle came out in front of her, it gave her eight seconds to do something to not hit the back of the truck, and she didn't.
Q. Okay. But you didn't calculate the difference in spacing between Ms. Turner and Mr. Geter's Mack truck during that time period?
MS. SHAW: Asked and answered.
BY MR. BELT:
Q. You didn't perform any of those calculations, did you?
A. There was no need to.
Q. You did not do any sort of simulation to try to show the movements of the Mack truck relative to the Chevy Traverse and their orientation to each other throughout the, say, eight seconds prior to impact, did you?
MS. SHAW: Asked and answered.
THE WITNESS: That was outside of the scope of what I was asked to do. Well, back up. If



you're saying I never made those calculations, I ran the numbers that your guy did, and your guy's numbers were fine with me because they were right based upon the data. And, at that point, it really becomes irrelevant. So...
BY MR. BELT:
Q. Did you perform -- and I guess you didn't because we don't have any calculation in your report. So you did not perform any sort of calculation to find out when she would have had to have started braking to avoid impact?
A. Again, she -- at eight seconds out, she was 900-and-something feet away, 903. At 77 miles per hour, it's only going to take her right at four, 450, in that range if you use that 1.5 perception-reaction that you asked about because that's in the code of Virginia, and that's where I did a lot of accident reconstruction for awhile. That's why I know it off the top of my head.
In that time to stop, she only needs a little over half of the distance she has available to stop. That doesn't even account just slowing down, seeing what the guy is doing, reacting to traffic ahead of her, which is a common driving task.
Q. Okay. But you're certainly not contending



that eight seconds out, she should have slammed on her brakes and attempted to stop because she sees a truck that kind of starts to move towards her lane?
A. If you'll look back to what I said, I said, when that truck starts to come out, she needs to be aware that it's potentially going slower and that she would potentially have to do something to avoid that vehicle. At that point, she has several options.
Q. But you never computed the brake to -- brake to avoid the accident, what that calculation would be? You never computed that calculation, true?
A. I just gave it to you.
MS. SHAW: Asked and answered.
BY MR. BELT:
Q. All right. Well, what's the calculation for her to -- what speed would she have to have slowed to, to avoid the wreck?
A. Well, again, I don't think she would have had to have slowed to avoid the wreck. I'm saying, worst-case scenario, she could have stopped at about 450 feet, 450 to 500, right there at 77 miles an hour. So she certainly had a lot of room in there to do something other than jamming on her brakes and stopping in the freeway, which I would definitely not recommend. But she did have the opportunity to see that the

Page 89

vehicle in front of her was doing something, and she potentially could have to react to it.
Q. If there was a truck on the right of Mr. Geter, then she would not have been able to go around them, true?
A. Depends upon how fast that truck is going.
Q. I'm just saying, if Mr. Geter testified that he had a truck right to its right at the time that he was hit and before, that would indicate she had no way to go around him, true --
A. Again --
Q. -- if that's factually accurate testimony?
A. Again, it would depend upon how fast that truck is going.
MS. SHAW: Are you good to keep going? We've been going for about another hour.
THE WITNESS: I would just soon get it done. I mean, if we're going to be here another couple hours, then, yeah, we need to --
MR. BELT: We're not. We're not.
BY MR. BELT:
Q. All right. With regard to the lane change by Mr. Geter, obviously, when a truck is changing lanes, a driver would be able to see they're changing lanes. But that's not a hazard unless and until there's an

Page 90

appreciation that the truck is traveling slower to a point that that would make the closing distance less, true?
A. Repeat that, please.
Q. I mean, if you're going down the interstate going, let's say, 77 like Ms. Turner and the truck pulls over at -- and let's say he's going 70, that's a difference in if he pulls over and he's going 40; a big difference, right?
A. Yeah, you're correct. That is different. But, but, but, but -- hang on. Once he makes that lane change, it should give her rise to figure out, hey, being a tractor without a trailer or with a tractor-trailer in general, the odds of that tractor-trailer pulling out in front of you is going faster than you at 77 is very, very unlikely.
Q. Yeah, I understand that. Stay with me for a minute. Let me ask my question here.
So what I'm saying is, if the vehicle moving into your lane, just the act of moving -- moving is not a hazard. It's the recognition of the difference in speed between you and that vehicle. That's the hazard. You have to recognize that, true?
A. And a reasonable and prudent person that saw a tractor-trailer pull out in that lane like that in

Page 91

front of them, particularly if there was another truck in front of them when he did it, would be a high-value clue that that truck is going slower than you are, particularly if you're exceeding the speed limit at 77 miles per hour.
Q. Yeah. But all I'm saying is, if I'm going down the interstate in my car and somebody pulls out in front of me hundreds of feet in front of me -- let's say they're going 70 and I'm going 77 -- that's not a hazard to me, seven miles an hour difference if I'm hundreds of feet back. I've got plenty of time to react and see what they're doing, true? You agree with that?
A. Well, no. Having driven the roads like that, if a truck comes out like that and I am running 77 miles per hour, I'm expecting that truck to be going slower, and it's going to require me to do something different. And if you add in the fact that it went out and it came back and it went out, as one of your hypotheticals was, yeah, that's a clue that should put you on high alert.
Q. Okay. But here's my point: My point is, the driver, in order for it to be an eminent hazard, has to recognize and appreciate the difference in speed and the fact that that difference in speed presents a

Page 92

hazard to them. That's the only point I'm making. The difference in speed is a critical component here. Do you agree with that? And you have to recognize that.
A. And it being a tractor-trailer on a freeway coming from the right lane to the left lane would be a clue that, more often than not, that that vehicle is going to be going slower than you are and that you would need to do something other than run up on it and wait until a second left to slam on your brakes.
Q. Point is -- strike that.
You did not do any sort of analysis to determine when in time Ms. Turner appreciated the difference in speeds between her vehicle and the truck?
A. Well, that would be a human factors opinion. There's no data to show whether or not she did or how long it took her because she jammed on the brakes in the report at somewhere in the negative point zero five mark. So somewhere in there, she did perceive what was going on and reacted to it. But, again, you're asking for a human factors opinion. If you're wanting me to opine on that, no, I didn't do that. It's a human factors opinion.
Q. Okay. So as far as -- do you agree with me that, to opine on Ms. Turner and what she perceived, what she should have perceived, how she should react,

those are all human factors opinions; are they not?
A. No. My opinion that when that truck changed lanes and come out, that's from a recon standpoint and from an experience standpoint of being out here running up and down the roads and knowing what -- you know, that's driving experience, you know. That's experience from training, defensive driving. That's experience from training, emergency vehicle operations course, all of those things, you know. That's driver training that -- driver training 101 that you get.
Q. But you're saying that when the truck starts to come over into her lane, that because it's coming over, that she should recognize that's a possible hazard as opposed to giving the opinion that she should have appreciated that exact moment the difference in their speeds. You're not giving that opinion, true?
A. No, I'm not giving you an opinion of when she appreciated anything other than what I've said. She appreciated something one second before -- approximately one second before this crash occurred because she got on the brakes. That's when she reacted. Her perception to reaction -- we firmly established is that I'm not giving a perception to reaction in this case. I didn't calculate one. I'm not giving you one. Okay? Somewhere in that time, she



recognized that that vehicle was not going as fast as she was, and she jammed on her brakes.
What I'm saying is, when that vehicle came out, that's when she should have appreciated that, and that's not a human factors opinion. That's a recon opinion, a driver training opinion, and an experienced driver opinion.
Q. Now, when you said the vehicle -- "when the vehicle came out", what does that mean? What point in time did the vehicle -- what does that mean, "when the vehicle came out"? Are you talking about when the vehicle got into her lane?
A. When the lane change started, eight seconds is what your guy calculated.
Q. So with regard to -- so it's your opinion that eight seconds before impact -- when the truck started to move into the left lane, it's your opinion that she should have started braking; is that right?
A. That's not what I said. You're misconstruing everything that I've said to this point. I believe what I said is, at that point, she's on notice. That's a visual clue that something's in front of her that's potentially going slower than she is, and she needs to appreciate it and she didn't.
Q. Well, first off, you don't know that. You



don't know what she appreciated eight seconds out.
A. Okay. Well, I know what she was doing five seconds out. So, if eight seconds out, she appreciated and was going even faster and slowed down to 77, okay. But given that you have five full seconds at 77 continuous, yeah, I believe that the other three, she was going 77. Could she have been going faster? Sure, she could. She could have put on the brakes and slowed down a little bit. We don't have that data. Could she have been going slower? Somewhat, but not a whole lot because you've got to look at percent of throttle. And, in the first three seconds of the percent of throttle, you're at 16 percent. So eight seconds out, if she was going significantly slower, to get a 77 at five seconds out, she'd have to have some throttle.
Q. Do you -- you do not have an opinion as to when she should have started braking; is that true?
A. I don't know how many times I can explain it to you. I've explained it to you several times. The only time we know that she's on the brakes is one second before, and I didn't give you an opinion on when she should have. What I gave you an opinion on was at the eight second and change, whatever your guy came up with, when the -- when the lane change started, she should have appreciated that something was going on in



front of her that could cause her to have to take some sort of action. That's a standard driving task that happens millions of times a day.
Q. But you don't have an opinion on what she should have done other than appreciate?
MS. SHAW: Asked and answered.
BY MR. BELT:
Q. True?
A. I've told you my answer. I'm tired of answering the same question. I've answered that question five or six times easily.
Q. You said she should have appreciated. You didn't say what she should have done.
A. I said many times what she should have done. I said, she should have appreciated that something was in front of her that was going to require her to take some sort of action. I mentioned braking. I mentioned slowing down. I mentioned changing lanes. And all of those responses, it's in there.
Q. Take a look at your opinion in your report. Once again, do you know whether or not your opinion about she should have braked or changed lanes, do you know if changing lanes was even an available option to her? Do you know?
A. The only thing I'm aware of is, he said there

was a truck in front of her. If there was another vehicle to her right, I don't recall her saying that. If there was a vehicle to her right and she couldn't go to the right, she certainly had sufficient time and distance to slow down and not rear end the truck in front of her.
Q. You agree with me, there was some period of time she had to perceive and react to hit the brake before she hit the brake at roughly one second? I know you're not giving an opinion on what that time is, but there has to be some period of time before that. Do you agree with that?
A. We've been over that.
Q. And you did not do any sort of study or research to try to determine and come to an opinion as to how much time would have been reasonable for her to perceive and react prior to hitting the brake at roughly the one second mark?
MS. SHAW: Asked and answered.
THE WITNESS: That sounds like a human factors opinion to me, and I think I covered those.
BY MR. BELT:
Q. Meaning, you did not do that type of analysis?
A. I do not hold myself out as a human factors expert.



Q. Now, you give the opinion -- in your opinion one, you said that Ms. Turner did not create the 22-foot tire mark. What's the basis for that?
A. The CDR data that showed she wasn't braking in that area.
Q. What does that mean?
A. I'm sorry?
Q. You said, "CDR data"?
A. See the box below the explanation that says "Bosch CDR" data?
Q. Okay. Well, she's braking for potentially up to almost a second pre-impact, right?
A. Yeah, but there's no marks leading up to the point of impact. There's a mark and there's a skip and then there's impact.
Q. Well, let's take a look, if we could. Take a look at Exhibit 8.
A. Yep.
Q. That's two photographs of the same mark. The second photo on page 32 is a closer up. Do you see that, the mark on the left side of the lane?
A. I do.
Q. Now, what vehicle left that mark?
A. Not one involved in this crash.
Q. Okay. And do you think that that vehicle --



that mark was not left in this crash why?
A. Because if she was on the brakes enough to leave a skid mark, at one second up to the point of impact, that mark would lead to the point of impact. That mark is there, there's blank area, and then there's impact.
Q. This -- are you familiar with ABS brake marks?
A. I am.
Q. Does she have ABS?
A. Sure.
Q. So do you think this mark is too short or too long to fit the data or what? Do you have an opinion about why this would not be consistent with an ABS mark here?
A. Well, number one, as dark as it is, that's my first reason that I don't think it's involved. But, again, my second reason is, because if you look at the distance between the end of the mark and where impact is, that's not an ABS mark. ABS marks are typically skip marks.
Q. What does that mean?
A. You know how an ABS system works?
Q. Yeah.
A. Okay. ABS system goes along. When it senses lockup, it releases the wheel. So if it's leaving a



mark, when the system releases the wheel, that will stop the mark. And then when it goes back, if it begins to leave a mark again, you get skid marks. You also get light marks. That mark does not look like an ABS mark to me.
Q. Okay. How far is the impact point past the eastern most portion of the mark we're looking at in Exhibit 8? Do you know?
A. Give me a second.
Q. And I don't see an opinion like that in your report where you gave any opinion on point of impact or where it was.
A. Well, if you look at the skip lines, understanding that the skip lines are 10 and 30, it appears there's at least a -- one skip line, which would be ten feet, and then a blank space, which would be 30 feet. So that gives you a minimum of 40 feet in between there. That's based upon the pictures and looking at it. And, as you'll recall, when I was out at the scene, there wasn't any physical evidence out there.
Q. But you don't have an opinion on exact point of impact, do you?
A. Yeah, I do, where that black mark on the truck is.

Page 101

Q. I'm talking on the roadway.
A. Yeah, where those black marks on the truck are.
Q. On the truck?
A. The duals, that's where I believe impact is because that's when the damage to the duals and the movement of the axles would start causing marks.
Q. Well, if a vehicle is going 77 miles per hour, that is how many feet per second?
A. 112.
Q. And so, if the vehicle is going 67 miles per hour, how many feet per second?
A. 98 feet per second.
Q. And so as it pertains to -- I understand you disagree with these marks left in this accident, but the area where the mark is located would be within the area of where she is braking prior to impact with the impact point that you just described. Would you agree with that?
MS. SHAW: Object as that misstates prior testimony. You can respond.
THE WITNESS: I didn't understand it. Repeat it, please.
BY MR. BELT:
Q. Yeah. I understand you're giving the opinion

Page 102

that this mark we're looking at in Exhibit 8 was not left by the Chevy. But the area where this mark is located relative to point of impact, the Chevy was braking in this area where this mark is located.
MS. SHAW: Same objection.
MR. BELT: Will you agree with that?
THE WITNESS: Yeah, because she's 98 feet away from -- yeah, yes. But what you're not appreciating is, it never comes off the brake, so -- in the data. So within a half a second -- less than a half a second, if she came off the brake, you would expect a mark much closer to the point of impact than you have in that picture.
MR. BELT: Well, it's possible she was braking for a full second, right?
MS. SHAW: Object.
BY MR. BELT:
Q. If she starts braking just inside negative one second --
A. Yeah. But if she was braking the whole time, the mark would lead to impact, and it does not.
MS. SHAW: Keith, can we take a five-minute break for us to fool with this air conditioning?
MR. BELT: Yeah. I think I'm about done,

Page 103

so we can take a five-minute break. I've probably got less than 15 minutes left.
MS. SHAW: Awesome.
MR. BELT: So let's come back at 12:30 my time, 1:30 y'all's time.
(A recess was taken.)
BY MR. BELT:
Q. All right. Mr. Partenheimer, I've got just a few more questions. This one issue I do want to drill down on that we've talked about, but I want to make sure I understand it because it's not in your report. So I want to make sure I got everything from you here today while you're under oath.
Now, with regard -- you said something earlier that you believe she should have started to prepare for something at roughly the eight second mark, and you said because that's when your guy something. And I just want to make sure I'm understanding where this eight seconds is coming from.
A. That's in Mr. McCort's report. He said that, at eight seconds, that's when the truck started changing lanes.
Q. Okay. And I don't have his report in front of me, so I don't know if that's correct or incorrect. But let me ask it this way because his report says

Page 104

whatever it says, and I'll go look it up and see it. But I don't have an exhibit there, and I don't have a copy of it sitting in front of me. But here's what I didn't have. Can you stay with me for a minute?
A. I'm with you. Go ahead.
Q. Mr. Partenheimer?
A. I'm with you. Go ahead.
Q. Okay. When the truck is totally in the right lane -- hasn't come over the center line at all; hasn't started moving into the left lane -- it's not presenting a hazard to Ms. Turner. Do you agree with that?
MS. SHAW: Asked and answered, but you can respond.
THE WITNESS: Yes.
BY MR. BELT:
Q. You agree it's not a hazard?
A. I believe I've already said that more than once.
Q. Okay. So it becomes -- it's your opinion I think -- and let's make sure we're on the same page -- that she should start preparing for possible issues as soon as the truck is coming across the center line -- starts coming across towards her lane; is that correct?
A. Correct.

Q. Okay. So whatever point in time that is -- you say eight seconds. That may be right. I'm just not sure. At whatever point in time the truck is coming across the center line into her lane, that's the point in time you believe she's got to start preparing for possible evasive action. Is that a fair statement?

MS. SHAW: Object to the form of that question. You can respond.

THE WITNESS: AND that's not what I said. I said, when he starts moving and -- granted, is it going to take her a little bit of time for her to appreciate it coming over? But once it starts moving to the left and going to be in front of her, whether partially or fully, as soon as it starts coming out, as she's running up there at 77 miles an hour, yes, she needs to appreciate and understand that that vehicle is potentially going slower than she is.

BY MR. BELT:

Q. Okay. But starts moving left -- conceptionally, the truck could be on the right side of the lane and be moving inside the right lane. It could be moving left in the lane. That would not be a hazard to her, would it, if [inaudible] --

A. I don't believe that's what your guy said.

Q. -- completely in the right lane. That



wouldn't be a hazard.

A. I don't believe that's what your guy said, but you're correct.

Q. [Inaudible].

A. If he's all the way over on the right lane, then he's not -- you know, until he starts to move left and comes into the lane, that's when she needs to be aware that it's in front of her, and clearly she wasn't.

Q. Okay. And I think you just said what I thought you were trying to say earlier. I just want to make sure.

As soon as the truck begins to cross the line to come into her lane, that's when you believe she has to prepare; is that right?

A. Well, when it crosses the line, it's definitely a hazard. As it's moving right to left, if she can appreciate it moving right to left and that it's coming out there, yeah. I mean, as you're going down the road and you're humming along at 77 miles an hour in the left lane and you're keeping a proper lookout, you see traffic in front of you that always comes out into that lane, and as they start to move, they may not be immediately out there, but you can see them start to move; and as they start to move, you



should be thinking, well, this person may be coming out in front of me and may be coming out slower.

So, yeah, in defensive driving techniques, when you see something start moving, yes, that's when you should start figuring out what my next response is going to be. I might have to do something.

Q. Okay. And I think you just -- that's a perfect segue into my next question, which is, the opinion that she should have been preparing to do something as the truck is starting across the center line, that opinion that that's when she should start to do something is based on what? And I want to list them all one through whatever. One, you said defensive driving techniques.

What else would support the opinion that the second that truck's tire starts coming across the center line into her lane is when she has to do something? What other defensive driving techniques would support that opinion?

A. You just previously disregarded the answer to my last question. What I said was, when she appreciates that truck moving, if it's moving and it's coming toward the left, then, yeah, she should be aware of it. When it gets to the center line, she should be even more aware of it because now it's crossed over



into her lane. All right? And, when it's crossed over to her lane, she needs to appreciate that something is in front of her doing something and she may have to react to it. That is one of the tenants of defensive driving, you know. They teach keeping a proper lookout, watching what's going on, planning for people not doing what you expect them to do.

Q. All right. Do you have anything -- any other sources or anything to point to, to support that premise other than defensive driving techniques?

A. It's driver training. It's in driver training classes. It's in -- you know, I don't specifically have a text out there that it's in, but it's in all -- it's been in all of my driver training classes. It's been in the defensive driving. It's probably even in the manual, the driver's manual.

Q. Okay. But is there anything else that would support your opinion that she's got to begin to do something or prepare to do something as the truck starts moving in her lane other than defensive driving type books or training? Is there anything else you can point me to that would support that opinion other than that?

MS. SHAW: I'm going to object to the --

THE WITNESS: I think I've given you what

I can give you.
MR. BELT: Okay. Let me look through my notes. I think I'm done.
THE WITNESS: Thank you.
MR. BELT: Hold on. Let me just flip through my notes real quick.
THE WITNESS: Okay.
MR. BELT: I think I'm done. Like 30 seconds maybe.
THE WITNESS: Do you have his information so I can bill him?
MS. SHAW: Yes, and I've got a brief.
THE WITNESS: Okay. Just give me one second if you don't mind.
MR. BELT: Yeah. I'll give you my email address so you can email me your bill.
THE WITNESS: That would be awesome.
BY MR. BELT:
Q. All right. Conclusory questions I would ask in every expert deposition: Between your report and what we've talked about today, have I heard every opinion you would intend to give in this case?
A. Yes.
Q. And do you have any intention of doing any additional research or work in this matter prior to now



and trial?
A. Well, number one, I would say, that's not up to me. And, number two, since your guy hadn't addressed the other data, I would be surprised if there weren't more for me to do. But, again, that's not on me.
Q. Other than possibly review maybe a rebuttal report from Mr. McCort, that would be about it, as far as your expectation going forward?
A. I can't tell you what my expectation is because I don't know what my client is going to ask me.
Q. Okay. One more thing. There is an exhibit in front of you we hadn't talked about, and we can deal with it in 20 seconds. Look at Exhibit 11 real quick.
A. Okay.
Q. Tell me when you're there.
A. Yep.
Q. It's two photos.
A. Okay.
Q. These are some tire marks way back west from the accident scene. You get a good look at in the first picture in 11 all the way at the top just in front of the car, and here's another photo. Do you agree with everybody in this case that those have nothing to do with this accident?



A. They don't appear to.
Q. Okay.
MS. SHAW: What's the Bates stamp of the second for on 11, Keith, just if you have it offhand?
MR. BELT: Golly, I'm going to have to put my glasses on.
MS. SHAW: I know you've got 250 on the first one. If it follows chronologically --
MR. BELT: The first one is 250, and the second one is 257.
MS. SHAW: Okay. Perfect. Thank you.
MR. BELT: And those are Turner. Okay. That's all I've got, Mr. Partenheimer. Let me give you my email so you can send me your bill for your time during the depo.
THE WITNESS: Give me one second.
MR. BELT: This can be off the record. This don't need to be on the record.
MS. SHAW: I've got one thing that I need to do on the record really quickly. I'm just going to formally tender Defense Exhibit 1, which was Defendant Darling Ingredients' objections and responses to plaintiff's notice of taking videotaped deposition of Will Partenheimer, which was filed and provided to plaintiffs' counsel prior to the deposition.



I'm also just preserving defendant's right to depose plaintiff's expert, Mr. Mike McCort, to the extent he has any rebuttal opinions to Mr. Partenheimer's report that we've discussed today. And that's it. We can go off the record.
(Ex. No. 1 marked.)
(Concluded at 12:41 p.m.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE )
)
COUNTY OF WILSON )

I, APRIL DANIEL, Licensed Court Reporter in and for the State of Tennessee,

DO HEREBY CERTIFY the foregoing transcript of proceedings was taken at the time and place set forth in the caption thereof; the witness therein was duly sworn on oath to testify the truth; the proceedings were stenographically reported by me in shorthand; and the foregoing transcript of proceedings constitutes a true and correct transcript of said proceedings to the best of my ability.

I FURTHER CERTIFY I am not a relative or employee or attorney or counsel of any of the parties hereto, nor a relative or employee of such attorney or counsel, nor do I have any interest, financial or otherwise, in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 6th day of March, 2024, at Lebanon, Wilson County, Tennessee.

April Daniel
April Daniel
License No. 141
Expires: June 30, 2024
Electronically Signed: 3/6/24

SIGNATURE PAGE/ERRATA SHEET

WITNESS:
DATE:
CASE REFERENCE:

After you have read your transcript, please note any errors, amendments or changes on this page. DO NOT mark on the transcript itself. Please sign and date this sheet as indicated below. If additional lines are required for corrections, attach additional sheets. If no corrections, please indicate "None."

| PAGE/LINE | ERROR/AMENDMENT | REASON FOR CHANGE |
|---|---|---|
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |
| _______ | ____________________ | _________________ |

I have read my transcript and subscribe to its accuracy, to include the corrections or amendments noted above or hereto attached.

__________________________
Signature of Witness Date

**A**

**a.m** 5:3,12,18
**ability** 34:14 60:15 113:13
**able** 10:18 22:3 35:13 44:15 50:15,22 89:4 89:24
**abort** 77:25
**ABS** 99:7,9,13 99:19,19,22,24 100:5
**Absolutely** 59:12 61:23 78:2 83:12
**accident** 13:16 13:17,18,19 14:3 22:2,6,14 22:15,17,23 23:6,6 24:12 24:25 25:3 26:8,11,17,22 27:5,9,10,18 28:10 32:3 38:14 50:7 54:1 60:13 62:15 67:12 68:1 69:8 71:3 75:18 81:16 87:17 88:10 101:15 110:21 110:25
**accidents** 45:22
**account** 87:22
**accredited** 36:4
**accuracy** 114:20
**accurate** 19:11 19:17 20:6,9,9 20:15 65:15 89:12
**achieve** 36:18 50:16 62:11,17
**acknowledged** 57:6
**ACM** 50:12 51:7 56:8 60:6,17 60:19
**act** 90:20
**ACTAR** 36:2,3
**action** 1:7 96:2 96:17 105:6 113:18
**activated** 29:23 30:7 64:16,18 64:19
**active** 37:17
**actual** 36:17 56:15
**add** 91:18
**additional** 9:24 74:14 109:25 114:5,6
**address** 23:14 109:16
**addressed** 110:4
**addresses** 69:5
**adequate** 43:21 44:4,18
**affect** 35:17
**affirmative** 7:12 36:1
**affixed** 113:19
**ago** 6:14 34:11 41:6
**agree** 22:22 23:21 24:10,19 27:9,14 28:2 30:23 31:13 38:25 43:6,10 48:15 65:13 69:20 70:2,12 75:19 77:8,12 77:14,22 82:23 83:17 91:12 92:3,23 97:7 97:12 101:18 102:6 104:11 104:17 110:24
**agreed** 4:11
**agreement** 7:24
**agrees** 57:2
**ahead** 52:8 67:5 72:21 74:8,10 75:6 80:9 85:16 87:23 104:5,7
**air** 34:5,7 102:23
**al** 1:11 53:11
**Alabama** 1:1 2:7 5:10 26:12 31:25 52:3 53:20 54:19 83:24 84:6
**alert** 91:21
**ALFA** 1:11
**allowed** 40:24
**amendments** 114:4,20
**amount** 63:14 66:2 70:19
**analysis** 9:1 14:10 49:17,17 49:19 55:21 92:11 97:23
**analyze** 25:3,22
**and/or** 1:9 22:6 80:10
**Andy** 55:9,9
**anger** 54:13
**angle** 24:1
**angular** 35:2
**animation** 21:21 21:22,24 22:7 22:8
**answer** 8:9,9,12 39:4 40:3 63:10 66:18 68:5,6 69:19 71:12,24 78:17 81:8,10 82:11 82:12 83:3,9 84:3 85:24 96:9 107:20
**answered** 40:2 79:14 84:15 85:15,23 86:13 86:23 88:13 96:6,10 97:19 104:13
**answering** 96:10
**anticipate** 76:19
**appear** 19:17 20:14 28:24 69:21 111:1
**appears** 10:11 24:14 29:4 52:24 100:15
**appreciate** 58:10 69:22 75:1 76:21 91:24 94:24 96:5 105:12,16 106:18 108:2
**appreciated** 75:25 92:12 93:15,18,19 94:4 95:1,3,25 96:12,15
**appreciates** 107:22
**appreciating** 102:9
**appreciation** 75:18,19 90:1
**appropriate** 20:6,15 71:9 84:12
**approximately** 85:1,3 93:20
**April** 1:22 4:11 113:4,23,23
**arbitration** 52:9 52:10,11
**area** 25:11 38:24 39:13 98:5 99:5 101:16,17 102:2,4
**argument** 63:17 65:14,15
**articulated** 16:23
**asked** 6:10 13:24 18:5,14 22:12,17 40:2 49:15 65:5 67:4 72:1,20 79:13,18 81:5 85:6,15,23 86:13,23,25 87:16 88:13 96:6 97:19 104:13
**asking** 68:17,18 78:19 79:4 92:19
**asks** 46:24
**aspect** 40:1 49:9
**associated** 69:6
**assume** 63:17 65:13,15
**assuming** 21:21 84:25
**assumption** 71:8
**Atlanta** 2:11
**attach** 114:6
**attached** 16:13 35:4 39:21 45:23 114:21
**attachments** 17:19
**attempt** 49:11 78:6 82:14
**attempted** 48:24 50:12 51:7 88:2
**attempting** 35:18
**attention** 35:20 66:21 80:11
**attorney** 6:19 41:12 113:15 113:16
**August** 7:13,25 8:2,4 33:22 37:23
**authored** 18:17 18:25
**authorized** 9:23

9:25 32:21
**Auto** 12:24
**automobile** 62:16
**available** 14:13 21:6 25:4 56:9 59:16 87:21 96:23
**average** 66:13 66:25 67:1 77:15 80:24
**avoid** 78:15 80:9 87:11 88:7,10 88:17,19
**avoidance** 75:18
**aware** 51:14 88:6 96:25 106:8 107:23 107:25
**awesome** 103:3 109:17
**awhile** 87:18
**axles** 101:7

**B**

**back** 10:20,25 15:21 18:6 20:18,19 21:16 24:20 25:10 32:8 37:13 40:15 50:20 56:4 57:13,13 57:24,25 66:14 75:17 77:25 78:22,24 86:9 86:25 88:4 91:11,19 100:2 103:4 110:20
**bad** 13:18 22:4
**Baldwin** 53:19
**Barbara** 6:15,20 8:1
**Barnett** 2:5
**based** 24:15 30:20 39:18 54:12 56:19 70:20 72:24 87:3 100:18 107:12
**basic** 36:13
**basically** 28:8
**basis** 16:18,21 43:20 98:3
**Bates** 111:3
**BC** 50:5
**beginning** 5:2
**begins** 100:3 106:13
**behalf** 1:17 4:3 41:25 42:4,12 45:16 46:13
**belief** 65:12
**believe** 9:24 12:4 20:22,25 28:13 29:11 61:25 63:19 70:16 75:10 78:13 79:22 80:12 82:3 84:5,11,14 94:20 95:6 101:5 103:15 104:18 105:5 105:24 106:2 106:14
**believed** 56:20
**Belt** 2:5,5 3:4 5:17,17,23 6:23 7:15 10:16,24 11:2 11:5 31:4,8 32:13,24 33:5 33:10 39:9 40:7,12,14,18 40:21 44:23 45:2 63:15 64:2,7,14 66:24 67:9 68:6,11,20 70:1 71:18 72:2,11 73:5 74:23 79:1,15 81:8,14 82:12 82:16,23 83:5 83:16,25 84:4 84:8,16,22 85:19 86:2,14 87:6 88:14 89:20,21 96:7 97:22 101:24 102:6,14,17,25 103:4,7 104:16 105:18 109:2,5 109:8,15,18 111:5,9,12,17
**Bendix** 19:22,22 20:5,13
**Bennett** 26:22 27:3,10,21 28:6
**best** 19:17 113:13
**better** 11:3 70:16
**beyond** 14:22
**big** 13:18 45:22 45:24 77:1 90:8
**bigger** 76:13
**bill** 7:10 11:23 11:24 12:21 109:11,16 111:14
**billable** 12:10
**billing** 12:1,13 21:16
**bills** 12:20,20
**Birmingham** 2:7,15
**bit** 18:21 29:12 70:3 78:22 95:9 105:11
**black** 100:24 101:2
**blank** 99:5 100:16
**Bloomberg** 8:7 8:18 9:3,10
**blow** 43:4,4
**blowout** 54:24
**board** 51:4
**bobtail** 35:4,6,7 35:18 45:8,17 45:23 76:4,5 77:3 80:25 81:11,21
**body** 26:16,18 26:20 27:4 39:1 68:21,24
**books** 108:21
**Bosch** 98:10
**bottom** 7:18 21:25 29:20,25 52:20,23 53:1 53:3,7 54:18
**box** 46:1 62:3 98:9
**Bradley** 2:14
**Bradshaw** 53:10 53:18,25
**brake** 19:23 29:22 30:5,6,7 30:23 35:11 64:4,16 79:3 88:9,9 97:8,9 97:17 99:7 102:9,11
**braked** 96:22
**brakes** 35:15 49:2 81:2 84:10 88:2,23 92:9,16 93:21 94:2 95:8,20 99:2
**braking** 29:2,20 30:3,8,13,16 30:25 31:1,12 31:14 35:7,10 60:20 61:9 62:11,12,18 63:1,3,18 64:18 65:1,18 66:4,7,11,15 79:12,21 80:10 80:15,19 87:10 94:18 95:17 96:17 98:4,11 101:17 102:4 102:15,18,20
**breadth** 46:5,7
**break** 11:7 40:9 102:23 103:1
**breaking** 30:20
**brief** 109:12
**Broad** 4:5
**brought** 41:7
**Bruner** 2:5
**bullet-pointed** 17:7
**bunch** 54:16
**buses** 46:1
**business** 9:17
**Byrd** 53:11

**C**

**C** 2:1
**calculate** 86:10 93:24
**calculated** 65:21 85:11,18,20 94:14
**calculation** 14:22 87:8,9 88:10,11,15
**calculations** 14:14,15,17,19 14:24,25 15:3 48:7,16 65:25 66:1 86:15 87:1
**calculator** 15:5 48:9
**call** 23:5 76:24 83:6
**called** 5:20 6:20 38:19
**calls** 67:3 82:18
**cam** 26:16,18,20 27:4
**capacity** 6:1,7

**captain** 54:1
**caption** 4:7 113:8
**car** 54:15 91:7 110:23
**Carden** 55:8,8
**careful** 35:10
**cars** 32:1 34:22 73:16
**case** 5:8 6:8,13 7:4,9 8:21 9:12 12:13 13:11,20 14:15 15:4,13 16:12,14 19:8 19:14,21 20:14 20:23 21:5 25:23,24,25 39:11 41:4,7 41:15 42:20 43:5 44:2 45:7 46:18 48:8,19 49:10 52:3,21 52:23 53:5,12 53:20,24 54:7 54:11,18,21 55:2,22 68:18 75:24 81:7 93:24 109:22 110:24 114:3
**cases** 15:16 20:10,21 42:8 42:19,22,25 43:2,13,18 45:12 46:5,6,9 46:12 52:1,15 52:16,16 53:16
**catch** 37:9
**categories** 46:25 46:25 47:1
**cause** 5:1 78:3 96:1
**causing** 101:7
**CDL** 34:2,3
**CDR** 98:4,8,10
**center** 54:25 104:9,23 105:4 107:10,17,24
**centered** 43:8
**central** 5:18
**certain** 47:12
**certainly** 39:19 78:1 87:25 88:22 97:4
**certificate** 4:8 36:2 113:1
**certified** 4:12 36:4
**CERTIFY** 113:6,14
**cetera** 4:8
**challenge** 41:1
**change** 6:8 57:23 59:2 70:5,8,8 74:13 77:16,24 82:24 83:13,18 84:8 89:22 90:12 94:13 95:23,24 114:7
**changed** 93:2 96:22
**changes** 70:14 76:4 80:25 114:4
**changing** 58:12 58:17 70:6,18 73:3,19 74:12 74:14 80:10 89:23,24 96:18 96:23 103:22
**characteristics** 35:18
**chart** 30:10
**checking** 59:21
**checklist** 48:6
**Chevrolet** 56:13
**Chevy** 23:15 50:13 56:9,18 59:11,16 62:10 62:11,17 63:19 64:3 65:9 86:20 102:2,3
**chip** 50:25
**choice** 9:14,15
**Christine** 53:10
**chron** 53:17
**chronologically** 111:8
**circumstances** 43:12
**civil** 1:7 4:6 16:6 22:21 45:13
**Class** 45:25
**classes** 36:11,23 38:12 108:12 108:14
**clear** 9:3 24:14 56:11 59:19
**clearly** 106:8
**client** 9:18 10:5 10:6 110:11
**client's** 9:15
**client-based** 9:17
**closed** 30:15
**closer** 98:20 102:12
**closing** 72:13 90:2
**cloud** 13:2,5 47:14
**clue** 76:13,18 77:1,6 78:3,22 91:3,20 92:6 94:22
**clues** 70:11 74:14
**code** 67:18 87:16
**cognitive** 72:14
**college** 36:7,18
**column** 51:23
**come** 15:21 17:11 18:2 20:18 40:15 50:21 65:7 73:17 76:25 77:24 78:24 79:23,24 81:13 88:5 93:3,12 97:15 103:4 104:9 106:14
**comes** 91:15 102:9 106:7,23
**coming** 21:7 60:5 70:12 74:15,18 78:3 78:23 80:1 92:5 93:12 103:19 104:23 104:24 105:4 105:12,14 106:19 107:1,2 107:16,23
**commercial** 33:15 34:13 45:25 46:2,4,6 46:10,11
**common** 81:20 87:24
**comp** 52:10
**company** 1:11 45:17 46:13,15 54:5
**compare** 78:5,7
**compensation** 21:4
**complete** 16:10 16:14,25 28:24
**completed** 4:14 13:7
**completely** 30:24 44:15 105:25
**component** 92:2
**compute** 62:24 63:1
**computed** 88:9 88:11
**computer** 13:3
**concept** 69:10 69:25 72:3,6
**conceptionally** 105:20
**concern** 78:3
**Concluded** 112:7
**conclusion** 82:19
**Conclusory** 109:19
**conditioning** 102:24
**confirm** 48:2
**confirms** 60:6
**connect** 50:17 50:22,24
**consider** 8:20 9:11
**considered** 17:3
**consistent** 27:14 28:9 72:15 99:13
**constitutes** 113:11
**consulting** 8:7 8:19,19 9:3,10 9:11
**contain** 16:9,14 16:21 18:8 22:23 39:22
**contained** 16:6 19:16 23:5 27:4
**contending** 80:14 87:25
**continued** 65:19
**continuous** 95:6
**contract** 8:6,14 8:15
**control** 19:6 48:24
**controls** 10:4
**conventional** 35:23
**conversation** 10:2
**Cookeville** 1:22 4:5
**copies** 22:2

**copy** 15:2 21:11 104:3
**corporate** 37:6 37:14,15
**Corporation** 1:9 1:10
**correct** 9:13 14:7,9,17,25 15:17 17:9,12 17:25 19:2,9 19:15 21:10,14 23:11,12,17 25:8,15 26:8,9 27:23 29:2,22 31:17 45:14 48:11,14 49:11 50:9,14,17 58:3,8 59:11 60:11 90:10 103:24 104:24 104:25 106:3 113:12
**corrections** 114:6,6,20
**correctly** 60:7
**counsel** 5:12 9:25 111:25 113:15,17
**country** 58:16
**County** 41:4 53:19 54:19 113:3,21
**couple** 12:3,6 34:21,21 89:18
**course** 34:10,12 38:21 93:8
**courses** 36:13 38:8,19,21
**coursework** 38:9 39:1
**court** 1:1,22 4:12 5:9,14 15:15,19 40:23 113:4
**covered** 30:5 97:21
**covering** 30:23 79:3
**covers** 80:12
**crash** 34:13,18 49:12 57:19 66:21 93:20 98:24 99:1
**crashes** 33:16 82:14,15
**crashing** 80:9
**create** 98:2
**created** 49:14 50:3,5,8
**creating** 13:2
**credit** 36:17
**creeping** 74:22
**critical** 23:25 92:2
**criticisms** 24:4
**cross** 106:13
**crossed** 54:25 107:25 108:1
**crosses** 106:16
**crossover** 32:4,8
**current** 12:12 21:1
**Currently** 12:11
**CV** 18:18,19,22 20:18 33:12

**D**

**d** 3:1 52:4 82:15
**d/b/a** 1:9
**Dalton** 2:14
**damage** 101:6
**damaged** 13:3
**danger** 82:17
**Daniel** 1:22 4:11 113:4,23,23
**DANNY** 1:6
**DAR** 1:10
**dark** 99:15
**Darling** 1:9 5:8 5:16 7:1,4 111:22
**Darling-D** 56:5
**data** 13:21 14:2 14:13,24 15:3 17:3 19:1,4,11 19:21 20:9 21:21 22:5 23:3 27:1 28:13 29:4,6,9 56:8,12 57:1 57:19 59:9,10 59:16,18 60:6 60:16,17,19 61:16 62:8 65:14 87:4 92:15 95:9 98:4,8,10 99:12 102:10 110:4
**date** 5:11 11:8 17:21 21:12 36:3 114:2,5 114:23
**Daubert** 41:1
**DAWSON** 1:4
**day** 26:17 58:15 58:15 81:23,25 96:3 113:20
**DCM** 20:13
**deal** 19:1 20:18 23:18 110:13
**deals** 29:1,20 68:25
**Deborah** 53:2
**deceleration** 66:2
**deem** 31:20
**defendant** 5:15 46:13 111:21
**defendant's** 112:1
**Defendants** 1:12 2:9
**Defendants'** 3:11
**defense** 9:25 46:15 52:5,6 52:13,14 111:21
**defensive** 73:12 93:7 107:3,13 107:18 108:4 108:10,15,20
**deficiencies** 8:24
**define** 31:24
**defined** 49:4
**defines** 31:25
**definitely** 88:24 106:17
**definition** 48:23 49:5
**degree** 36:7,12 36:14,24 37:2 37:25 38:3
**Delta** 50:23,23 50:24
**department** 37:6,16
**depend** 31:24 32:19 62:19 89:13
**depending** 43:15
**depends** 31:22 48:22 49:5 89:6
**depo** 51:22 111:15
**depose** 112:2
**deposition** 1:15 3:12 4:2,14 5:6 11:12 12:16 17:20,24 21:13 22:11 46:17 47:8 59:8,23 109:20 111:23 111:25
**depositions** 68:2
**described** 46:5 72:12 101:18
**describing** 27:11
**description** 12:20
**despite** 22:13
**detection** 68:14 68:25 72:12,13 72:13
**determination** 30:8 61:2 79:10
**determine** 14:24 26:4 66:2 92:12 97:15
**determining** 66:4
**development** 38:8
**dictate** 16:6
**diesel** 12:24 19:6 20:13
**differ** 35:7
**difference** 13:19 69:15 73:11 75:11 86:10 90:8,9,21 91:10,24,25 92:2,13 93:15
**different** 46:3 46:24 49:7 53:1 56:24 70:8 71:3 73:4 73:7,20 82:21 90:10 91:18
**Direct** 3:4 5:22
**directly** 76:25
**disagree** 70:7 101:15
**disallowed** 41:3
**discount** 73:15
**discuss** 68:13
**discussed** 38:20 112:4
**discussion** 21:19
**discussions** 26:21
**disprove** 49:9
**disputing** 30:13
**Disregard** 53:2
**disregarded**

107:20
**distance** 14:19 23:14 35:25 57:3 58:4 80:7 80:8 85:5,21 87:21 90:2 97:5 99:18
**distances** 75:9
**distinguished** 50:3
**District** 1:1,1 5:9,10
**Division** 1:2 5:10
**document** 7:21 7:23 8:2,4
**documentation** 51:8
**documents** 19:23 50:2,3,4 50:5
**Dodge** 54:23
**doing** 22:14,15 24:16 34:18 42:21 48:7 57:7,24 69:21 69:23 72:17 78:11 79:5 83:11 87:23 89:1 91:12 95:2 108:3,7 109:24
**download** 19:13 20:12 48:24 50:12,16 51:7 59:10,16
**Drew** 2:10 7:2,6 8:1
**drill** 103:9
**drinking** 40:9
**drive** 32:25 34:14 69:24 71:5
**driven** 33:24 34:4 35:3 91:14
**driver** 37:7 54:5 58:6,6,9 68:14 68:15,25 69:1 71:16,20 72:16 75:1 80:24 89:24 91:23 93:9,10 94:6,7 108:11,11,14
**driver's** 108:16
**drivers** 70:4,7
**driving** 33:6 34:6 35:6,7 54:12,23 58:16 59:1 67:1 70:9 70:19 72:25 73:9,12 76:14 80:11 81:21 87:24 93:6,7 96:2 107:3,14 107:18 108:5 108:10,15,20
**drop** 65:2
**dropped** 65:17
**dropping** 64:8
**duals** 101:5,6
**dudes** 55:10
**due** 43:20 44:4
**duly** 5:3,21 113:8
**dumped** 54:15 54:16
**dynamic** 27:9 28:10
**dynamics** 27:15

**E**

**E** 2:1,1 3:1
**earlier** 17:24 48:5 70:3 103:14 106:11
**easier** 74:2,20 75:3,11
**easiest** 80:23
**easily** 96:11
**East** 4:5
**eastern** 1:2 5:10
100:7
**Eckl** 2:10 7:2,6 8:1
**ECM** 20:4 28:14 28:16,20 29:4
**Ed** 53:21,22,23
**edge** 25:12
**education** 36:6
**eight** 30:2 79:23 79:23 80:14,15 84:23 85:6,9 86:6,8,21 87:12 88:1 94:13,16 95:1 95:3,13,23 103:16,19,21 105:2
**either** 42:6
**electronic** 19:1,3 19:6 27:25
**Electronically** 113:25
**Ellis** 53:21,22,23
**email** 109:15,16 111:14
**emergency** 73:13 93:8
**eminent** 75:20 76:1 91:23
**employee** 9:4,10 113:15,16
**employees** 6:25
**employer** 7:1
**encompass** 46:2
**encounter** 77:23
**ended** 22:15 42:1 44:16
**ender** 41:16 42:23 44:8
**enders** 41:22
**engineer** 37:25
**engines** 19:6
**entire** 47:4
**equate** 64:9
**equation** 42:9
**ERROR/AM...**
114:7
**errors** 114:4
**ESQUIRE** 2:5,9
**establish** 25:14 40:5 70:25
**established** 37:1 93:23
**establishes** 28:13
**estimates** 8:23
**et** 1:11 4:8 53:11
**evaluate** 8:20 9:12
**evasive** 105:6
**event** 8:24 19:19 28:8
**events** 113:18
**everybody** 40:15 48:24 110:24
**evidence** 23:8 25:4,6 27:25 100:20
**Ex** 112:6
**exact** 63:14 65:12 93:15 100:22
**exactly** 64:17 65:14 77:20
**Examination** 3:4 5:22
**example** 14:5,12 44:1 63:3,17
**examples** 44:5
**exceeding** 78:4 91:4
**excessive** 71:15
**excessively** 82:6
**excuse** 8:3 10:25 26:1 33:22 34:20 50:23 51:11 52:19 62:9 67:19
**executed** 7:25
**exhibit** 7:16,18 10:8,10 11:7
15:21,23 16:13 18:19 20:24 21:16,20 22:22 22:25 23:6 24:22 25:17 26:12 28:17 33:12 46:17 51:16 52:16 56:1,1 98:17 100:8 102:1 104:2 110:12 110:14 111:21
**exhibits** 3:9 17:20 18:8,10 18:12,13
**exist** 48:2
**existing** 51:2,3,4
**expect** 102:12 108:7
**expectation** 74:16 110:9,10
**expecting** 91:16
**experience** 19:10 39:18 69:23 70:18 71:2 72:25,25 73:9,15 80:25 93:4,6,6,7
**experienced** 94:6
**expert** 16:2,21 38:5,15 41:6 41:15,20,21 42:7 45:13 55:23 69:9 70:23 71:4 97:25 109:20 112:2
**expertise** 38:24
**experts** 41:11 67:7
**Expires** 113:24
**explain** 44:9 95:18
**explained** 95:19
**explanation**

98:9
**extensive** 72:25
**extent** 13:23 63:9,10 67:5 71:23 72:21 112:3
**eye** 26:21 27:20

**F**

**F** 4:4
**facet** 75:23
**fact** 7:17 17:23 41:12 44:17 91:18,25
**factor** 70:24
**factors** 38:3,5 38:10,11,13,15 38:16,19,21,24 39:2,13,20,20 44:25 55:21,23 66:22 67:7,8 67:14,22 69:3 69:9 70:21,23 72:9 78:11,19 92:14,20,22 93:1 94:5 97:21,24
**facts** 17:3 43:8 43:16 83:9
**factually** 89:12
**failed** 44:11 54:2
**failure** 44:6
**fair** 15:9,10 17:11,21,22 18:4 20:16 21:23 24:7,12 24:17 25:6 26:18 30:4 35:14,16 37:24 38:22 39:23 43:22 44:13 51:9 64:17 79:9 85:22 105:6
**fairness** 61:24
**fake** 10:18
**fall** 14:6
**fallen** 52:25
**familiar** 49:22 55:6 68:21,24 69:4,25 71:19 72:3,5,19 99:7
**far** 16:2 17:21 20:6,12 21:12 22:20 26:6 27:8,11 28:10 36:6 38:8 49:1 50:2 51:5 55:11 58:22 59:2 60:19,22 78:14 84:23 85:9,13 92:23 100:6 110:8
**Farnham** 2:10 7:2,6 8:1
**FARO** 50:10 51:6
**Faron** 52:3
**farther** 57:13,13 57:20,24,25 58:1
**fast** 29:6 62:8 65:9 70:17 74:17 77:2 89:6,13 94:1
**faster** 57:11,22 74:2 90:16 95:4,7
**fault** 43:9,15,19 44:3
**federal** 4:6 15:15,19 16:5 22:21
**feel** 9:20 71:4
**feet** 14:20 57:16 57:17 85:1,3 86:6 87:13 88:21 91:8,11 100:16,17,17 101:9,12,13 102:7
**fieldwork** 22:1,5
**figure** 64:15 73:18 78:6 90:12
**figures** 17:19 59:2
**figuring** 107:5
**file** 6:22 11:14 11:16 12:3 25:23 39:22 47:4,9,12,23 50:1 54:13
**filed** 111:24
**filled** 26:12
**financial** 113:17
**find** 44:3 87:9
**fine** 40:13 48:3 87:3
**fire** 53:25
**firm** 6:24 7:5 8:1
**firmly** 93:22
**first** 5:20 7:8 9:2 12:14,21 21:19 21:20 33:15 53:3,7,12 80:23 94:25 95:12 99:16 110:22 111:8,9
**fit** 26:4 59:10 99:12
**fitting** 26:6
**five** 10:17 20:22 20:25 24:11 40:12 61:10,13 61:15,17,18 62:1,3,5 63:6 63:18 64:21,24 65:1,16 66:4 71:19 72:4,15 72:19,23 85:19 92:17 95:2,5 95:15 96:11
**five-minute** 40:9 102:23 103:1
**flip** 109:5
**focused** 18:1
**focusing** 24:16 24:18
**fog** 25:11
**folder** 50:6
**following** 68:15 69:1 71:20 72:4,16
**follows** 5:4,21 111:8
**fool** 102:23
**foot** 30:22
**foregoing** 5:1 113:6,11
**forgot** 51:10
**form** 4:9 14:2,2 14:3 31:3 32:10,17 33:2 39:3 44:20 66:17 69:18 71:12 78:16 81:4 83:2,21 84:13,18 105:7
**formalities** 4:7
**formally** 111:21
**forming** 17:4
**forth** 113:7
**forward** 110:9
**four** 20:25 21:1 37:11 51:19 53:3,7 61:19 63:20 64:8 77:15 85:20 87:14
**frame** 61:14 64:19
**freeway** 88:24 92:4
**friction** 35:14
**fried** 51:4
**Friend** 1:5
**front** 7:17 20:23 21:17 26:11 28:16,16,18 43:3 44:10,15 45:4 46:20,21 58:12,17 70:6 70:9,10,14 73:2,23 74:21 74:22 75:13,19 76:4,17,20,25 80:1,17 81:1 86:8 89:1 90:15 91:1,2,8 91:8 94:22 96:1,16 97:1,6 103:23 104:3 105:13 106:8 106:22 107:2 108:3 110:13 110:23
**full** 11:8 36:4 37:5 95:5 102:15
**fully** 35:12 105:14
**fun** 54:14
**FURTHER** 113:14

**G**

**gas** 80:23
**gathered** 50:4
**general** 71:8 90:14
**generally** 68:19 68:21
**generated** 51:8
**Georgia** 2:11 36:10
**Geter** 1:10 5:16 27:21 28:5,6 30:3 32:6,12 32:14 59:23 76:11 89:4,7 89:23
**Geter's** 14:12 27:12 59:23 60:4 86:11
**getting** 10:21 34:14 42:1
**gigs** 47:24
**give** 18:16 20:21

30:7 33:13 38:15 39:20 40:23 42:2,5 42:17,19,20 43:1,4 44:1,4 60:14 80:4 81:12 90:12 95:21 98:1 100:9 109:1,13 109:15,22 111:13,16
**given** 40:24 51:19 95:5 108:25
**gives** 9:18 100:17
**giving** 68:2 70:10 80:11 93:14,16,17,23 93:25 97:10 101:25
**glasses** 111:6
**go** 12:12 18:21 20:19 21:15 24:20,25 46:4 47:22 67:5 72:16,21 74:8 74:10 75:6 76:24 77:2,25 81:10 85:15 89:4,10 97:3 104:1,5,7 112:5
**goes** 9:22 36:6 99:24 100:2
**going** 10:3,18 11:24 13:16 20:11 25:2,3 25:22 29:6 30:13,16,17 32:14 35:11,21 35:22,25 38:6 40:8,14 47:20 53:17 56:20 57:8,10,12,15 57:22 58:7,19 58:21 60:24 61:4,12,25 62:8 63:4,8,11 63:19 65:10,16 67:2 70:11,15 70:17 71:8,11 71:14,22 72:18 73:17,18,22,25 74:2,6,17 75:9 75:14 76:5,18 77:2,4 78:25 79:5 87:14 88:6 89:6,14 89:15,16,18 90:5,6,7,8,15 91:3,6,9,9,16 91:17 92:7,7 92:19 94:1,23 95:4,7,7,10,14 95:25 96:16 101:8,11 105:11,13,17 106:19 107:6 108:6,24 110:9 110:11 111:5 111:20
**Golly** 111:5
**good** 10:21 55:10 62:13 81:13 89:15 110:21
**Gosh** 6:14
**gotten** 21:5
**grain** 28:12
**granted** 105:10
**great** 26:7
**gree** 69:15
**Greenbush** 54:20
**Greg** 55:8,8
**Gs** 62:11,17 63:1 64:4,9 66:2
**guess** 11:24,24 16:4 19:22 21:8 28:4 39:15 40:14 87:7
**guy** 54:12 78:11 79:22 87:2,23 94:14 95:23 103:17 105:24 106:2 110:3
**guy's** 54:10 87:2
**guys** 10:12 11:3

**H**

**habit** 33:4
**half** 63:5 65:18 87:21 102:10 102:11
**Hall** 52:4
**hand** 14:19
**handling** 35:17
**hang** 7:10 48:22 85:2,2 90:11
**happen** 41:22 43:15,17,18 61:16 80:21
**happened** 42:17 83:5,6
**happens** 58:15 70:12 81:23,25 96:3
**hard** 54:14
**harder** 35:22
**hardware** 51:2,3 51:4
**hazard** 58:7,9 58:11,13,14 66:16 69:2,17 70:6 75:18,20 75:20 76:1 77:10,11 83:15 84:7 89:25 90:21,22 91:10 91:23 92:1 93:14 104:11 104:17 105:22 106:1,17
**hazardous** 72:17
**hazards** 82:22
**head** 26:24 31:25 32:8 36:21 72:10 76:13 87:19
**hear** 8:9 11:3 29:8
**heard** 5:2 8:12 69:10 109:21
**hearing** 4:10 10:13,15,17
**Heflin** 81:12
**helping** 37:9
**hereto** 113:16 114:21
**hereunto** 113:19
**hey** 78:23 90:12
**hide** 47:10
**high** 60:5 63:25 76:6 91:21
**high-value** 91:2
**higher** 46:8
**hired** 6:8,13,15 53:20 54:9,20 55:2
**hit** 86:9 89:9 97:8,9
**hits** 43:7
**hitting** 48:6 97:17
**hold** 38:4,14 52:22 69:8 97:24 109:5
**Honey** 2:9 5:15 21:11
**honor** 9:19
**hope** 66:19,20
**Hopefully** 11:2
**hour** 12:11 14:20 30:11,11 40:8 57:18 59:1 61:12,25 63:6,20 64:8 65:2,11,17 73:23 76:6,14 77:5 79:6 81:3 81:22 83:19 84:10,25 87:14 88:21 89:16 91:5,10,16 101:8,12 105:15 106:21
**hours** 36:17 89:19
**huge** 76:18
**Huh** 81:24
**human** 38:3,5 38:10,11,13,15 38:15,19,21,23 39:2,13,19,20 55:21,23 66:22 67:6,7,14,22 69:3,9 70:21 70:23,24 72:8 78:10,19 92:14 92:20,21 93:1 94:5 97:20,24
**humming** 77:5 106:20
**hundreds** 41:19 45:11 91:8,11
**hypothetical** 83:4,7,23
**hypothetically** 64:12
**hypotheticals** 44:22 91:20

**I**

**I-20** 81:11
**i.e** 35:4
**idea** 11:19,22 12:7,9 62:15
**illustrations** 49:14
**immediately** 82:25 106:24
**impact** 27:13 29:7,24 30:3 30:19 34:19 60:10,20 62:1 62:8 65:10,16 65:19,19 78:13

79:11,20 84:23 85:5,9,13 86:1 86:4,5,6,7,21 87:11 94:16 98:14,15 99:4 99:4,6,18 100:6,11,23 101:5,17,18 102:3,12,21
**important** 64:16 75:17
**impression** 41:10
**Improper** 44:6
**inaudible** 105:23 106:4
**incident** 29:3 78:12
**include** 16:18 17:3 23:4 48:16 114:20
**included** 48:18 50:6
**including** 18:16 46:1,1
**incoming** 25:23
**Incorporate** 7:1
**Incorporated** 5:8
**incorrect** 23:2 57:4 67:15 103:24
**incorrectly** 58:24
**index** 3:9 12:24 29:20
**indicate** 30:2 63:5 89:9 114:6
**indicated** 114:5
**Individually** 1:4 1:4,6,10
**information** 15:7 17:10 19:16 20:7,14 47:2 62:6 109:10
**ing** 37:25
**Ingredients** 1:9 5:8,16 7:1,5
**Ingredients'** 111:22
**injured** 52:17
**ins** 61:1
**inside** 31:19,20 102:18 105:21
**inspected** 49:3
**inspecting** 49:1
**inspection** 6:15 49:7
**instantaneously** 65:2
**INSURANCE** 1:11
**intend** 16:15 21:22 36:24 109:22
**intended** 22:9
**intending** 18:2 41:2 48:15
**intention** 109:24
**interest** 113:17
**interpret** 60:15
**interstate** 31:21 32:15,25 58:17 66:14 71:7,9 73:22 81:1 90:5 91:7
**interstates** 81:21 82:9,17
**interview** 27:3
**introduce** 5:13
**invalid** 59:15
**invalidates** 59:5 59:7
**investigation** 13:16,17 37:13
**investigator** 37:14,15 55:5 55:9
**invoice** 13:15 21:7,19 24:23 25:18
**invoices** 10:8,11 11:8,10,14 21:6 24:21
**involve** 46:9,11
**involved** 7:8 41:16 98:24 99:16
**involves** 45:21
**involving** 45:7
**irrelevant** 81:6 87:5
**issue** 23:20 39:2 75:24 103:9
**issues** 10:22 25:24,24 38:19 54:13 104:22
**items** 51:9

**J**

**jammed** 92:16 94:2
**jamming** 88:23
**January** 11:15 11:16 21:9
**Jessica** 2:16
**Johnson** 2:16
**Jr** 2:5 52:4
**judge** 41:7
**July** 24:23
**June** 37:22 113:24
**Junior** 53:11
**Jut** 80:20

**K**

**Kaylie** 1:4,5 27:11
**keep** 46:14 89:15
**keeping** 106:21 108:5
**Keith** 1:10 2:5 5:16,17 102:22 111:4
**kind** 48:4 66:22 68:3 70:3 88:3
**know** 9:21 10:12 10:13 11:23 14:19 15:24 17:19,21 19:17 20:6 25:19 30:18,19 31:4 31:14 32:6 33:12 39:16,17 43:3 44:25 45:1 46:20 47:7 49:3 51:1 56:13,17,17 57:7 61:1,20 63:4,13 64:1,1 64:7,13,17,25 65:4,8,9 66:8 69:23,24 75:15 77:4 78:11 79:3 81:9 83:11 84:19,20 85:10 87:18 93:5,6,9 94:25 95:1,2,18,20 96:21,23,24 97:9 99:22 100:8 103:24 106:6 108:5,12 110:11 111:7
**knowing** 93:5
**knowledge** 38:13
**Kyle** 26:22 27:10

**L**

**L** 2:9 4:1
**lack** 43:21 44:4
**lane** 27:12,12 28:7,7 31:16 31:18,18,19,20 31:20,21,23 32:2 44:11,16 70:5,8 73:23 74:1,1,1,15,25 75:1,3,8,9 76:7 76:15,16,23,23 76:24 77:9,10 77:11,24,25 80:2 82:24,24 83:11,18 84:9 84:9 88:3 89:22 90:11,20 90:25 92:5,5 93:12 94:12,13 94:17 95:24 98:21 104:9,10 104:24 105:4 105:21,21,22 105:25 106:5,7 106:14,21,23 107:17 108:1,2 108:20
**lanes** 24:2,9 58:12,17 70:6 70:14,18 73:3 73:20 74:12,13 74:14 76:4 77:16 80:10 81:1 89:23,24 93:3 96:18,22 96:23 103:22
**large** 38:25 47:23
**late** 67:22
**laterally** 75:12
**law** 4:4 7:5 8:1 83:24 84:6,15 84:21
**laws** 31:24
**lawyer** 6:24 7:2 55:2,4
**lawyers** 6:25 7:3 15:8 52:17
**lead** 71:20 72:5 72:17 99:4 102:21
**leading** 57:18 98:13
**leave** 37:3 40:14 99:3 100:3
**leaving** 99:25

**Lebanon** 113:20
**left** 27:12 28:7 31:15,18,20 37:23 76:7,15 77:10 82:24 83:11,18 84:9 92:5,9 94:17 98:21,23 99:1 101:15 102:2 103:2 104:10 105:13,19,22 106:6,17,18,21 107:23
**legal** 32:15 82:19
**legally** 82:2
**Lem** 53:11
**let's** 23:9 24:20 28:14 33:11 46:4 51:15 55:25 58:5 63:17 65:13,15 90:6,7 91:8 98:16 103:4 104:21
**letter** 7:24
**letting** 80:22
**License** 1:23 113:24
**licensed** 4:12 34:1 113:4
**life** 36:22
**light** 100:4
**lighting** 44:6 45:3
**lights** 49:3
**liked** 37:13
**limit** 71:14,15 71:16 78:4 82:5,7 91:4
**limiting** 45:24
**limits** 50:5 82:8
**line** 25:11,22 29:25 54:25 81:12 100:15 104:9,23 105:4 106:13,16 107:11,17,24
**lines** 100:13,14 114:6
**link** 47:5
**list** 6:21 17:14 18:16,23 20:19 20:21,23 21:1 51:18 107:12
**listed** 17:8 23:10 27:5 51:5 52:2 52:15 56:5
**listened** 41:7
**literature** 39:1 39:10,13,23,24 39:25 40:5 68:14,22,24 69:4 70:21 72:12
**litigation** 45:13
**little** 11:6 18:7 18:21 20:19 29:12 37:19 46:8 63:25,25 65:17 70:3 78:22 87:20 95:9 105:11
**LLC** 8:19 52:4
**loaded** 35:12
**located** 101:16 102:3,4
**location** 37:11
**lockup** 99:25
**log** 10:19,20,24 10:25
**logged** 29:3
**Logistics** 54:20
**long** 6:14 33:18 34:23 37:18 58:15 73:24 92:16 99:12
**longer** 69:22 73:18
**look** 6:10 7:16 10:7 12:21 15:23,23 18:18 25:19 28:15,17 30:9,14 32:1 33:11 38:7 43:11 46:17 51:16 55:25 57:22 75:17 88:4 95:11 96:20 98:16,17 99:17 100:4,13 104:1 109:2 110:14,21
**looked** 50:2 55:18 62:20,22 63:24 72:22
**looking** 17:13 30:17,18 50:1 58:10 100:7,19 102:1
**lookout** 106:22 108:6
**looks** 18:25 36:9 46:24 52:3,8
**looning** 69:11,12
**lost** 30:11
**lot** 34:4 40:9 44:7 46:2 87:17 88:22 95:10
**lots** 73:14
**low** 65:24

**M**

**Mack** 19:8,13 19:18 20:5,12 22:6 23:15,21 24:1,8,11 28:16 29:6,21 33:6 35:3,6 50:6,10 57:13 57:23 75:25 77:3 80:10 82:23 83:17 84:8,24 85:10 85:14,22 86:11 86:19
**madam** 5:4
**major** 36:23
**making** 28:4 44:6,9 45:3 57:14 58:1,24 59:13 92:1
**maneuver** 30:3 32:16 62:12 66:11,15 78:1 83:1,20 84:12
**maneuvers** 57:14 58:2
**manual** 108:16 108:16
**March** 1:18 4:3 5:2,11 11:24 11:25 113:20
**Marie** 53:10
**Marion** 54:19
**mark** 25:3,14,16 92:18 97:18 98:3,14,19,21 98:23 99:1,3,4 99:5,11,13,18 99:19 100:1,2 100:3,4,5,7,24 101:16 102:1,2 102:4,12,21 103:16 114:5
**marked** 51:23 112:6
**marks** 25:5,12 98:13 99:7,19 99:20 100:3,4 101:2,7,15 110:20
**Marschalk** 6:17 6:18,21 8:1
**Marsh** 55:5
**Marshan** 6:16
**material** 6:11
**materials** 14:6 14:11 17:7 25:23 26:15 47:21
**math** 48:7 64:12
**matter** 5:7 55:12 109:25
**max** 62:12,17 66:7,11,15
**maximum** 82:7
**McCort** 17:15 18:2 50:19,20 56:8 57:12 110:8 112:2
**McCort's** 6:5 14:6,11,16 23:20,25 24:7 24:19 28:5 57:22 58:25 103:20
**mean** 6:4 13:25 14:16 28:14,25 39:16 43:2 46:2 49:4 57:6 60:21 61:15 62:2 71:16 73:13 75:24 76:1 79:2 80:18 81:10 86:3 89:18 90:5 94:9,10 98:6 99:21 106:19
**Meaning** 9:14 16:25 17:18 43:13 45:22 97:23
**means** 19:4 30:5 30:6 35:20
**measurements** 55:12,13,15,16 55:17
**median** 32:4,8 32:15 33:1 83:1,20 84:11
**memorializing** 20:15
**mention** 51:10
**mentioned** 96:17,17,18
**method** 80:23
**Mike** 112:2

**miles** 14:20 30:10,11 57:18 58:25 61:12,25 63:6,20 64:8 65:2,11,17 69:24 73:22 76:6,14 77:4 79:6 81:3,22 83:19 84:10,25 87:13 88:21 91:5,10,16 101:8,11 105:15 106:20
**millions** 96:3
**mind** 109:14
**minimum** 82:1,2 82:4,8 100:17
**minute** 15:12,22 20:19 21:3 33:13 40:19 58:22 60:24 67:25 90:18 104:4
**minutes** 103:2
**misconstruing** 94:19
**misstates** 101:20
**misstating** 83:9
**model** 13:3,6,7 13:10 51:1
**models** 49:13
**modify** 59:9
**module** 20:5 48:24 50:13,25
**modules** 19:6,11
**moment** 10:25 93:15
**Monday** 5:2
**Montclair** 2:6
**month** 11:23
**months** 37:20
**morning** 40:10
**Mother** 1:5
**motor** 46:2,4 72:14
**motorcycles** 34:21
**move** 78:21 88:3 94:17 106:6,23 106:25,25
**moved** 24:9 33:19
**movement** 28:1 28:5 101:7
**movements** 14:12 20:16 23:21,25 24:8 24:10 86:19
**moves** 31:14 78:21,22
**moving** 27:12 74:25 75:9,12 76:22 79:25 80:2 82:16 90:19,20,20 104:10 105:10 105:12,19,21 105:22 106:17 106:18 107:4 107:22,22 108:20
**multiple** 47:1 50:11
**multitudes** 39:5
**MUTUAL** 1:11

**N**

**N** 1:22 2:1 3:1 4:1,11
**name** 5:24 6:21 42:20 53:21 54:10,22
**names** 42:19
**NAPARS** 34:10
**Nathan** 53:2
**nature** 42:24
**NE** 2:10
**necessarily** 29:16 47:16 61:15 72:10
**necessary** 8:20 9:11
**need** 9:20 40:4 48:16 59:17 75:15 77:6 86:17 89:19 92:8 111:18,19
**needed** 9:24 13:23 14:2 22:10 48:18 80:16
**needs** 83:14 87:20 88:5 94:23 105:16 106:7 108:2
**negative** 66:3 92:17 102:18
**neighborhood** 36:20
**Neon** 54:23
**never** 41:1 87:1 88:9,11 102:9
**new** 59:9,17
**nine** 63:18
**Nope** 62:23
**normal** 81:20
**Northern** 1:1 5:10
**note** 4:24 114:4
**noted** 114:21
**notes** 15:6 109:3 109:6
**notice** 3:11 46:17 83:14 94:21 111:23
**noticed** 8:14 23:13,19 26:15
**November** 33:23
**number** 5:8 18:7 23:14 32:19 42:2,5,17 56:21 62:14 65:3,12 77:20 78:18 80:7 85:11 99:15 110:2,3
**numbered** 47:1
**numbers** 46:14 63:24 87:2,2
**Numeral** 18:15 20:20
**numerous** 42:18 43:23

**O**

**O** 4:1
**oath** 5:3 103:13 113:9
**object** 31:3 32:10,17 33:2 39:3 44:20 63:8 66:17 67:2 68:4 69:18 71:11,22 72:18 74:6 78:16 81:4 82:10,18 83:2 83:21 84:13,18 101:20 102:16 105:7 108:24
**objecting** 74:9 83:8
**objection** 31:5 33:8 63:22 64:5,10 72:7 79:13 83:22 84:2 102:5
**objections** 3:11 4:8 111:22
**observe** 6:15
**observed** 60:4
**Obtain** 22:1
**obviously** 8:6 9:17 10:2,6 31:14 47:22 55:14 56:25,25 59:9,25 89:23
**occasions** 77:23
**occur** 32:3
**occurred** 60:20 93:20
**occurring** 30:8
**occurs** 76:17
**odds** 76:4 90:14
**offer** 16:15 18:3
**offhand** 111:4
**office** 4:4 47:6 47:11
**office's** 7:24
**officer** 37:4,17
**offices** 4:4
**oh** 52:25 53:1 85:1
**okay** 6:13 7:8,16 8:6,11,14 9:2 10:7,14,16,24 11:2,3,13 12:2 12:19 13:1,10 13:15 14:10,22 15:7,11,21 16:1,12,17 17:18,23 18:6 18:15,21 19:10 20:11,18 21:2 21:18 22:8,13 22:20 23:5,9 23:18,24 24:6 24:14,20 25:9 25:17 26:6,25 27:2,24 28:14 28:20,25 29:5 29:10,19 30:17 33:11 35:3 37:3,24 38:6 38:17,25 39:21 40:7 41:10,15 41:23 42:7,22 43:6 44:1,13 45:7 46:16,19 47:18,25 48:4 48:10 49:13 50:24 51:13,15 51:17,25 52:12 53:4,8,17 54:4 55:11 56:3 58:21 59:8,13 59:21,25 60:9 60:12,17,19 61:7,21,24

62:4,7,10 63:3 64:3,7 65:6 66:10 69:10 70:2,20 73:21 74:13 77:8,14 77:17,22 79:2 79:19 80:13 83:13 85:8 86:10 87:25 91:22 92:23 93:25 95:2,4 98:11,25 99:24 100:6 103:23 104:8,20 105:1 105:19 106:10 107:7 108:17 109:2,7,13 110:12,15,19 111:2,11,12
**Old** 53:5,8
**once** 11:20 20:4 60:19 76:20,24 83:13 90:11 96:21 104:19 105:12
**one-and-a-half** 68:9
**OneDrive** 47:14
**ones** 39:7,7 53:15,15
**online** 49:16
**operating** 45:17
**operations** 73:13 93:8
**opine** 92:21,24
**opinion** 16:14 23:13 31:9,10 40:22 44:14 56:4 57:3,10 58:22 59:14,22 60:3 65:7 66:10,23 67:8 69:3 71:5 73:4 78:19 79:8,11 79:19 80:5,7 81:12 84:1 92:14,20,22 93:2,14,16,17 94:5,6,6,7,15 94:17 95:16,21 95:22 96:4,20 96:21 97:10,15 97:21 98:1,1 99:12 100:10 100:11,22 101:25 104:20 107:9,11,15,19 108:18,22 109:22
**opinions** 6:5 14:2,4 16:10 16:17,19,22 17:4,11 18:9 22:18 23:11,13 24:15,19 38:16 39:12,20 40:5 42:25 43:1 48:17 54:4 65:8 71:23 93:1 112:3
**opportunity** 20:2 70:16 88:25
**opposed** 57:11 75:12 93:14
**option** 96:23
**options** 88:8
**order** 7:19 39:11 53:17 58:9 84:10 91:23
**orientation** 34:25 59:3 86:20
**original** 6:19
**originally** 6:10 6:14 9:21
**outcome** 113:18
**outside** 63:9 65:4 67:3 71:23,25 74:10 79:17 81:5 82:10 86:24
**owned** 45:17
**owner** 9:6,8

**P**

**P** 2:1,1 4:1
**P.C** 2:5
**p.m** 112:7
**page** 3:3 10:3 16:4 21:20 24:22 25:17 28:21 29:25 52:20 53:3,7 53:12 54:19 98:20 104:21 114:4
**PAGE/ERRA...** 114:1
**PAGE/LINE** 114:7
**pages** 17:8
**paid** 7:4,5 21:4
**paint** 25:10,12 25:14
**paper** 72:9
**papers** 39:6 68:13
**paragraph** 8:15 33:15
**paragraphs** 47:1
**parcel** 6:11
**parking** 34:4
**part** 6:11 12:14 27:18 44:14,17 44:21
**Partenheimer** 1:16 3:12 4:2 5:7,19,25 6:1 17:14 40:22 103:8 104:6 111:13,24
**Partenheimer's** 112:4
**partially** 105:14
**particular** 57:3 72:9
**particularly** 74:14 91:1,4
**parties** 113:15
**parts** 44:19
**party** 43:9 45:19 52:17
**pass** 76:8
**passing** 31:18,21 31:23 74:25 75:5 76:9,23 76:24
**pause** 40:15
**pavement** 25:12
**pay** 35:20
**paying** 66:20
**PC-Crash** 49:16 49:20,22
**Peachtree** 2:10
**peer** 39:1,22,24 39:25 40:5 68:13
**people** 6:20 32:1 43:3 54:16 58:17 67:14,22 70:8,16 71:5 73:19 108:6
**perceive** 70:5 75:11 92:18 97:8,17
**perceived** 92:24 92:25
**percent** 46:8,9 95:11,12,13
**percentage** 45:21 46:12
**perception** 67:20 68:9 69:5 74:20 93:22,23
**perception-re...** 66:25 67:11,15 67:21,24 68:8 87:15
**perfect** 107:8 111:11
**perfectly** 10:15
**perform** 86:15 87:7,9
**perimeter** 37:8
**period** 31:13 59:1 86:12 97:7,11
**person** 44:17 66:13 67:1 69:22 76:14 90:24 107:1
**personal** 69:23 70:18 71:1
**pertains** 101:14
**phonetic** 4:24
**photo** 98:20 110:23
**photogramme...** 55:19
**photographs** 22:1 25:13 98:19
**photos** 25:5 50:6 50:6,7 51:5,6 110:18
**physical** 100:20
**pick** 39:7
**picked** 62:3
**picture** 102:13 110:22
**pictures** 100:18
**pieces** 26:2,3,3,6 26:10 27:8,19 27:24
**place** 47:11 113:7
**plaintiff** 42:13 42:13,23 44:3 52:5,12,18 53:19 55:3
**plaintiff's** 52:21 52:23 53:5,12 53:16 54:7,17 111:23 112:2
**Plaintiffs** 1:7,17 2:4 4:3
**plaintiffs'** 3:11

111:25
**planning** 22:14 108:6
**please** 5:12,24 21:17 90:4 101:23 114:4,5 114:6
**plenty** 91:11
**plotted** 23:21,25
**plotting** 24:8,10
**plug** 7:11
**point** 6:9 10:17 13:2,5 18:13 23:19 28:4 29:17 31:15 32:18 36:12 37:1 56:19 58:2,24 61:10 61:12,15,17,17 61:18,19,19 62:1,3,5 63:6 63:16,18,18,20 64:8,21,23 65:1,16 66:3,4 70:22,25 74:19 77:11 81:15 85:5 86:1,4,5,7 87:4 88:8 90:2 91:22,22 92:1 92:10,17 94:9 94:20,21 98:14 99:3,4 100:6 100:11,22 101:18 102:3 102:12 105:1,3 105:5 108:9,22
**pointing** 57:7
**police** 37:4,16 37:17
**polled** 61:16 62:3 65:3
**portion** 9:7 28:25 43:19 100:7
**positioning** 24:2 24:9
**positive** 36:19
**possibility** 65:23
**possible** 63:21 69:5 93:13 102:14 104:22 105:6
**possibly** 72:17 110:7
**potentially** 58:13,14 64:1 70:15 78:25 88:6,7 89:2 94:23 98:11 105:17
**power** 51:4
**pre-impact** 63:4 98:12
**pre-incident** 30:19
**preliminary** 13:16 22:2
**premise** 108:10
**preparation** 11:11 68:18
**prepare** 12:16 67:4 78:24 79:2,2 80:17 103:15 106:15 108:19
**prepared** 1:21 8:7 71:17 79:25 80:20
**preparing** 80:3 80:4 104:22 105:5 107:9
**present** 2:14 5:12
**presenting** 75:20 104:11
**presents** 82:22 91:25
**preserving** 112:1
**pretty** 10:19 24:14 47:7,23 59:19 76:6
**prevent** 82:13 82:14
**previously** 107:20
**prior** 14:10 19:19 20:16 22:11 23:15 29:24 30:3 86:21 97:17 101:17,20 109:25 111:25
**private** 33:19
**PRO** 1:10
**probably** 7:18 21:8 29:12 41:19 46:8 64:6 76:6 103:1 108:15
**problems** 8:11
**Procedure** 4:6 16:6 22:22
**proceedings** 113:7,9,11,12
**proceeds** 5:4
**Process** 22:5
**procure** 21:20
**produce** 15:3 22:10
**produced** 17:15 17:21 22:21 47:12
**production** 62:16
**professional** 38:7
**proof** 11:8
**proper** 32:16 80:11 106:21 108:5
**properly** 8:20 9:12 43:21
**prove** 49:9
**provide** 8:19,23 8:25 9:11 15:8 22:2,11 47:4
**provided** 15:8
15:12,16 47:21 50:1,4 111:24
**provides** 74:14
**providing** 47:8
**prudent** 90:24
**psychology** 38:2
**public** 33:25
**publications** 18:17,23 19:1
**pull** 39:19 40:4 76:15 90:25
**pulled** 39:16 43:3 51:3
**pulling** 35:8 70:24 76:7 90:15
**pulls** 74:1 90:7,8 91:7
**purpose** 34:6 82:8
**purposes** 4:6
**pursuant** 29:5 29:19
**put** 11:11 24:3 27:19 37:10,13 43:24 50:25 57:2,12 91:20 95:8 111:6
**puts** 83:14
**puzzle** 26:2,3,5 26:7,10 27:8 27:19,19,25

**Q**

**qualifications** 18:16
**qualified** 41:8,9
**question** 38:7 61:8 68:23 81:13 83:16,17 85:4 90:18 96:10,11 105:8 107:8,21
**questions** 4:9 103:9 109:19
**quick** 18:18
28:15 109:6 110:14
**quickly** 111:20
**quite** 35:13
**quote** 56:15 78:14
**quoted** 56:14

**R**

**R** 2:1 52:4
**raise** 23:20
**ran** 87:1
**range** 62:19,20 63:14 77:19,21 87:15
**rate** 12:10 60:5
**raw** 22:5
**Rawls** 52:20,22 54:19
**re-ask** 85:7
**react** 58:4,6,7,9 80:17,18,20 89:2 91:12 92:25 97:8,17 108:4
**reacted** 92:19 93:22
**reacting** 87:23
**reaction** 68:10 69:5 74:20 93:22,24
**read** 8:16 9:3,9 12:18 59:23 60:7,21 69:7 114:4,20
**reading** 4:13 58:23,23 72:10
**real** 28:15 109:6 110:14
**reality** 57:18
**realize** 66:15
**really** 17:25 18:1 20:11 24:15 33:19 47:1,25 63:12 76:1 87:4

111:20
**rear** 27:13 35:9 35:24 41:16,22 42:1,4,23,24 44:8,12,16 66:22 97:5
**rear-en** 82:14
**rear-end** 82:14
**rear-ender** 42:8 44:2
**rear-ending** 42:14 43:14
**reason** 31:11 74:17 99:16,17 114:7
**reasonable** 90:24 97:16
**reasons** 16:18 16:22 43:23
**rebut** 22:18
**rebuttal** 6:3 14:1 18:3 23:7 23:8 63:9 65:8 110:7 112:3
**recall** 26:23 32:20 36:20 38:23 45:6,20 56:22 72:10 76:12 77:20 97:2 100:19
**received** 14:6 18:10 39:22
**receiving** 14:11 42:10
**recess** 11:1 40:20 103:6
**reckless** 84:1,16 84:20
**recognition** 90:21
**recognize** 27:2 56:7 90:23 91:24 92:3 93:13
**recognized** 94:1
**recognizing** 69:16
**recommend** 88:24
**recon** 68:10 93:3 94:5
**reconstruct** 13:22
**reconstruction** 13:18,19 14:3 22:2,6,14,15 22:17,23 23:4 23:6 26:8 38:12,14 69:8 71:3 78:20 87:18
**reconstructio...** 27:18 60:13 62:16
**reconstructions** 67:12 68:1
**record** 5:6,13 6:19 19:11 20:6,9 83:9 111:17,18,20 112:5
**recorded** 28:21
**recorder** 19:23 20:5,13
**recreate** 49:11
**redone** 59:17
**REFERENCE** 114:3
**regard** 8:14 9:2 12:19 15:11 20:12 26:10 35:6 36:2 38:17 51:15 52:2 56:4 58:5 58:6 59:22,22 62:7,10 68:12 70:4 74:24 77:8 78:5 80:13 89:22 94:15 103:14
**regular** 35:22
**regularity** 26:8
**regulations** 32:23
**relate** 73:14
**related** 39:2
**relates** 38:13 71:2
**relation** 22:17 69:7
**relationship** 23:14
**relationships** 57:3
**relative** 23:15 24:1,2,8 66:4 68:14,25 71:20 72:13 75:1,2 85:21 86:19 102:3 113:14 113:16
**releases** 99:25 100:1
**relevance** 68:4
**rely** 48:15
**remember** 6:19 26:22 34:22 53:14 54:10,11 55:4,4 56:23
**remove** 50:25
**rendition** 27:10 27:11 28:8
**repeat** 68:23 90:4 101:23
**rephrase** 75:14
**Reponses** 3:11
**report** 6:6 12:18 15:12,15,19 16:3,7,9,12,13 16:21,23 17:5 17:8,19 18:8 18:22 19:16,22 20:1,20 22:20 22:25 23:10,10 23:19,20 24:3 26:11 27:5,10 28:24 29:1 48:12,17 51:10 51:12 55:13 56:2,8,12,17 57:4 58:25 59:9 60:21 61:2 63:10 79:8 80:5 87:8 92:17 96:20 100:11 103:11 103:20,23,25 109:20 110:8 112:4
**reported** 113:10
**reporter** 4:12 5:4,14 113:4
**REPORTER'S** 113:1
**Reporters** 1:22 2:15
**reports** 68:2
**representation** 19:18
**representing** 41:24,24 45:18
**represents** 10:10
**request** 8:24
**require** 70:15 91:17 96:16
**required** 16:2 20:20 66:3 82:2 114:6
**requirement** 18:7 21:3
**requirements** 15:18 18:6
**requires** 60:13
**research** 12:22 12:23 97:15 109:25
**reserved** 4:9,15
**respect** 25:23
**respond** 12:8 43:21 44:4,18 67:5 70:4 72:21 80:8 83:15 101:21 104:14 105:8
**responds** 59:8
**response** 6:5 68:15 69:1 71:20 72:4,14 72:14 74:3 78:7,9 107:5
**responses** 96:19 111:22
**responsibility** 8:25
**rest** 26:5
**result** 50:18,19
**retained** 41:20 45:13 52:17
**review** 18:3 19:23 20:2 23:2,10 26:11 27:1 39:1,10 39:24,24,25 70:20 110:7
**reviewed** 13:21 14:13,16 17:11 17:14,18 19:14 26:16,16 39:23 40:5 59:25 68:13,13
**reviewing** 29:9
**revised** 9:1
**Rich's** 37:6,7
**Rickard** 55:5
**right** 5:5,24 8:22 11:6 14:5,6,8 17:2 21:2,15 23:16 24:20 27:12,20,22 28:7 31:15 32:3 33:13 37:20 40:8,16 43:13 44:18 45:3 47:13,20 48:17 50:8 51:13 52:24 54:17 55:11,25 55:25 57:5,8 58:7,11 59:13

60:1,9,21 61:15,22 63:7 66:1,24 67:25 68:12 73:25 74:22 76:2,16 76:23 77:9,11 77:21 80:5 82:24 83:18 84:9 85:2 87:3 87:14 88:15,21 89:3,8,8,22 90:9 92:5 94:18 97:2,3,4 98:12 102:15 103:8 104:8 105:2,20,21,25 106:5,15,17,18 108:1,8 109:19 112:2
**rights** 30:12
**rise** 90:12
**road** 2:6 25:15 54:24 73:1,10 76:3 77:3 106:20
**roads** 67:1 91:14 93:5
**roadway** 25:4,5 33:25 77:23 82:1 101:1
**roadways** 58:15
**Roberson** 4:4
**Rodney** 1:10 5:16
**Roman** 18:15 20:20
**room** 88:22
**roughly** 37:21 60:20 65:17,20 97:9,18 103:16
**routine** 47:7
**Roy** 52:4
**rule** 16:2
**Rules** 4:6 16:5 22:21
**ruling** 41:11
**run** 49:8,8 65:25 66:1 92:8
**running** 57:16 57:17,18 84:25 91:15 93:4 105:15
**rural** 81:1,21
**Rutherford** 41:4

**S**

**S** 2:1 4:1,1
**safe** 84:12
**sake** 63:17 65:14 65:15
**salt** 28:12
**sat** 72:22
**saw** 90:24
**saying** 27:17 28:6 30:14 38:18 44:9 49:7 56:16 57:2 59:14 60:3,17 67:23 74:24 75:7,7 75:10 79:24 87:1 88:19 89:7 90:19 91:6 93:11 94:3 97:2
**says** 8:2,4 9:9 12:21 13:1,15 16:17 17:2 18:7,15 21:25 21:25 25:2,22 29:11,13 33:14 56:16 65:20 76:9 79:8,22 98:9 103:25 104:1
**scale** 55:15
**scan** 13:7,13 22:5 50:10 55:14
**scanned** 13:5
**scans** 50:11
**scenario** 44:13
62:12 81:16 88:20
**scene** 13:12,13 13:14 25:13 51:6 54:1 55:16,17 100:20 110:21
**school** 37:3
**scope** 9:15,15,18 9:19 63:9 67:3 71:25 74:10 79:17 81:5 82:10 86:25
**scrub** 63:20
**second** 8:15 14:20 25:22 29:25 52:2,20 52:25 54:18 57:17,17 60:20 60:23 61:10,22 62:3,7 63:4,5 63:12,13 65:18 66:21 67:18,20 74:5,8,12 78:10,12 85:2 85:3 92:9 93:19,20 95:21 95:23 97:9,18 98:12,20 99:3 99:17 100:9 101:9,12,13 102:10,11,15 102:19 103:16 107:16 109:14 111:4,10,16
**seconds** 24:11 29:24 30:2,11 30:19,20,25 61:11,13,15,17 62:1 63:6,20 64:8 68:3,9 73:24 74:4 77:15 78:13 79:11,20,23,24 80:14,15 84:23 85:6,9,13,20
86:6,8,21 87:12 88:1 94:13,16 95:1 95:3,3,5,12,13 95:15 103:19 103:21 105:2 109:9 110:14
**section** 65:4 67:19 81:1
**sector** 33:19
**security** 37:6,8 37:10,10,14,15
**see** 7:21 10:24 16:19 21:24 24:23 25:4 28:23 29:19,21 29:23,25 36:3 38:9,20 40:19 47:2 48:1,4,6 55:13 56:5 58:4,5 61:4 63:12 65:8 76:15,17 79:8 81:11 88:25 89:24 91:12 98:9,20 100:10 104:1 106:22 106:24 107:4
**seeing** 69:16 87:22
**seek** 39:25
**seeking** 47:2
**seen** 13:14 46:22 69:7 73:16 77:18,19 78:1
**sees** 88:2
**segue** 107:8
**seminar-type** 38:8
**send** 26:2 111:14
**sense** 71:4
**senses** 99:24
**sent** 8:5 48:23
**sentence** 8:16 9:2
**separate** 26:21
**September** 12:21
**sequences** 19:19
**service** 29:22
**services** 8:19,25 9:11
**set** 113:7
**setup** 49:8
**seven** 85:13,19 91:10
**ShareFile** 47:5
**Shaw** 2:9 5:15 5:15 6:17 7:12 31:3,5 32:10 32:17 33:2,8 39:3 40:2,11 40:17 44:20 63:8,22 64:5 64:10 66:17 67:2 68:4,17 69:18 71:11,22 72:7,18 74:6,9 78:16 79:13 81:4 82:10,18 83:2,8,21 84:2 84:13,18 85:15 85:23 86:13,23 88:13 89:15 96:6 97:19 101:20 102:5 102:16,22 103:3 104:13 105:7 108:24 109:12 111:3,7 111:11,19
**she'd** 95:15
**sheet** 114:1,5
**sheets** 114:6
**Shipes** 53:2,2,8
**shoplifters** 37:9
**short** 99:11
**shorthand** 113:10
**shortly** 21:8
**show** 60:22

86:19 92:15
**showed** 25:13 98:4
**showing** 11:14 25:5 64:24
**shown** 27:4
**shows** 30:10 60:19
**side** 34:19,24 41:25 45:13 98:21 105:20
**sides** 42:8 45:15
**sign** 8:5 32:20 32:22 114:5
**signal** 10:21
**signature** 113:20 114:1 114:23
**Signed** 113:25
**significantly** 73:17,19 82:21 95:14
**signing** 4:14
**signs** 32:20
**similar** 19:7 20:4
**simple** 10:19
**simulation** 57:11,25 59:3 59:5,7,15 79:10 86:18
**simulations** 49:14 57:23
**sir** 5:24 10:9 11:9 13:21 21:17 23:1 24:7 61:24 79:9 81:15
**sit** 14:18 32:1 41:12
**site** 24:25 25:3 50:7
**sitting** 15:6 104:3
**situation** 9:22 78:8 80:25
**situations** 43:2
**six** 52:7 77:15 85:19 96:11
**skid** 99:3 100:3
**skip** 98:14 99:20 100:13,14,15
**slam** 92:9
**slammed** 88:1
**slap** 70:9
**slow** 58:20 60:9 74:25 82:16,25 83:18 84:10 97:5
**slowed** 28:7 88:16,19 95:4 95:8
**slower** 58:19 73:17,19 76:5 76:18 78:25 79:25 88:6 90:1 91:3,17 92:7 94:23 95:10,14 105:17 107:2
**slowing** 27:13 27:16 30:22 32:7 35:21 60:6 80:22 87:22 96:18
**slows** 81:2
**small** 9:7
**software** 49:17 49:19
**sole** 8:25
**solely** 39:2
**SOLUTIONS** 1:10
**somebody** 43:3 44:10 58:12 91:7
**something's** 94:22
**Somewhat** 95:10
**soon** 76:22 89:17 104:23
105:14 106:13
**sorry** 8:12 11:20 12:8 13:17 22:3 53:1 62:25 74:8 75:6 84:20 98:7
**sort** 38:2 39:10 48:4,6 49:13 49:16,17 67:10 79:10 86:18 87:9 92:11 96:2,17 97:14
**sought** 40:23
**sound** 44:22
**sounds** 17:25 72:8 97:20
**sources** 12:22,23 20:14 108:9
**space** 100:16
**spacing** 86:11
**speaking** 29:7
**specialist** 13:2,6
**specialize** 33:14 33:15
**specialized** 36:10
**specific** 42:5 43:1,5 46:14 56:22
**specifically** 14:16,18 18:23 19:5 26:23 34:22 45:20 47:21 62:20 108:12
**speculation** 67:3 74:10 82:19
**speed** 14:11 24:1 24:9 30:17,18 30:21 56:13,16 56:17,18 59:1 60:5 62:2 66:14 71:10,14 71:15,16 75:5 78:4 82:1,2,4,7
82:8 88:16 90:22 91:4,24 91:25 92:2
**speeding** 74:15 76:3
**speeds** 19:18 28:1 29:1 75:15,15 82:21 92:13 93:16
**spellings** 4:24
**spend** 36:9
**spent** 12:5
**spot** 47:16
**stack** 7:17 10:8
**stages** 71:19 72:4,11,15,19 72:23
**stamp** 111:3
**standard** 67:10 67:14 68:3 96:2
**standpoint** 93:3 93:4
**start** 11:25 39:15 56:3 61:9 101:7 104:22 105:5 106:23,25,25 107:4,5,11
**started** 37:7,22 63:3,18 65:1 79:12,21,23 80:1,3,15 87:10 94:13,16 94:18 95:17,24 103:15,21 104:10
**starting** 79:24 107:10
**starts** 8:16 77:24 78:21 88:3,5 93:11 102:18 104:24 105:10 105:12,14,19 106:6 107:16 108:20
**state** 4:12 26:13 27:2 31:22,23 36:10 52:11 81:12 113:2,5
**stated** 66:6
**statement** 15:9 15:10 16:10,14 18:4,11 21:3,9 21:23 24:7,17 25:6 30:4 33:16,18 35:14 35:16 37:24 38:10,22 39:24 43:22 51:9 60:1,4,13,14 64:17 79:9 85:22 105:6
**States** 1:1 5:9
**Stats** 12:24
**stay** 90:17 104:4
**steering** 24:1
**stenographica...** 113:10
**step** 24:6
**stop** 35:19,22,25 54:2 87:20,21 88:2 100:2
**stopped** 88:20
**stopping** 88:23
**store** 37:6,8
**Street** 2:10 4:5
**strictly** 38:21,23
**strike** 42:10 44:12 53:15 66:13 78:6 92:10
**striking** 42:9,13 43:9,14,19 44:2
**strip** 34:5,7
**struck** 40:23
**student** 36:11,13
**studies** 70:21,24
**study** 21:4 97:14
**stuff** 10:19 47:14 49:4

**subject** 13:8
**subscribe** 114:20
**suffered** 41:1
**sufficient** 80:6,8 97:4
**Suite** 2:6,11
**summarize** 18:9
**summary** 16:1
**supervisor** 37:12,13
**support** 18:9 39:11 107:15 107:19 108:9 108:18,22
**supports** 57:19
**supposed** 16:18 17:2 20:21 81:10
**sure** 11:25 14:17 16:3 31:25 40:11,17 48:5 57:9 59:13 64:25 68:10 95:7 99:10 103:11,12,18 104:21 105:3 106:12
**surmise** 31:11
**surprised** 110:4
**SW1** 29:20,22
**swear** 4:13 5:14
**switch** 30:6,7,14 30:15
**sworn** 5:3,21 113:9
**syncs** 47:16
**system** 99:22,24 100:1

**T**

**T** 2:5 4:1,1
**tagged** 54:25 55:1
**take** 7:16 10:7 11:6 15:23 18:18 24:21 25:19 28:11,15 28:17 33:11 35:25 40:8,12 46:16 51:16 55:12,16,16,25 69:22 87:14 96:1,16,20 98:16,16 102:22 103:1 105:11
**taken** 1:17 4:3 11:1 38:9 40:20 103:6 113:7
**takes** 74:7,12 77:14
**talk** 19:3 47:25 58:21 65:5 67:13,25
**talked** 9:21 21:6 48:5 56:23,24 70:3 103:10 109:21 110:13
**talking** 11:7 25:24 27:15,17 31:22 56:16 64:12 73:1,2,9 76:2 80:19,19 80:20 94:11 101:1
**Tammy** 52:19 52:20 54:22,23 54:23,23
**task** 80:11 87:24 96:2
**teach** 108:5
**techniques** 107:3,14,18 108:10
**tell** 7:7 10:10 19:4 28:17,22 40:7 58:23 61:5,5 65:22 67:7 71:1 72:23 73:6 110:10,16
**telling** 61:1
**tells** 73:10
**ten** 18:17 24:11 73:24 74:4 100:16
**tenants** 108:4
**tender** 111:21
**Tennessee** 4:5 4:13 41:5 113:2,5,21
**term** 19:3 22:23 75:21
**terrible** 10:12
**test** 62:13
**tested** 63:23 66:9
**testified** 5:21 20:22 42:12 46:6 72:19,24 89:7
**testify** 41:14 52:5 67:4 72:20 81:5 82:11 113:9
**testifying** 6:2 41:25 42:3,22 45:16
**testimony** 21:4 51:15,18,21 56:20 60:7 73:21 76:11 89:12 101:21
**testing** 34:13,18 48:19,23,25 49:5,5,7 67:21
**tests** 49:8,9
**Texas** 31:23 52:11
**text** 108:13
**textbooks** 39:1
**Thank** 40:19 109:4 111:11
**theirs** 9:4
**thereof** 113:8
**therewith** 69:6
**thing** 13:13 14:18,21 39:17 54:15 78:9 96:25 110:12 111:19
**things** 9:20 12:25 24:18 25:14 34:11 39:17 43:4 46:3 47:10 48:1,2 55:18 69:21 75:22 93:9
**think** 5:18 6:11 12:12 15:2 29:14 34:21 39:7 43:24,24 44:5 47:24 49:6 53:25 54:22 56:14 64:3 65:24 70:7 71:13 74:19 75:20 81:20 83:24 88:18 97:21 98:25 99:11,16 102:25 104:21 106:10 107:7 108:25 109:3,8
**thinking** 107:1
**third** 8:16 24:22 45:4 53:11,18 54:15,18 56:4
**thorough** 16:25
**thought** 54:13 59:19 106:11
**thousands** 41:19
**three** 18:7,25 23:10,14 27:20 37:11,20 52:20 52:22 54:8 58:22 59:14 61:19 85:20 95:6,12
**three-quarters** 67:17,19,20,20
**throttle** 95:11 95:13,15
**time** 5:11,13,18 6:9 11:14,15 11:18,22,23 12:5 21:13,22 22:13 25:6 29:6 31:13 32:2 34:23 36:9,22 37:5,5 40:16 41:14,22 43:21 44:4,18 58:3 59:1 61:14 63:14 64:19 66:25 67:11,15,24 68:8 69:22 70:13 71:20 73:18,25 74:3 80:6,8 82:20 85:1 86:12 87:20 89:8 91:11 92:12 93:25 94:10 95:20 97:4,8 97:10,11,16 102:20 103:5,5 105:1,3,5,11 111:14 113:7
**times** 9:19 41:23 41:25 42:3,16 42:18 45:10,15 45:18 66:3 68:15 69:1,5 80:24 95:18,19 96:3,11,14
**tire** 98:3 107:16 110:20
**tired** 96:9
**title** 38:20
**today** 6:2,25 12:17 72:20 103:13 109:21 112:4
**Today's** 5:11
**told** 46:15 96:9

**Tommy** 52:19
**tons** 81:25
**top** 26:23 31:25 36:21 53:11,14 53:18 54:3 72:10 87:19 110:22
**topic** 15:22
**totality** 9:22 25:25 43:11
**totally** 51:1 104:8
**touch** 21:2 40:18
**Town** 53:5,8
**track** 23:9
**tracking** 28:5
**tracks** 28:1
**tractor** 33:7 35:3,6,18 76:4 76:5 77:3 80:10 90:13
**tractor-trailer** 34:15,20 54:2 54:5,24 55:1 74:12 90:14,15 90:25 92:4
**tractors** 45:22 45:25
**traditional-type** 36:12
**traffic** 80:9,17 87:23 106:22
**trailer** 34:16,20 35:1,4,8,11,12 45:23 90:13
**trailers** 45:25
**training** 34:8,9 39:18 72:24 73:6,10,12,12 73:13,14 93:7 93:8,9,10 94:6 108:11,11,14 108:21
**transcript** 113:6 113:11,12 114:4,5,20
**travel** 24:2
**traveling** 71:7,9 82:4,6,21 90:1
**Traverse** 50:13 56:9 62:10,11 62:17 63:19 64:3 65:9 86:20
**trial** 41:13,13 48:16 51:21,23 52:3,7 110:1
**trials** 51:24 52:1
**trigger** 28:21 29:11,13,15,16 29:17
**trolley** 53:5,8 54:12,14
**trooper** 26:13 26:17 27:3
**troopers'** 26:18
**truck** 12:24 13:8 13:12,13 14:12 19:8,18 20:5 20:12 23:21 24:1,8,11 27:12 29:6,21 33:7 45:8 49:2 49:3 50:6,10 51:6,6 55:14 57:14,24 58:1 75:25 76:8,10 76:15 77:9,15 77:15 78:15 80:25 82:24 83:17 84:8,24 85:10,14,22 86:9,12,19 88:2,5 89:3,6,8 89:14,23 90:1 90:6 91:1,3,15 91:16 92:13 93:2,11 94:16 97:1,5 100:24 101:2,4 103:21 104:8,23 105:3 105:20 106:13 107:10,22 108:19
**truck's** 20:16 107:16
**trucking** 45:16 46:13 52:4
**trucks** 45:22,24 46:1 81:11,21
**true** 9:12 15:16 17:16 18:11 19:14 21:9 22:15 27:6 28:14 30:20 31:16 33:16,18 38:10,11 58:18 58:19 60:10 61:21 66:7 70:22 88:11 89:5,10 90:3 90:23 91:12 93:16 95:17 96:8 113:12
**truth** 113:9
**try** 10:20 70:24 86:18 97:15
**trying** 57:1 63:16 64:15 78:14 106:11
**turn** 28:21 29:24 44:6,9 45:3 54:14 84:11
**turned** 44:11
**Turner** 1:4,4,5,6 5:7 24:16 27:11,21 57:10 60:4 78:5 79:12,20 80:8 85:10,14 86:11 90:6 92:12,24 98:2 104:11 111:12
**Turner's** 28:8 56:19 57:12 84:24 85:21
**Turners** 5:17
**turning** 83:12
**turns** 44:10
**twelve** 37:19,19
**two** 14:8 20:14 26:18,20 32:19 44:19 51:23,25 57:4 59:22 74:5 98:19 110:3,18
**type** 13:10 14:18 14:21 18:10 20:1 34:18 36:23,24 37:1 37:25 43:4 53:24 55:19 62:12 65:18 97:23 108:21
**types** 14:25 42:25
**typically** 52:18 70:4 99:19

**U**

**U** 4:1
**U-turn** 32:14 82:25 83:19
**U-turns** 33:1
**U.S** 82:9
**uh-huh** 7:12 36:1
**under-ride-type** 34:24
**understand** 15:18 16:4,7,9 17:13,23 21:5 22:9 23:24 24:4 30:9 38:18 49:18 50:18 70:17 72:16 90:17 101:14,22,25 103:11 105:16
**understanding** 6:3 8:17,18 11:9,11 17:17 27:7 50:21 56:21 57:9 100:14 103:18
**unit** 19:13
**United** 1:1 5:9
**University** 36:10
**unreasonable** 83:1,20,25 84:17
**unsafe** 83:1,20 84:1
**unsuccessful** 50:15
**unusual** 81:15
**up-to-date** 18:19
**use** 19:3 21:21 22:6 49:19 58:25 68:7 87:15
**usually** 69:24
**utilize** 67:11
**utilized** 42:7

**V**

**v** 50:23,23,24 52:4
**valid** 39:7 67:23
**validate** 39:25 60:15
**validated** 20:8
**various** 12:22 66:3
**vehicle** 13:3,5 28:6,6 29:1 33:15 35:23 42:1,4,9,9,14 43:7,7,14,19 44:2,15 46:10 55:1 57:13 62:20 66:14 68:15 69:1,16 70:5,9,10,14 71:8,13,21 72:5,5,12,17 73:2,3,13,23 73:25 74:3,4

74:11,13,16,18 74:21,25 75:2 75:2,3 76:17 76:18,22,25 77:1,4 78:21 78:24 80:1 84:24 85:21 86:7 88:8 89:1 90:19,22 92:6 92:13 93:8 94:1,3,8,9,10 94:11,12 97:2 97:3 98:23,25 101:8,11 105:16
**vehicles** 28:1 32:21 34:13 45:25 46:2,4,7 46:11 54:3 59:3 69:21 71:14,15 75:8 75:12 82:16,20
**velocities** 72:13
**velocity** 68:14 68:25 75:2,11
**verifying** 15:3
**versa** 47:19
**verse** 54:20 64:21 73:25
**versus** 5:7 53:8 53:11
**vice** 47:19
**video** 2:4 5:6 26:17,20 27:4
**Videographer** 2:14 5:5
**videos** 26:18
**videotaped** 3:12 111:23
**Vinlink** 12:24
**violation** 84:6 84:15
**Virginia** 67:18 87:17
**visual** 70:11 77:6 78:3
94:22
**VS** 1:8

**W**

**wade** 39:6
**wait** 61:8 92:9
**waived** 4:8
**walked** 75:6
**want** 16:3 21:15 37:22 40:8,12 41:10 48:1,5 57:9,16 77:2 81:6 83:6 103:9,10,12,18 106:11 107:12
**wanted** 37:2
**wanting** 41:2 92:20
**Wash** 52:19
**Washburn** 52:19,22,24 54:19
**wasn't** 18:14 22:12 49:15 54:22 78:11 83:16 85:4 98:4 100:20 106:9
**watching** 108:6
**water** 40:9
**Waters** 52:4
**way** 48:25 59:19 79:4,7 81:4,9 89:9 103:25 106:5 110:20 110:22
**ways** 47:11
**we'll** 10:2 15:21 18:21 20:18 21:2 23:18 39:15 40:19 65:8 67:25
**we're** 10:3,3,15 10:18,22 15:22 47:2 58:21 60:24 61:4 64:15 76:1 80:18,19 89:18 89:20,20 100:7 102:1 104:21
**we've** 20:22 27:20,20 40:7 89:16 97:13 103:10 109:21 112:4
**week** 7:14
**weeks** 12:3,6
**weight** 35:9,15 35:23
**went** 12:14 13:12 30:10 37:16 54:2 91:18,19
**weren't** 9:21 110:5
**west** 32:9 110:20
**wheel** 99:25 100:1
**wheeler** 32:16 32:19 33:24 34:7
**wheels** 35:9
**WHEREOF** 113:19
**whipped** 54:15
**William** 4:4
**Wilson** 113:3,21
**witness** 4:13,14 5:3,14,20 6:3 6:18 7:13 10:22 11:4 14:1 17:3 26:21 27:5 31:6 32:11,18 33:3,9 39:5 40:4,13 42:8 44:21,24 63:11 63:23 64:6,11 66:19 67:6 68:7 69:20 71:13,25 72:8 72:22 74:7,11 78:18 81:9 82:13,20 83:4 83:10,23 84:3 84:5,14,19 85:17,25 86:24 89:17 97:20 101:22 102:7 104:15 105:9 108:25 109:4,7 109:10,13,17 111:16 113:8 113:19 114:2 114:23
**witnesses** 27:20
**word** 56:23
**worded** 59:19
**wording** 56:22
**words** 10:17
**work** 9:14,16,24 10:4 21:8 36:24 39:11 40:1 45:21 51:2 52:12 54:8 55:11 109:25
**worked** 12:3 53:19
**workers'** 52:10
**working** 11:21 13:1 36:12 37:5 38:12 45:12 46:13
**works** 7:2 99:22
**world** 22:24 78:20
**worst-case** 88:20
**wouldn't** 41:13 55:23 70:4,24 106:1
**wound** 54:3
**wreck** 20:16 23:16 26:13 88:17,19
**written** 8:23 48:10,12 60:1 60:4 77:20
**wrong** 17:25
**www.cookevil...** 1:23

**X**

**X** 3:1

**Y**

**y'all** 10:13 40:8
**y'all's** 40:16 103:5
**yeah** 23:3 27:17 41:22 47:24 53:9,10 54:12 54:23 55:7 57:21 58:14 66:20 69:13,25 74:19 80:6 84:6 85:2,3,25 89:19 90:10,17 91:6,20 95:6 98:13 99:23 100:24 101:2 101:25 102:7,8 102:20,25 106:19 107:3 107:23 109:15
**year** 11:15,16 12:15 33:21 36:15 69:25
**years** 14:8 18:17 20:22,25 21:1 34:10 37:11,19 37:19 39:19 41:6 42:21 51:19 71:3
**Yep** 7:20 98:18 110:17
**yield** 44:7,11

**Z**

**zero** 43:24 62:5 65:20 92:17
**Zoom** 2:4 8:11 10:12 11:20

12:8 40:14

**0**

**1**

**1** 3:11 17:8 46:17 111:21 112:6
**1.0** 64:21,24
**1.14** 64:4,9
**1.5** 68:3 87:15
**1:02** 5:12
**1:22-CV-0075...** 1:8 5:9
**1:30** 103:5
**10** 63:6,20 64:8 65:2,17 100:14
**10:00** 5:3
**10:02** 5:18
**101** 93:10
**11** 110:14,22 111:4
**11/30/2023** 25:18
**11:00** 40:16
**112** 3:12 57:17 101:10
**12** 26:12
**12:00** 40:16
**12:30** 103:4
**12:41** 112:7
**13** 10:8,10 11:7 15:21 21:16,20 24:22 25:17
**14** 7:16
**141** 1:23 113:24
**15** 36:20 41:5,5 103:2
**16** 41:5 95:13
**16th** 11:15,16
**17** 41:5 47:24
**1704** 56:5
**18** 32:16,19 33:24 34:7
**1987** 37:15
**1st** 11:24,25

**2**

**2** 15:23 17:8
**20** 36:20 46:24 47:1 110:14
**2002** 36:5
**2021** 12:21
**2023** 24:23
**2024** 1:18 4:3 5:2,11 113:20 113:24
**205** 2:7
**21** 7:14,25 8:2,4
**22-foot** 98:3
**250** 111:7,9
**257** 111:10
**27** 30:10
**27.3** 29:11,17

**3**

**3** 16:13 18:7 22:22,25 23:6 56:1,1
**3/6/24** 113:25
**30** 42:21 71:2,3 73:25 74:2 75:9 81:3,22 83:19 84:10 100:14,17 109:9 113:24
**300** 2:6
**303** 2:10
**30308** 2:11
**31st** 37:23
**32** 98:20
**320** 4:5
**350** 12:11
**3500** 2:11
**35213** 2:7
**375** 12:12,12,12
**3D** 13:2,7
**3rd** 7:13

**4**

**4** 1:18 4:3 5:2 18:15 20:24 51:16 52:16
**40** 30:11 82:3 90:8 100:17
**404** 2:12
**450** 87:14 88:21 88:21
**4th** 5:11

**5**

**5** 3:4 18:19 20:20 33:12
**500** 88:21
**528-3641** 1:24
**57** 65:20
**59** 65:20

**6**

**65** 57:11,15,15 57:16
**65-mile-per-h...** 56:18
**67** 30:10,18 61:12,25 63:5 63:19 65:11,16 101:11
**6th** 8:2,4 113:20

**7**

**70** 56:20 69:24 73:22 77:4 90:7 91:9
**70-mile-per-h...** 77:3
**70/30** 46:15
**77** 14:20 57:11 57:17,18 58:25 62:9,9 76:6,14 77:5 79:6 84:25 87:13 88:21 90:6,16 91:5,9,16 95:4 95:5,7,14 101:8 105:15 106:20
**79** 36:16

**8**

**8** 30:11,19,20,25 98:17 100:8 102:1
**8.25** 29:24
**80** 36:16
**80,000** 69:24
**85** 46:8,9
**87** 37:21,23
**880** 2:6
**885-6474** 2:12

**9**

**9** 28:17
**900** 85:1,3 86:6
**900-and-some...** 87:13
**903** 87:13
**931** 1:24
**933-1500** 2:7
**95** 57:16
**98** 101:13 102:7
**99** 33:23 37:21 37:23
**9th** 7:25 8:5