UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| KAYLIE TURNER et al., } | |
| } | |
| Plaintiffs, } | |
| } | |
| v. } | Case No.: 1:22-cv-00757-RDP |
| } | |
| DARLING INGREDIENTS INC. et al., } | |
| } | |
| Defendants. } | |

## MEMORANDUM OPINION

This case involves an accident between a tractor truck and an SUV on I-20 in Cleburne County, Alabama.[1] Plaintiffs Kaylie Turner, Danny Turner, and their minor child Dawson Turner contend that Defendant Rodney Keith Geter was responsible for the crash and that he and his employer, Darling Ingredients, Inc., are liable.

Before the court is Defendants' Motion in Limine to exclude Plaintiffs' Expert Michael McCort (Doc. # 77), Defendant Rodney Keith Geter's Motion for Partial Summary Judgment (Doc. # 79), Defendants' Motion in Limine to Exclude Testimony and Opinions from Dr. Richard Bowman, II (Doc. # 81), Defendants' Motion for Partial Summary Judgment (Doc. # 82), and Defendant Darling Ingredients Inc.'s Motion for Partial Summary Judgment (Doc. # 86). The parties have fully briefed the Motions (Docs. # 76, 80, 90, 93; 78, 83, 88; 84, 85, 87, 88; 89, 95; 91, 94). For the reasons explained below, Defendant Geter's Motion for Partial Summary Judgment (Doc. # 79) is due to be denied, Defendants' Motion for Partial Summary Judgment (Doc. # 82) is due to be granted, and Defendant Darling's Motion for Partial Summary Judgment (Doc. # 86) is due to be granted. Defendants' Motion in Limine to Exclude Plaintiffs' Expert

---

[1] Plaintiffs filed this case in the Circuit Court of Cleburne County, Alabama, and it was removed to this court based on diversity jurisdiction grounds after the Circuit Court granted a non-diverse defendant's Motion to Opt Out. (Doc. # 1 at 3).

Michael McCort (Doc. # 77), and Defendants' Motion in Limine to Exclude Testimony and Opinions from Dr. Richard Bowman, II (Doc. # 81) are each moot.

I.     **Factual Background**

The court has gleaned the facts set out in this opinion from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

This case involves a car crash on I-20, which is a four-lane, asphalt-paved interstate highway running east to west. (Doc. # 77-1 at 6). The crash happened in the eastbound direction of I-20 near mile marker 196.2 in Cleburne County, Alabama when the road condition was dry, it was daylight, and the weather was clear. (*Id.* at 1, 6).

On May 19, 2021, Defendant Rodney Geter was operating a 2016 Mack CXU 613 tractor without an attached trailer on I-20 while working for co-Defendant Darling Ingredients, Inc. ("Darling") (Docs. # 76-1 at 21-22; 80 ¶ 2; 90 at 3 ¶ 2, 7 ¶ 1; 77-2 at 2; 76-3 at 2). Geter is a CDL-licensed, professional truck driver with over twenty years of training and experience driving commercial vehicles. (Docs. # 76-1 at 13-14; 80 ¶ 1; 90 at 3 ¶ 1). Before he began driving that day, Geter performed a pre-trip inspection of his truck. (Docs. # 76-1 at 17; 80 ¶ 31; 90 at 6 ¶ 31). This inspection included checking truck belts, fluids, brakes, and lights. (*Id.*). Geter's truck was equipped with an electronic system, which tracked and recorded the truck's speed, accelerations, decelerations, and his GPS coordinates. (Docs. # 76-1 at 18-19; 80 ¶ 3; 90 at 3 ¶ 3). He logged into the electronic monitoring system before he left Darling's yard. (*Id.*). At the time of the accident,

Geter was not in violation of any hours-of-service regulations, was not texting while driving, and was not issued any traffic citations. (Docs. # 76-1 at 24, 50; 80 ¶ 30; 90 at 6 ¶ 30).

Leading up to the accident, Geter was on his way to assist another Darling driver whose truck had broken down on the interstate. (Docs. # 76-1 at 23; 80 ¶ 4; 90 at 3 ¶ 4). Geter was traveling westbound on I-20 when he spotted the disabled tractor and trailer across the interstate, on the eastbound side of I-20. (Docs. # 76-1 at 30; 80 ¶ 5; 90 at 3 ¶ 5). Geter continued westbound past the disabled truck, got off at the next exit, crossed over I-20, and got back on the interstate headed eastbound. (Docs. # 76-1 at 30-31; 80 ¶ 6; 90 at 3 ¶ 6). As Geter arrived back at the scene, he drove past the disabled truck before exiting onto the right shoulder of the interstate, leaving roughly one hundred yards of room behind him for the tow truck that was en route to tow the disabled tractor. (Docs. # 76-1 at 33; 80 ¶ 7; 90 at 3 ¶ 7). Geter put his truck in park, engaged the truck's emergency flashers, and placed his triangle safety cones on the ground near his truck. (Docs. # 76-1 at 33; 80 ¶ 8; 90 at 3 ¶ 8). When the tow truck arrived five minutes later, the tow truck driver mistakenly pulled up directly in front of Geter's tractor, incorrectly assuming it was Geter's tractor that needed towing. (Docs. # 76-1 at 33-34; 80 ¶ 9; 90 at 3 ¶ 9). After the tow truck driver realized his mistake, he asked Geter to either back around the disabled truck or get back onto the interstate to circle back so that Geter's tractor was no longer between the tow truck and the disabled tractor. (Docs. # 76-1 at 34; 80 ¶ 10; 90 at 3 ¶ 10).

Geter decided to reenter the interstate to head eastbound. (Docs. # 76-1 at 34; 80 ¶ 11; 90 at 3 ¶ 11). Geter testified that his intention was to take the next exit, enter I-20 westbound, and then exit to return eastbound to the scene of the disabled tractor. (Docs. # 76-1 at 34-35; 80 ¶ 11). Geter testified that he applied his blinker as he reentered I-20 from the shoulder. (Docs. # 76-1 at 39, 41-42; 80 ¶ 12; 90 at 3 ¶ 12). He further testified that he traveled in the right-hand lane for

3

approximately two seconds before moving into the left-hand lane to allow approaching traffic behind him in the right-hand lane to pass as he continued to gain speed. (*Id.*). Geter also testified that before changing lanes, he checked his truck mirrors to ensure he saw no approaching traffic in the left-hand lane. (Docs. # 76-1 at 39; 80 ¶ 13; 90 at 4 ¶ 13). Geter is aware of the importance of only changing lanes when it is safe to do so. (Docs. # 76-1 at 13; 80 ¶ 15; 90 at 4 ¶ 15).

At some point after changing lanes, Geter saw using his mirrors that Plaintiff Kaylie Turner's[2] SUV was quickly approaching behind him in the left lane at a high rate of speed, and that her car did not appear to be slowing. (Docs. # 76-1 at 36, 39; 80 ¶¶ 16-17; 90 at 4 ¶¶ 16-17). Geter later told Darling Ingredients' Safety Coordinator, Kim Law, that Geter thought Turner would go around him. (Docs. # 88-3 at 3, 14; 90 at 4 ¶ 13). Geter had previously testified in a deposition that he "never said that" because the traffic in the right lane made it impossible for him or Turner to merge into the right lane. (Docs. # 76-1 at 39; 90 at 8 ¶ 13).

Geter was unable to reenter the right lane because of a tractor trailer next to him. (Docs. # 76-1 at 36; 80 ¶ 18). Geter testified that although there was no vehicle in the left lane when he merged into the left lane, by the time of the accident there was a vehicle that his tractor approached within fifty yards. (Docs. # 76-1 at 41; 80 ¶ 18). Geter added that he has a "bar in front of the truck" that would detect how close the truck gets to vehicles and will disengage if the truck "comes within a hundred yards." (Doc. # 76-1 at 41). Turner testified that she did not recall any other vehicles in front of her when she was traveling in the left lane before the collision. (Docs. # 81-6 at 11; 90 at 4 ¶ 18).

After Geter merged into the left lane, and as Turner approached Geter's tractor, Geter tapped his brakes to illuminate his brake lights – a technique that Geter identified that helps avoid

---

[2] For brevity, in this opinion Plaintiff Kaylie Turner is referenced as "Turner."

4

getting rear-ended. (Docs. # 76-1 at 12-13, 36; 80 ¶ 19; 90 at 5 ¶ 19). Darling required drivers like Geter to complete monthly training, which includes training on how to avoid rear-end collisions. (Docs. # 85-3 at 13; 90 at 13 ¶ 38). Geter also testified that when he first saw Turner's car in his mirrors, she was about "five football fields behind him," and that about a "minute" elapsed between when he tapped his brakes to warn Turner and when she collided with him. (Docs. # 76-1 at 41; 90 at 3 ¶ 12; 93 ¶ 13). At some point, Turner rear-ended Geter's vehicle, forcing his truck onto the left-hand shoulder of the interstate. (Docs. # 76-1 at 42; 80 ¶ 20; 90 at 5 ¶ 20).

Turner testified that she was returning home after having lunch with her husband Danny Turner, and that her son Dawson Turner was in the car with her. (Docs. # 81-6 at 9; 90 at 7 ¶ 1; 93 at 4 ¶ 3). She was familiar with I-20, and testified that she travels on it "[a]bout every day." (Docs. # 81-6 at 9; 90 at 7 ¶ 3; 93 at 4 ¶ 3). Turner was driving a 2021 Chevrolet Traverse. (Docs. # 76-3 at 2; 90 at 7 ¶ 2). She testified that she was driving in the left-hand lane with the intent to pass two tractor trailers in the right-hand lane, and that she observed the front tractor yank over into her lane and immediately slam on his brakes, causing her to collide with him. (Docs. # 81-6 at 10; 90 at 7 ¶¶ 7-8; 93 at 4 ¶ 7; 88-10 at 3).

Turner's car had an Airbag Control Module that was used to download data on her Chevrolet's movements prior to the collision. (Doc. # 77-2 at 1). That data indicates that Turner was driving seventy-seven miles per hour during the five seconds prior to the crash and slowed to sixty-seven miles per hour a half second before the crash when she applied her service brake. (*Id.* at 3). The posted speed limit on I-20 at this location is seventy miles per hour. (Docs. # 81-6 at 11; 77-4 at 33; 88-6 at 5, 7; 88-7 at 20; 88-11 at 3).

Although Geter testified that he believed he was going fifty-five miles per hour when he was hit, he could not remember the slowest speed he traveled within ten seconds prior to impact. (Docs. # 76-1 at 40, 48; 80 ¶¶ 21, 24; 90 at 5 ¶ 24; 93 ¶ 21).

Plaintiffs' accident reconstruction expert, Michael McCort, downloaded the truck's Engine Control Module for the date of the collision and analyzed the data to evaluate the truck's movements prior to the crash. (Doc. # 76-3 at 9-10). This data indicates the following:

- Sixty seconds before the collision, Geter's truck was traveling at thirty-two miles per hour. (*Id.* at 10).
- Over the next thirty seconds, the truck increased its speed to sixty-seven miles per hour by applying 100% throttle. (*Id.*).
- About eight seconds before the collision, the truck's accelerator was reduced to 0%, and shortly after the service brake switched on. (*Id.*).
- The truck's speed then decreased from sixty-seven miles per hour to zero miles per hour six seconds before the collision, followed by an increase around the time of the collision to about twenty-seven miles per hour. (Docs. # 76-2 at 5-6; 76-3 at 16-17; 90 at 5 ¶ 21, 10 ¶ 29; 80 ¶ 22; 93 at 6 ¶ 29).

Plaintiffs' expert also analyzed data downloaded from two more systems on the truck. (Doc. # 76-3 at 11-12). The results of this data were consistent with the Engine Control Module data, except that they listed Geter's speed at thirty-one miles per hour roughly seven seconds pre-collision and did not indicate that Geter's speed ever reached zero miles per hour. (*Id.* at 12). This data also indicated that Geter was "inputting minor left steer" prior to the collision. (*Id.*). Defendants also hired an accident reconstructionist, Will Partenheimer, but he did not perform any simulations of the crash and instead relied upon Plaintiffs' expert's simulation. (Docs. # 88-6; 88-7 at 13; 90 at 12 ¶ 33; 93 at 6 ¶ 33).

Alabama State Trooper Russell Wright investigated the accident, and later opined that Geter was traveling "much, much slower than 55 miles an hour," guessing that the minimum speed on this portion of I-20 was about forty-five miles per hour. (Docs. # 88-4 at 25, 32; 90 at 9 ¶¶ 21, 24). Geter acknowledged that driving thirty miles per hour on the interstate is too slow if there is

6

no traffic or other condition causing such a slowdown. (Docs. # 76-1 at 47; 80 ¶ 23; 90 at 5 ¶ 23; 93 ¶ 23).

Plaintiffs' accident reconstruction expert opined that based on his simulation, Geter would have arrived at the median crossover at a speed of fifteen miles per hour if he had continued to slow at the same rate and had not been involved in a collision. (Docs. # 76-3 at 16; 90 at 10 ¶ 27, 13 ¶ 34; 93 at 6 ¶¶ 27, 34). Trooper Wright concluded similarly, noting that "to make a turn, you would have to come below [the minimum] speed" on I-20. (Docs. # 80 ¶ 26; 90 at 6 ¶ 26, 10 ¶ 26, 13 ¶ 35; 88-4 at 23-24, 31; 77-1 at 6). Turner also testified that "[i]t looked like he was trying to cut into the median." (Doc. # 81-6 at 11). Geter denied this, noting that it would be illegal and reckless for a tractor to turn left into the median of an interstate to make a U-turn, particularly when it would mean abruptly slowing down while knowing a car was approaching quickly. (Docs. # 76-1 at 46; 80 ¶¶ 27-29; 90 at 6 ¶¶ 27-29). The collision occurred roughly 125 feet from the median crossover. (Docs. # 76-3 at 15; 90 at 9 ¶ 20).

As part of Trooper Wright's post-collision investigation, he spoke with Turner and Danny Turner, interviewed eyewitness Kyle Bennett, photographed the Chevrolet and Mack, and photographed the roadway with markings. (Docs. # 88-4 at 4, 7-8; 90 at 8 ¶ 16). Trooper Wright testified that Kyle Bennett said, "he was a couple of vehicles behind the accident," and observed Geter's truck changing from the right to the left lane. (Docs. # 88-4 at 10; 90 at 8 ¶ 17; 93 at 5 ¶ 17). Trooper Wright also testified that Bennett recalled that, although he "wasn't a hundred percent sure," it appeared that the truck "had almost come to a full stop in the roadway" and "didn't have any four-way flashers or blinkers on." (Docs. # 88-4 at 10; 90 at 9 ¶ 18; 93 at 5 ¶ 18). Based on statements of Turner and another witness, but not on his own perception, Trooper Wright concluded that Geter improperly changed lanes, failed to use his turn signal, and failed to give

appropriate space for performing the action he appeared to be performing, which was abruptly stopping and "turning into the median." (Docs. # 88-4 at 23; 90 at 6 ¶ 30, 9 ¶ 19; 93 at 5 ¶ 19). Geter testified that the trooper at the accident scene told Geter that Turner "was drinking, texting on the phone because she was going absolutely too fast." (Docs. # 76-1 at 29; 93 at 5-6 ¶ 19).

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

**III.     Analysis**

Plaintiffs assert the following claims against Defendants: Count I (negligence, wantonness, and/or reckless conduct by Darling Ingredients, Inc.), Count II (negligent entrustment by Darling Ingredients, Inc.), Count III (negligence, wantonness, and/or reckless conduct by Rodney Keith Geter), Count IV (negligence per se by all Defendants), Count V (since dismissed), and Count VI (loss of consortium by all Defendants). Defendants' Motions for Summary Judgment do not address all counts, so the court addresses each Motion below.

> **A.     Defendant Geter's Motion for Partial Summary Judgment on Count III Claims of Wantonness and/or Reckless Conduct**

Alabama law defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3). "Wantonness is qualitatively different from 'negligence' and involves the conscious doing of some act or omission of some duty while knowing of the existing conditions <u>and</u> being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Armstrong v. Hill*, 290 So. 3d 411, 418 (Ala. 2019) (quoting in part *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (some internal quotations omitted) (emphasis in original)). "The actor's knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference; it need not be proved by direct evidence." *Hamme v. CSX Transp., Inc.*, 621 So. 2d 281, 283 (Ala. 1993) (quoted in *Hornady Truck Line, Inc. v. Meadows*, 847 So. 2d 908, 916 (Ala. 2002)). The Alabama Supreme Court has held that "while speed alone does not amount to wantonness, speed, coupled with other circumstances, may amount to wantonness." *Hicks v. Dunn*, 819 So. 2d 22, 24 (Ala. 2001) (citing *Knowles v. Poppell*, 545 So. 2d 40, 42 (Ala. 1989)).

In this case, there are genuine issues of fact as to whether Geter was traveling below a safe speed, whether Geter was conscious of his slow speed, whether Geter conducted an improper lane

change, whether Geter was aware he was conducting an improper lane change, and whether it was safe for Geter to attempt to use a gravel crossover on the interstate. Because these factors taken together could allow a jury to find wantonness, disputes of these facts are material and must be submitted to a jury.

In *Hornady Truck Line, Inc. v. Meadows*, the Alabama Supreme Court considered a case in which a car attempted to pass a tractor-trailer truck, hydroplaned, and collided with the truck in a way that forced the car across an interstate into oncoming traffic. 847 So. 2d 908 (Ala. 2002). The undisputed evidence indicated that the truck was driving in the right lane on I-65 during a severe thunderstorm at sixty-five miles per hour and was aware of his speed. *Id.* at 912. Because the truck driver testified that he was aware that "[y]ou can hydroplane at 45 miles an hour," *id.* at 913, the court determined that a jury could reasonably have found that the truck was driving at an unsafe speed. *Id.* Considering this, the Alabama Supreme Court held that "[t]he speed of the [] tractor-trailer truck, coupled with the weather conditions, the failure of the driver of the tractor-trailer truck to check his side-view mirrors, [] testimony that without warning the tractor-trailer truck moved into the left lane and into the [] automobile, was sufficient to permit the trial court to submit the wantonness claim against [the defendant] to the jury." *Id.* at 916.

While the truck driver in *Hornady* testified that he was aware of his speed, Geter's testimony is that he was unaware of the slowest speed he was traveling before the collision and that he believed he was going fifty-five miles per hour when he was hit. (Docs. # 76-1 at 40, 48; 80 ¶¶ 21, 24; 90 at 5 ¶ 24; 93 ¶ 21). Plaintiffs dispute that Geter was traveling fifty-five miles per hour at the time of the collision. Indeed, the data downloaded from Geter's truck indicates that Geter had likely slowed down from sixty-seven miles per hour to thirty-one miles per hour (or even slower) within the eight seconds of the collision. (Docs. # 76-2 at 5-6; 76-3 at 11-12, 16-17;

11

90 at 5 ¶ 21, 10 ¶ 29; 80 ¶ 22; 93 at 6 ¶ 29). Trooper Wright similarly opined that Geter was traveling "much, much slower than 55 miles an hour." (Docs. # 88-4 at 25, 32; 90 at 9 ¶¶ 21, 24). There is a dispute of fact as to how slowly Geter was traveling at the time of the collision.

Plaintiffs have also pointed to Rule 56 record evidence that places in dispute Geter's testimony about whether he was conscious of his slow speed. Geter testified that he intentionally tapped his brakes as he observed Turner's car approaching him, but only for the purpose of illuminating his brake lights to catch her attention, which he was trained is a safe driving technique. (Docs. # 76-1 at 12-13, 36; 80 ¶ 19; 90 at 5 ¶ 19). However, the data downloaded from Geter's truck indicates that Geter engaged the service brake roughly eight seconds before the collision, which caused the truck to slow from sixty-seven miles per hour to roughly thirty-one miles per hour – potentially coming to a halt during this time. (Docs. # 76-2 at 5-6; 76-3 at 11-12, 16-17; 90 at 5 ¶ 21, 10 ¶ 29; 80 ¶ 22; 93 at 6 ¶ 29). A jury could find that this information is not consistent with a mere tap on the brakes, and that by engaging the brake to slow down as quickly as he did, Geter was intentionally slowing down and was conscious of his slow speed.

Geter also testified that another condition on the road – a driver in front of him – caused him to slow down because his truck has a "bar in front of the truck" that disengages the truck if it "comes within a hundred yards" of a vehicle. (Doc. # 76-1 at 41). Turner testified that she did not recall any other vehicles in front of her when she was traveling in the left lane before the collision. (Docs. # 81-6 at 11; 90 at 4 ¶ 18). This represents another dispute of fact that may be material as to whether Geter consciously slowed down to prevent his truck from shutting down, or whether Geter slowed down for some other reason – *e.g.*, to turn into a restricted gravel turn around lane.

Geter has over twenty years of training and experience driving commercial vehicles and performed a pre-trip inspection of his truck that day, which included checking truck belts, fluids,

12

brakes, and lights. (Docs. # 76-1 at 13-14, 17; 80 ¶¶ 1, 31; 90 at 3 ¶ 1, 6 ¶ 31; 76-3 at 2). This evidence could allow a jury to conclude that Geter was able to read his speedometer, properly "tap" (rather than apply) the brakes, and was aware of how fast he was going. And, this Rule 56 evidence puts in dispute whether Geter was aware that he was creating an unsafe condition by driving too slowly. Geter's slow speed and his awareness of his slow speed are therefore genuine issues of material fact that must be submitted to a jury.

The Alabama Supreme Court has also held that "evidence of an unsafe lane change in a speeding case is an additional circumstance that can support a finding of wantonness." *State Farm Mut. Automobile Ins. Co. v. Wood*, 392 So. 3d 489, 498 (Ala. 2023). In *Hornady*, there was disputed evidence about whether the truck driver committed an unsafe lane change, as the driver insisted that he had not left the right lane, while an eyewitness testified that he had. *Hornady*, 847 So. 2d at 913. There was additional evidence from which a jury could have concluded that the truck made an improper lane change, including that the truck was approaching an entrance ramp onto the interstate and "may have instinctively been changing lanes to make room for potential traffic entering the highway." *Id.*

Similarly, in this case there is a dispute about whether Geter made an improper lane change. Geter testified that he checked his truck mirrors before changing lanes and saw that there was no approaching traffic in the left lane. (Docs. # 76-1 at 39; 80 ¶ 13; 90 at 4 ¶ 13). Turner testified that Geter yanked his truck into her lane and immediately slammed on his brakes, causing her to collide with him. (Docs. # 81-6 at 10; 90 at 7 ¶¶ 7-8; 93 at 4 ¶ 7; 88-10 at 3). Trooper Wright testified that eyewitness Kyle Bennett said he observed Geter's truck change from the right to the left lane and potentially come to a "full stop in the roadway." (Docs. # 88-4 at 10; 90 at 9 ¶ 18; 93 at 5 ¶ 18). Based on this and other information, Trooper Wright concluded that Geter had improperly changed

lanes. (Docs. # 88-4 at 23; 90 at 6 ¶ 30, 9 ¶ 19; 93 at 5 ¶ 19). These accounts therefore show there is a dispute of fact as to whether Geter improperly changed lanes.

There is also a dispute of fact as to whether Geter was conscious of improperly changing lanes. Turner's testimony suggests that she would have been visible to Geter when he merged into the left lane because she testified that she was already in the left lane and could see Geter as he merged into the left lane. (Docs. # 81-6 at 10; 90 at 7 ¶¶ 7-8; 93 at 4 ¶ 7; 88-10 at 3). Other Rule 56 evidence similarly places in doubt Geter's testimony that he did not see Turner before he changed lanes. For example, Kim Law testified that Geter said he thought that Turner would go around him (although Geter has since claimed he never said that). (Docs. # 88-3 at 14; 90 at 4 ¶ 13; 76-1 at 39). But, based on the summary judgment evidence in the Rule 56 file, a jury could conclude that Geter said this to Law and that Geter's statement indicates that he made the improper lane change because he assumed that Turner would swerve to the right to avoid him.

An additional factor that could establish a dispute of fact as to whether Geter was conscious of improperly changing lanes is the evidence that suggests Geter intended to use the gravel crossover to cross I-20 as a short cut. Plaintiffs' accident reconstruction expert opined that, based on his simulation, Geter would have arrived at the median crossover at a speed of fifteen miles per hour if he had continued to slow at the same rate and had not been involved in a collision. (Docs. # 76-3 at 16; 90 at 10 ¶ 27, 13 ¶ 34; 93 at 6 ¶ 27, 6 ¶ 34). Trooper Wright concluded similarly, noting that "to make a turn, you would have to come below [the minimum] speed" on I-20. (Docs. # 80 ¶ 26; 90 at 6 ¶ 26, 10 ¶ 26, 13 ¶ 35; 88-4 at 23-24, 31; 77-1 at 6). Turner also testified that "[i]t looked like he was trying to cut into the median." (Doc. # 81-6 at 11). Geter denies this, agreeing that it would be illegal and reckless for a tractor to turn left into the median of an interstate

to make a U-turn, particularly when it would mean abruptly slowing down while knowing a car was approaching quickly. (Docs. # 76-1 at 46; 80 ¶¶ 27-29; 90 at 6 ¶¶ 27-29).

Circumstantial evidence further casts doubt on Geter's denial of any intention to execute a U-turn. For example, the data Plaintiffs' expert downloaded from Geter's truck indicates that in the seconds prior to the collision, which happened roughly 125 feet from the median crossover, Geter was "inputting minor left steer." (Docs. # 76-3 at 12, 15; 90 at 9 ¶ 20). Geter was also attempting to assist another Darling truck driver who had broken down, but because of where the tow truck had parked, Geter was forced to re-enter I-20 to loop back around to the same spot. (Docs. # 76-1 at 23; 80 ¶ 4; 90 at 3 ¶ 4). Although Geter testified that his intention was to safely loop around by taking two exits on I-20 (Docs. # 76-1 at 34-35; 80 ¶ 11), it was possible for him to make an illegal U-turn at the gravel crossover. And, such a U-turn would likely have allowed Geter to shorten his drive. A jury could reasonably weigh this evidence and find that Geter intended to cross the median using the gravel crossover. The jury could also find that Geter made an improper lane change even though he saw Turner's car in the left lane because the median was close ahead, and because he expected Turner to go around him. These are disputes of material fact because they could establish that Geter was consciously conducting a maneuver that he knew would likely or probably cause an injury, which would establish wantonness.

At the summary judgment stage, all reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). As discussed above, there are reasonable doubts about the facts regarding Geter's speed and potential execution of an improper lane change that could establish wantonness. Therefore, Defendant Geter is not entitled to summary judgment on Count III.

### B. Defendants' Motion for Partial Summary Judgment on Count VI Claims of Loss of Consortium Claim Related to Plaintiff Dawson Turner

Plaintiffs do not oppose this Motion for Partial Summary Judgment (Doc. # 82). (*See* Doc. # 88 at 2 ¶ 4). Therefore, Defendants are entitled to summary judgment on Count VI solely as it relates to Plaintiff Dawson Turner.

### C. Defendant Darling's Motion for Partial Summary Judgment on Counts I, II, and IV Claims of Direct Liability

Plaintiffs do not oppose this Motion for Partial Summary Judgment (Doc. # 86). (*See* Doc. # 88 at 2 ¶ 5). Therefore, Defendant Darling is entitled to summary judgment on Counts I, II, and IV as they relate to direct liability claims against Defendant Darling for negligent, wanton, or reckless hiring, training, supervision, and entrustment; negligent, wanton, or reckless inspection, repair, or maintenance of Defendant Geter's vehicle; and negligence per se (again, only relating to Defendant Darling).

### D. Defendants' Motion in Limine to Exclude Plaintiffs' Expert Michael McCort and Defendants' Motion in Limine to Exclude Testimony and Opinions from Dr. Richard Bowman, II

As noted above, Defendants also filed a Motion in Limine to exclude Plaintiffs' Expert Michael McCort (Doc. # 77) and a Motion in Limine to Exclude Testimony and Opinions from Dr. Richard Bowman, II (Doc. # 81). The Motion in Limine to Exclude McCort's testimony (Doc. # 77) argues that McCort has offered some opinions outside his area of expertise, and specifically as the opinions apply to "human factors" involved in the collision. (*Id.* at 2). The court has not analyzed this argument because none of the court's Rule 56 analysis relies on this "human factors" evidence. Therefore, this Motion in Limine is due to be denied as moot.

In their Motion in Limine to Exclude Testimony and Opinions from Dr. Richard Bowman, II (Doc. # 81), Defendants argue that Dr. Bowman fails to meet admissibility requirements of

Federal Rule of Evidence 702 "because his testimony is not the product of reliable principles and methods and his opinions do not reflect a reliable application of the principles and methods to this case." (*Id.* at 2). Specifically, Defendants contend that Dr. Bowman has not established a patient-physician relationship with Turner. The court has not analyzed this argument because none of the court's Rule 56 analysis relies on this expert opinion testimony of Dr. Bowman. Therefore, this Motion in Limine is due to be denied as moot.

Although the evidence these Motions (Docs. # 77, 81) sought to exclude was not relevant to the court's consideration of Defendants' various Motions for Summary Judgment, when the case is set for trial, the court will set deadlines for Motions in Limine, and the arguments in these Motions (Docs. # 77, 81) may be re-asserted at that time, as appropriate.

## IV.  Conclusion

For the reasons discussed above, Defendant Geter's Motion for Partial Summary Judgment (Doc. # 79) is due to be denied, Defendants' Motion for Partial Summary Judgment (Doc. # 82) is due to be granted, and Defendant Darling's Motion for Partial Summary Judgment (Doc. # 86) is due to be granted. Defendants' Motion in Limine to Exclude Plaintiffs' Expert Michael McCort (Doc. # 77), and Defendants' Motion in Limine to Exclude Testimony and Opinions from Dr. Richard Bowman, II (Doc. # 81) are moot. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this December 11, 2024.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE